# EXHIBIT A

Acosta-Aguayo v. Walgreen Co., Slip Copy (2023)

2023 WL 2333300

2023 WL 2333300
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Tam Dang Yasmine ACOSTA-AGUAYO, on behalf of
themselves and all others similarly situated, Plaintiffs,

v.

WALGREEN CO. d/b/a Walgreens, Defendant.

Case No. 22-cv-00177
|
Signed March 2, 2023

**Attorneys and Law Firms**

David Charles Magagna, Pro Hac Vice, Charles E. Schaffer, Levin Sedran & Berman, Philadelphia, PA, Jonathan Shub, Shub Law Firm LLC, Haddonfield, NJ, Kevin Laukaitis, Laukaitis Law Firm LLC, Chicago, IL, Melissa Kaye Sims, Milberg Coleman Bryson Phillips Grossman, PLLC, Knoxville, TN, Nick Suciu, III, Milberg Coleman Bryson Phillips Grossman, PLLC, Bloomfield Hills, MI, for Plaintiff Tam Dang.

Kevin Laukaitis, Laukaitis Law Firm LLC, Chicago, IL, for Plaintiff Yasmine Acosta-Aguayo.

Leah Rachel Bruno, Emily A. Golding, Timothy Joseph Storino, Dentons U.S. LLP, Chicago, IL, Deborah Hilarie Renner, Sara Marie Gates, Dentons U.S. LLP, New York, NY, for Defendant.

**MEMORANDUM OPINION AND ORDER**

MARY M. ROWLAND, United States District Judge

*1 Plaintiffs bring this putative class action against Defendant Walgreens alleging that three of its pain-relieving products mislead consumers because the products' front labels state that they are "Maximum Strength" lidocaine products. Plaintiffs filed a ten-count First Amended Class Action Complaint and seek to represent a nationwide class and state subclasses. Defendant has moved to dismiss Plaintiffs' complaint in its entirety. For the reasons stated herein, Defendant's Motion to Dismiss [27] is granted in part and denied in part.

**I. Background**

This Court accepts as true the following facts from the operative complaint (Dkt. 22 "Compl."). *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

In their First Amended Class Action Complaint, Plaintiffs allege that Defendant offers over-the-counter lidocaine products including a range of external pain-relieving patches and creams for pain associated with or caused by ailments such as arthritis, backache, muscle strains, sprains, and bruises. Compl. [22] ¶ 1. The active ingredient in Defendant's Products, lidocaine, is a local anesthetic medicine that treats body soreness and pain. *Id.* ¶¶ 19–21. The three products at issue are: Pain Relieving Lidocaine Patch, Assorted Sizes Pain Relieving Lidocaine Patches, and Pain-Relieving Cream + Lidocaine (collectively, the "Products"). *Id.* ¶ 2. Defendant sells the Products in all 50 states in their brick-and-mortar stores and through their online store. *Id.* ¶ 22.

Plaintiffs allege that consumers consider dose strength an important factor when purchasing pain-relieving products. *Id.* ¶ 4. Defendant takes advantage of this by touting on the front of its Products' labels that the Products are "Maximum Strength" lidocaine products. *Id.* ¶ 5. According to Plaintiffs, Defendant makes this "Maximum Strength" representation in a knowingly false and deceptive manner because Defendant's Products contain only 4% lidocaine, and its competitors offer similar prescription patches that contain 5% lidocaine and an over-the-counter cream product that contains 5% lidocaine. *Id.* ¶ 7. As the complaint alleges, because consumers can obtain a stronger dose comparable lidocaine product in the market, Defendant's Products are not in fact "Maximum Strength" lidocaine products. *Id.* ¶¶ 31–32.

Plaintiffs allege that, because of Defendant's misleading labeling, reasonable consumers like them reasonably believe that they are purchasing a lidocaine product at maximum strength—that is, the highest dosage they can buy. *Id.* ¶ 9. Plaintiffs and Class Members would not have purchased the Products or would have not paid as much for them had they known the truth about the advertised Products. *Id.* ¶ 40. Plaintiffs claim that Defendant's mislabeling constitutes a pattern of unlawful and unfair business practices that deceives and harms consumers and the public. *Id.* ¶ 10.

In this lawsuit, Plaintiffs seek to represent four classes. The putative nationwide class comprises:

Acosta-Aguayo v. Walgreen Co., Slip Copy (2023)

2023 WL 2333300

All persons in the United States who, during the maximum period of time permitted by law, purchased Defendant's Products primarily for personal, family or household purposes, and not for resale.

**\*2** *Id.* ¶ 70. Plaintiffs also seek to represent a consumer fraud multi-State class, an Illinois subclass, and a California subclass. *Id.*

Plaintiffs bring the following claims against Defendant: breach of express warranties (Count I), breach of implied warranty (Count II), unjust enrichment (Count III), fraud (Count IV), violation of consumer fraud acts (Count V), violation of California false advertising law (FAL) (Count VI), violation of California unfair competition law (UCL) (Count VII), violation of California Consumer Legal Remedies Act (CLRA) (Count VIII), violation of Illinois Consumer Fraud Act (ICFA) (Count IX), and violation of the Illinois Uniform Deceptive Trade Practices Act (UDTPA) (Count X).

### II. Standard

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.' " *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019)

(quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

For fraud claims, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019). The plaintiff must "plead with particularity the circumstances constituting fraud" and allege the "who, what, when, where, and how" of the alleged conduct. *Id.*

Finally, where a defendant asserts a facial challenge to subject matter jurisdiction and moves to dismiss for lack of standing pursuant to Rule 12(b)(1), the Court applies *Twombly-Iqbal's* " 'plausibility' requirement." *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). In assessing whether a plaintiff has established standing, the Court accepts as true "all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor." *Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 381–82 (7th Cir. 2020).

### III. Analysis

**\*3** Defendant argues that: (1) Plaintiffs failed to plausibly allege that the product labels are misleading; (2) Plaintiffs lack standing because they failed to plead that they purchased all three products; (3) Plaintiffs failed to satisfy the pre-suit notice requirement for their state law warranty claims; (4) the ICFA claim is conclusory; (5) the common law fraud claim is insufficiently pled; (5) Plaintiffs do not have standing to bring claims under other states' laws; (6) the unjust enrichment claim must be dismissed along with the other claims; and (7) Plaintiffs do not have standing to seek injunctive relief.

### A. Plaintiffs failed to plead that they purchased all three products.

The Court begins with Defendant's argument that, although Plaintiffs' complaint alleges deceptive labeling of three

Acosta-Aguayo v. Walgreen Co., Slip Copy (2023)

2023 WL 2333300

products (two Patch Products and one Cream Product), Plaintiffs only claim to have purchased one of the Patch products (the Pain-Relieving Lidocaine Patch), thus undermining Plaintiffs' standing as to the two products they did not buy. Plaintiffs concede that they do not allege purchasing either the Assorted Sizes Patches or the Cream Product. Still, they urge the Court defer this issue until the class certification stage.

The doctrine of standing comes from Article III of the Constitution and in this context is a "short-hand term for the right to seek judicial relief for an alleged injury." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). A plaintiff must show that she: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1151 (7th Cir. 2020). Generally, "[p]laintiffs have no injury-in-fact caused by products that they did not buy, and therefore lack standing with respect to those products." *Bakopoulos v. Mars Petcare US, Inc.*, No. 20 CV 6841, 2021 WL 2915215, at *3 (N.D. Ill. July 12, 2021); *see also Brodsky v. Aldi Inc.*, No. 20 C 7632, 2021 WL 4439304, at *3 (N.D. Ill. Sept. 28, 2021) (plaintiffs lacked standing to sue based on a product they did not purchase in a consumer protection case).

As the parties acknowledge, courts in this circuit have taken different approaches to standing when a case involves substantially similar products. *Compare Willard v. Tropicana Mfg. Co., Inc.*, 577 F. Supp. 3d 814, 824 (N.D. Ill. 2021) (describing the majority approach in the Northern District of Illinois to this standing issue) *with Curtis v. 7-Eleven, Inc.*, No. 21-CV-6079, 2022 WL 4182384, at *8 (N.D. Ill. Sept. 13, 2022) ("Courts around the country have recognized a named plaintiff's standing to represent a putative class of purchasers who bought substantially similar products.") *and Womick v. Kroger Co.*, No. 21-CV-00574-NJR, 2022 WL 673095, at *4 (S.D. Ill. Mar. 7, 2022) (allowing the plaintiff to pursue claims even though he did not purchase all of the Kroger-brand coffee products at issue in the complaint). This Court adopts the latter approach here.

In Plaintiffs' complaint, the images of the products (Compl. at pp. 7–8) (of which Defendant asks the Court to take judicial notice (Dkt. 28 at 18) demonstrate that the two Patch products are substantially similar—in the colors of the packages and text, the images displayed, the text style and text descriptions in the bullet points, and the shape and size of the packaging. In this respect, the Court agrees with Plaintiffs that they

can represent class members for the patch product that they did not specifically purchase "because the products at issue and misrepresentations themselves are nearly identical." (Dkt. 31 at 18). However the images of the Cream as compared to the Patch products demonstrates that these products are not substantially similar. The front labels are different in a number of ways, including the colors, images displayed (or not), product descriptions, and the shape and size of the packaging. The text in the bullet points is different, as well as the comparison text bubble on each label. Plaintiffs do not otherwise explain why the Cream label is substantially similar to the Patch labels, and thus fail to persuade on this point.

**\*4** Therefore, Plaintiffs can pursue their claims for the Pain-Relieving Lidocaine Patch and the Assorted Sizes Pain Relieving Lidocaine Patches, but not for the Cream. Plaintiffs' allegations about the cream are dismissed.

### B. Plaintiffs sufficiently pled that the product labels are misleading.

Plaintiffs claim that the Products' "Maximum Strength" label deceives reasonable consumers because the label omits the fact that other prescription products available in the market "contain a higher percentage of lidocaine (i.e. 5%)," thus causing Plaintiffs to believe that the Products contain the highest percentage of lidocaine on the market. Compl. ¶ 29. Defendant contends that "[n]o reasonable consumer purchasing one of the Products would read 'Maximum Strength' on the labels to *literally* mean that the Products contain the maximum amount of lidocaine that a person could *ever* obtain anywhere." (Dkt. 28 at 16).

Plaintiffs allege that Defendant violated the ICFA, 815 Ill. Comp. Stat. 505/2, and other consumer protection acts. The parties agree that the same standard applies to claims under the ICFA, UCL, FAL, and CLRA: whether a reasonable consumer, acting reasonably under the circumstances, would be misled by the alleged conduct. Defendant argues that Plaintiffs fails to allege a requisite deceptive practice under these acts.

ICFA is "a regulatory and remedial statute intended to protect consumers against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 644, 646 (7th Cir. 2019) (cleaned up). To state a claim under the ICFA, a plaintiff must allege "(1) a deceptive or unfair act

or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012) (quotation omitted). "[A] statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001). "[W]hen analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005). Because courts take a "practical and fact-intensive approach to consumer behavior," whether reasonable consumers would interpret a label is usually a question of fact not resolved on a motion to dismiss. *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 478, 483 (7th Cir. 2020). On the other hand, if a plaintiff's claim is based on an "unreasonable or fanciful interpretations of labels or other advertising," dismissal on the pleadings may be proper. *Id.* at 477.

According to Defendant, a reasonable consumer would not believe the phrase "Maximum Strength" means that no other product—prescription or otherwise—contains more lidocaine. Defendant challenges Plaintiffs' assumption that a reasonable consumer shopping for over the counter ("OTC") pain relief options would equate off-the-shelf products with prescription-strength options. Plaintiffs respond that they plausibly alleged that in labeling its Products, Defendant deceived reasonable customers into believing that they are purchasing lidocaine products with the "Maximum Strength" to relieve their pain, even though the market offers higher strength comparable lidocaine products. While a reasonable consumer likely understands the difference between over the counter and prescription drugs, a reasonable consumer would not necessarily understand the "Maximum Strength" on the Product's label to exclude comparable prescription medication. In addition, in their response, Plaintiffs state that Defendant's Products "contain only 4% lidocaine, while similar products *both over-the-counter [ ] and prescription* contain 5% lidocaine." (Dkt. 31 at 8, emphasis added).[1] Reading the phrase "Maximum Strength" to mean the maximum strength of lidocaine available generally is not an "unreasonable or fanciful interpretation[ ]" of the Product's label. *Bell*, 982 F.3d at 477. Thus the Court finds that Plaintiffs' claim that Defendant deceived customers is plausible.

**\*5** Nevertheless Defendant challenges the plausibility by asserting that "[f]our percent lidocaine is [ ] the maximum concentration permitted [by the FDA] in non-prescription external analgesics." (Dkt. 28 at 19). In other words, according to Defendant, its label is accurate and there is no way the product could have more lidocaine concentration. Yet Defendant does not argue that a reasonable consumer would know this fact.[2] And this argument does not foreclose Plaintiffs' claim because "[a] label is deceptive if it is likely to mislead a reasonable consumer in a material respect, even if it is not literally false." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020).

Moreover, *Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, 552 F. Supp. 3d 901 (N.D. Cal. 2021), a case involving lidocaine patches, supports Plaintiffs' position. "In that case, the court concluded that the plaintiff stated a claim under the UCL or FAL by alleging that defendants' advertising and marketing is likely to deceive a reasonable consumer to believe, among other things, that Defendants' patches offer 'the maximum amount of lidocaine available in patch form.' " *Id.* at 922. *Scilex* is not binding on this Court and Defendant points out some distinguishing facts in that case. Nevertheless, it is instructive as it involved lidocaine patches and claims at issue here, the UCL and FAL.[3]

In sum, the Court concludes that this case requires factual development to determine how reasonable consumers would interpret Products' label. It therefore declines to find at this stage that the label was not misleading as a matter of law.

As to the ICFA count, Defendant also argues that Plaintiffs fail to sufficiently plead unfair conduct. That inquiry requires a court to analyze "whether the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers." *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830 (7th Cir. 2014). Plaintiffs allege that Defendant's acts "were immoral, unethical, oppressive, and unscrupulous [and] caused substantial injury to Plaintiff and Illinois Subclass members that they could not reasonably avoid." Compl. ¶ 180. As to the first element, a practice offends public policy where "the practice violates statutory or administrative rules establishing a certain standard of conduct." *Saika v. Ocwen Loan Servicing, LLC*, 357 F. Supp. 3d 704, 716 (N.D. Ill. 2018). Plaintiffs do not allege that Defendant's practice violates any statutory or administrative rule, and their reliance on *Hrapoff v. Hisamitsu Am., Inc.*, No. 21-CV-01943-JST, 2022 WL 2168076 (N.D. Cal. June 16, 2022) is not helpful because that case did

Acosta-Aguayo v. Walgreen Co., Slip Copy (2023)

2023 WL 2333300

not address whether the plaintiff sufficiently alleged *unfair* conduct.

**\*6** Plaintiffs' defense of its unfair conduct claim is otherwise undeveloped. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate."); *County of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 818 (7th Cir. 2006) ("When presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action.") (quotation omitted).

In sum, the Court declines to dismiss the ICFA, UCL, FAL, CLRA and consumer fraud acts claims (Counts V, VI, VII, VIII, and IX) at this stage. As for the ICFA count, it survives based on deceptive conduct but not based on unfair conduct.

### C. Pre-suit notice for the warranty claims

Defendant contends that Plaintiffs failed to satisfy the pre-suit notice requirement, a prerequisite for a warranty claim under either Illinois or California law. It is well-settled that "[b]uyers seeking to sue for breach of express or implied warranties must first notify the seller of its breach." *Rudy v. Fam. Dollar Stores, Inc.*, 583 F. Supp. 3d 1149, 1162 (N.D. Ill. 2022). The notice requirement serves to "encourage pre-suit settlement negotiations." *In re McDonald's French Fries Litig.*, 503 F. Supp. 2d 953, 956 (N.D. Ill. 2007).

"Under Illinois warranty law, 'direct notice is not required when ... the seller has actual knowledge of the defect of the particular product.' " *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 393 F. Supp. 3d 745, 759 (N.D. Ill. 2019) (quoting *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 589 (1996)). However, "[t]he notice 'of the breach' required is not of the facts," which the seller presumably knows, "but of buyer's claim that they constitute a breach." *Connick*, 675 N.E.2d at 590. This is because "generalized knowledge is not sufficient to excuse the pre-suit notice requirement." *Muir v. NBTY, Inc.*, No. 15 C 9835, 2016 WL 5234596, at \*9 (N.D. Ill. Sept. 22, 2016).

Plaintiffs maintain that they gave notice as demonstrated by: (1) letters dated January 12, 2022 and March 31, 2022, (2) Defendant's actual knowledge as described in Plaintiffs'

complaint, and (3) a federal lawsuit filed in the Southern District of New York, *Stevens v. Walgreen*, No. 21-CV-10603. First, the January 12, 2022 and March 31, 2022 letters came *after* the filing of the original complaint in this case. Merely citing to the complaint's allegations about Defendant's general knowledge (Dkt. 31 at 19) does not show that Defendant had *actual knowledge of Plaintiffs' claim*. Cf. *Keith v. Ferring Pharms., Inc.*, No. 15-10381, 2016 WL 5391224, at \*2 (N.D. Ill. Sept. 27, 2016) (reasoning that actual knowledge existed where defendant's internal quality monitoring had revealed that certain recalled drug lots did not meet potency specifications). Next, Plaintiffs' reference to the filing of either this lawsuit or the lawsuit in New York (*see* Dkt. 31 at 19–20) would at most amount to generalized knowledge, which is not sufficient. In *Stevens*, the plaintiff is different, and the claims, mostly brought under New York law, are not identical. *See Rudy*, 583 F. Supp. 3d at 1162 (explaining that the notice requirement "would be eviscerated if a party could satisfy [it] by filing suit"); *see also Cerretti v. Whole Foods Mkt. Grp., Inc.*, No. 21 CV 5516, 2022 WL 1062793, at \*6 (N.D. Ill. Apr. 8, 2022) (finding that "complaints (made by people other than [plaintiff]) at best put Whole Foods on notice of problems with the product line, and didn't alert the company to plaintiff's claim").

**\*7** Therefore, Plaintiffs' claims for breach of express and implied warranties (Counts I and II) are dismissed for failure to give pre-suit notice.

### D. Fraud

Next, the Court agrees with Defendant that Plaintiffs' common fraud claim is not adequately pled. To state a claim for common-law fraud, a plaintiff must plead: " '(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.' " *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (quoting *Connick*, 675 N.E.2d at 591). Plaintiffs do not dispute that the heightened pleading requirement of Rule 9(b) applies.

Plaintiffs' allegations about Defendant's knowledge and intent are too conclusory to survive dismissal. *See Hauger v. Dollar Gen. Corp.*, No. 121CV01270JESJEH, 2022 WL 2532487, at \*6 (C.D. Ill. July 7, 2022) (finding that

Acosta-Aguayo v. Walgreen Co., Slip Copy (2023)

2023 WL 2333300

plaintiff failed to sufficiently plead scienter where there were no factual details to support the allegation); *Rudy, 583 F. Supp. 3d at 1166* (dismissing fraud claim where allegations in support of fraudulent intent were conclusory). Plaintiffs merely allege that: "Defendant was aware, or should have been aware, of the misrepresentations regarding the Products," and "Defendant made the 'Maximum Strength' representation with the intention that Plaintiffs and Class members would rely on the 'Maximum Strength' representation." Compl. ¶¶ 87, 88. Indeed in the complaint Plaintiffs even qualify their allegation about Defendant's knowledge: "[Defendant] knew *or should have known* that those representations were false or misleading." *Id.* ¶ 117 (emphasis added). This is not sufficient. *See Lederman v. Hershey Co.*, No. 21-CV-4528, 2022 WL 3573034, at *6 (N.D. Ill. Aug. 19, 2022) (dismissing plaintiff's fraud claim where plaintiff broadly asserted that defendant had fraudulent intent without any factual allegations in support).

Further, the Court rejects Plaintiffs' argument that their fraud claim can be based on a fiduciary relationship. Plaintiffs contend that Defendant "took on this duty [to disclose] with its bold, inaccurate claims regarding the strength of its lidocaine products and others available on the market." (Dkt. 31 at 23). But Plaintiffs did not allege in their complaint that Defendant had a duty to disclose. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (stating that it is an "axiomatic rule that a plaintiff may not amend his complaint in his response brief"). Further, Plaintiffs do not allege or argue that a "fiduciary relationship" based on "a special confidence" existed between them and Defendant. *See Walker v. Bank of Am.*, No. 21-CV-03589, 2022 WL 910585, at *7 (N.D. Ill. Mar. 29, 2022). Indeed the cases cited by Plaintiffs (*see* Dkt. 31 at 23-24) do not address the situation here: a commercial transaction between retailer and a customer.

Accordingly, Plaintiffs' fraud claim is dismissed.

### E. Unjust Enrichment

**\*8**  In their unjust enrichment claim, Plaintiffs allege that they "conferred benefits on Defendant by purchasing Defendant's Products at a premium price," that Defendant "has been unjustly enriched in retaining the revenues derived from Plaintiffs and Class Members purchasing its Products," and that this retention is unjust and inequitable because Defendant "falsely and misleadingly labeled its Products as

'Maximum Strength' lidocaine products when it knew or should have known that those representations were false or misleading." Compl. ¶¶ 115, 117. Under Illinois law an unjust enrichment claim requires allegations that the defendant "unjustly retained a benefit to the plaintiff's detriment, and that the retention of the benefit violates fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). Defendant argues that because all of Plaintiffs' other claims fail, their unjust enrichment claim likewise fails, because this claim depends on the viability of another underlying claim. But several of Plaintiffs' claims have survived the dismissal motion. To the extent Defendant relies on allegations about a contract, those are only in the warranties claims, which this Court has dismissed. Thus Plaintiffs' unjust enrichment claim (Count III) survives.

### F. Other States' Laws

Defendant argues that although Plaintiffs allege 12 statutory consumer protection claims on behalf of a multi-state class under the laws of 12 states, including California and Illinois, Plaintiffs were not personally injured in and do not reside in the other states. The Court finds that Plaintiffs may proceed with these claims beyond the pleading stage.

In *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002), the Seventh Circuit distinguished the standing inquiry from "the inquiry under Rule 23 about the suitability of a plaintiff to serve as a class representative." *Id.* at 677. In addition, courts "in this district have largely declined to strike nationwide class allegations at the pleading stage where a party argued that a variation in state laws made a nationwide class impracticable." *Flaherty v. Clinique Lab'ys LLC*, No. 1:21-CV-03447, 2021 WL 5299773, at *7 (N.D. Ill. Nov. 15, 2021); *see also Joseph v. TGI Friday's, Inc.*, No. 21-CV-1340, 2022 WL 17251277, at *9–10 (N.D. Ill. Nov. 28, 2022) (same); *Rawson v. ALDI, Inc.*, No. 21-CV-2811, 2022 WL 1556395, at *5 (N.D. Ill. May 17, 2022) ("The prevailing view, particularly recently, is that the issue is best framed through the class-certification lens, not standing."). This Court will follow that prevailing view.

For now, this Court will allow Plaintiffs to pursue their claims under the various statutory consumer protection laws. Defendant is free to raise this argument again at a later stage of litigation.

### G. Injunctive Relief

Finally, Defendant argues that Plaintiffs do not have standing to seek injunctive relief and equitable remedies are unavailable. To have standing to obtain injunctive relief, the complaint must indicate a likelihood of *future injury*. *Curtis*, 2022 WL 4182384, at *11. Here Plaintiffs allege that they have "an intention to purchase the Product in the future if the products are truthfully labeled and not misleadingly advertised." Compl. ¶ 45. Yet they do not claim that they will purchase the allegedly mislabeled Products in the future. Plaintiffs' awareness of the alleged deceptive practice undermines the notion that they will likely sustain imminent future injury. *See Rudy*, 583 F. Supp. 3d at 1167; *Chiappetta v. Kellogg Sales Co.*, No. 21-CV-3545, 2022 WL 602505, at *9-10 (N.D. Ill. Mar. 1, 2022) (dismissing request for injunctive relief despite plaintiff's allegation "that Kellogg's deceptive practices continue and that she will purchase the Product once she can be sure that the Product packaging accurately represents the amount of strawberries inside the Product"). Thus the Court dismisses the demand for injunctive relief.

For the same reason, the Court also dismisses the UDTPA claim (Count X). *See Camasta*, 761 F.3d at 741 (dismissing UDTPA claim where the plaintiff failed to sufficiently allege that the defendant's conduct would likely cause him harm in the future). And finally, the Court agrees with Defendant that Plaintiffs fail to allege that they lack an adequate remedy at law, and so the Court dismisses their claims for restitution and disgorgement. *See Wyant v. Dude Prod., Inc.*, No. 21-CV-00682, 2022 WL 621815, at *2 (N.D. Ill. Mar. 3, 2022) (relying on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) and dismissing restitution and disgorgement claims).

### IV. Conclusion

**\*9** For the stated reasons, Defendant's Motion to Dismiss [27] is granted in part and denied in part. Counts I, II, IV, and X are dismissed. The remaining counts in the First Amended Class Action Complaint survive. Defendant shall answer the surviving counts by March 23, 2023.

### All Citations

Slip Copy, 2023 WL 2333300

### Footnotes

1    The paragraph in the operative complaint cited by Plaintiffs to support this, Compl. ¶ 7, alleges that similar prescription patches contain 5% lidocaine, and for the cream, similar products contain 5% lidocaine and are also available over the counter. At this pleading stage, the Court finds Plaintiffs have raised a reasonable inference that for the Patch Products, similar 5% lidocaine OTC products are available. Whether Plaintiffs can prove this is a matter for another day.

2    In *Bober*, as Defendant points out, the Seventh Circuit observed, in discussing a prescription and OTC medicine, that "[t]he drugs are approved for very different maladies, went through different approval processes, and are sold in different ways." 246 F.3d at 938. But the claims in *Bober* were not the same as those here. And that case did not hold that a reasonable consumer shopping for medication would interpret the phrase "Maximum Strength" to be limited to only OTC medicine.

3    Similarly, the Court finds *Stevens v. Walgreen* persuasive. In August 2022, the court in the Southern District of New York issued its opinion ruling on Walgreen's motion to dismiss in *Stevens v. Walgreen. See* Dkt. 33. This Court agrees with Defendant that this case and *Stevens* are not identical, and that opinion is not controlling. However as it involved some of the same issues here, it provides further support for this Court's conclusion about the allegations regarding the patch product labels. The *Stevens* court concluded that "it is plausible that a reasonable consumer would understand the patches to contain and deliver the maximum amount of lidocaine available in patch form, and the complaint raises a plausible inference that that is not the case, because there are prescription-strength lidocaine patches that contain 5% lidocaine." (*Id.* Exh. A, p.

10). The court rejected defendant's argument that prescription-strength patches are not proper comparators because "such fact-intensive disputes are not appropriate for resolution at this time." *Id.* Thus the court held that plaintiff "plausibly alleged that a consumer would be misled by the packaging's representations that some patches were 'maximum strength' ". (*Id.*, p. 4).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 10 of 48 PageID #:895

Avila v. Redwood Hill Farm and Creamery, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 2090045

2014 WL 2090045
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

Glen AVILA, individually and on behalf
of all others similarly situated, Plaintiff,

v.

REDWOOD HILL FARM AND
CREAMERY, INC., Defendant.

Case No. 5:13–CV–00335–EJD
|
Signed May 19, 2014

**Attorneys and Law Firms**

Ben F. Pierce Gore, Pratt & Associates, San Jose, CA, Matthew Christopher Matheny, Provost Umphrey Law Firm, Beaumont, TX, for Plaintiff.

Robert Edward Aune, Aune & Associates, San Francisco, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS**

**[Re: Docket No. 32]**

EDWARD J. DAVILA, United States District Judge

 **\*1** Presently before the Court is Defendant Redwood Hill Farm and Creamery's ("Defendant" or "RHFC") Motion to Dismiss Plaintiff's Second Amended Complaint ("SAC"). Plaintiff Glen Avila ("Plaintiff" or "Avila") filed this putative class action against Defendant alleging that Defendant's products have been improperly labeled so as to amount to misbranding and deception in violation of several California and federal laws.

Per Civ. L.R. 7–1(b), the motion was taken under submission without oral argument. Having fully reviewed the parties' papers, the Court grants Defendant's Motion to Dismiss for the reasons explained below.

**I. BACKGROUND**

Plaintiff is a California consumer who, since January 23, 2009, purchased four flavors of Defendant's Green Valley Organics yogurt product (strawberry, vanilla, blueberry, and peach flavors). Plaintiff argues that the yogurts' packaging is unlawful because it uses the term evaporated cane juice ("ECJ"). Dkt. No. 30 ¶¶ 4–6.

Plaintiff alleges that a label containing the term ECJ to describe sugar (1) is 'false' (e.g., states the product is a juice when it is not); and (2) violates a number of labeling regulations designed to ensure that manufacturers label their products with the common and usual names of the ingredients they use and accurately describe the ingredients they utilize. *Id.* ¶ 26. Plaintiff claims that he and the putative class members have been damaged by Defendant's alleged violations, in that they purchased misbranded and worthless products that were illegal to sell or possess. Plaintiff alleges one cause of action: violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code § 17200 et seq.

Plaintiff filed his original Complaint in this case on January 24, 2013 (Dkt. No. 1) and subsequently filed a First Amended Complaint ("FAC") on May 21, 2013 (Dkt. No. 14). Defendant filed a Motion to Dismiss on July 3, 2013 and Plaintiff filed the SAC on August 16, 2013 on behalf of himself and a putative class of all persons in the United States, or alternatively all persons in California, who have purchased the same products. Dkt. No. 30 ¶ 56. Defendant filed a Motion to Dismiss on September 30, 2013. Dkt. No. 32.

**II. LEGAL STANDARD**

The primary jurisdiction doctrine allows courts to "stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency." *Ivie v. Kraft Foods Global, Inc.,* No. C–12–02554–RMW, 2013 WL 685372, at \*5 (N.D.Cal. Feb. 25, 2013) (quoting *Clark v. Time Warner Cable,* 523 F.3d 1110, 1114 (9th Cir. 2008)). Courts consider the following factors in deciding whether the doctrine of primary jurisdiction applies: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Ivie,* 2013 WL 685372, at \*5.

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 11 of 48 PageID #:896

Avila v. Redwood Hill Farm and Creamery, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 2090045

**\*2** Where determination of a plaintiff's claim would require a court to decide an issue committed to the FDA's expertise without a clear indication of how the FDA would view the issue, courts of this district have found that dismissal or stay under the primary jurisdiction doctrine is appropriate. *See Hood v. Wholesoy & Co., Modesto Wholesoy Co. LLC,* No. 12–CV–5550–YGR, 2013 WL 3553979, at \*5–6 (N.D.Cal. July 12, 2013) (ECJ and soy yogurt claims dismissed because the FDA's position is unsettled); *Astiana v. Hain Celestial,* 905 F.Supp.2d 1013, 1016–17 (N.D.Cal. 2012) (holding that "[i]n absence of any FDA rules or regulations (or even informal policy statements) ... the court declines to make any independent determination of whether [the label] was false or misleading" and the claims were barred under the primary jurisdiction doctrine).

In contrast, however, where FDA policy is clearly established with respect to what constitutes an unlawful or misleading label, the primary jurisdiction doctrine is inapplicable because there is little risk that the courts will undermine the FDA's expertise. *See Brazil v. Dole Foods Co., Inc.,* 935 F.Supp.2d 947, 959 (N.D.Cal. 2013) (where the FDA has established requirements applicable to the violations, there is no risk of undercutting the FDA's judgment and authority, thus a stay is not necessary).

## III. DISCUSSION

Plaintiff alleges that Defendant violated state and federal labeling laws by using the term ECJ in labeling its food products because that is not the common or usual name of that ingredient and Plaintiff would not have bought the products if he knew they were illegal to sell and possess.

The operative statute in this matter is the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.,* as amended by the Nutrition Labeling and Education Act of 1990 ("NLEA"), 21 U.S.C. § 343 *et seq.* 21 U.S.C. § 343 establishes the conditions under which food is considered "misbranded." Generally, food is misbranded under 21 U.S.C. § 343(a)(1) if "its labeling is false or misleading in any particular." FDA regulations require that manufacturers list ingredients "on the label or labeling of a food ... by [their] common or usual name." 21 C.F.R. § 101.4(a)(1). The regulations provide that the "common or usual name of a food may be established by common usage or by establishment of a regulation." 21 C.F.R. § 102.5(d).

The California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code § 109875 *et seq.,* incorporates the requirements of the FDCA as the food labeling requirements of the state of California. Plaintiff brings a claim for relief under the UCL based on Defendant's alleged violations of the Sherman Law. Plaintiff alleges that ECJ is not the common or usual name of the ingredient used, and therefore Defendant's product is in violation of federal and state regulations.

This Court must decide whether Plaintiff's ECJ claims are barred by the doctrine of primary jurisdiction. Some courts in this district have decided that the FDA's position on the use of the term ECJ is unsettled and should therefore be determined by the FDA, not by courts. *See Hood,* 2013 WL 3553979, at \*5–6 ("with respect to 'evaporated cane juice' ... the FDA's position is not yet settled ... the Court finds it appropriate to defer to the authority and expertise of the FDA...."); *Figy v. Amy's Kitchen,* No. C–13–03816–SI, 2014 WL 1379915 (N.D.Cal. Apr. 9, 2014). Other courts—including this Court —have found that the FDA's guidance suggests that the agency does not view the issue as unsettled and the claim is not precluded by the primary jurisdiction doctrine. *See Swearingen v. Yucatan Foods, L.P.,* No. C–13–3544–RS, 2014 WL 553537 (N.D.Cal. Feb. 7, 2014); *Gitson v. Clover Stornetta Farms,* No. C–13–01517–EDL, 2014 WL 172338, at \*12 (N.D.Cal. Jan. 15, 2014); *Morgan v. Wallaby Yogurt Co., Inc.,* No. 13–CV–0296–WHO, 2013 WL 5514563, at \*4 (N.D.Cal. Oct. 4, 2013); *Werdebaugh v. Blue Diamond Growers,* No. 12–CV02724–LHK, 2013 WL 5487236, at \*8–9 (N.D.Cal. Oct. 2, 2013) (FDA, through guidance and warning letters, has articulated a position on ECJ); *Kane v. Chobani, Inc.,* No. 12–CV–02425–LHK, 2013 WL 3703981, at \*17 (N.D.Cal. Jul. 12, 2013), *vacated by* 2013 WL 5529723 (N.D.Cal. Jul. 25, 2013), *reconsidered by* 2013 WL 5289253 (N.D.Cal. Sept. 19, 2013) (denying motion to dismiss ECJ claim on primary jurisdiction ground, but granting motion to dismiss claim that use of ECJ in yogurt violated standards of identity for yogurt on primary jurisdiction grounds) [1] ; *Ivie,* 2013 WL 685372, at \*12 (holding that ECJ claims could go forward under "deceptive" prong of UCL); *Samet v. Procter & Gamble, Co.,* No. 12–CV–01891–PSG, 2013 WL 3124647, at \*8 (N.D.Cal. June 18, 2013) (FDA regulation that common or usual name be used to identify ingredients encompasses ECJ).

**\*3** At this juncture, the Court must dismiss the ECJ claims based on the primary jurisdiction doctrine. In the past, this Court, along with other courts in this district, has found that the primary jurisdiction doctrine did not bar adjudication of ECJ claims. However, in light of the FDA's

2014 WL 2090045

March 5, 2014 notice in the Federal Register reopening the comment period for the draft guidance on the term ECJ, this Court finds it appropriate to apply the doctrine of primary jurisdiction in this case. [2] *Draft Guidance for Industry on Ingredients Declared as Evaporated Cane Juice; Reopening of Comment Period; Request for Comments, Data, and Information, 79 Fed.Reg. 12507–08 (Mar. 5, 2014).* The notice states that the FDA has not resolved the issue of whether ECJ is the common or usual name of the ingredient at issue and that the FDA is engaged in active rulemaking on the issue. The notice explains that the FDA is seeking additional information on the method of production of ECJ, the differences between ECJ and other sweeteners, and the basic characterizing properties of ECJ. Resolution of these specific issues requires the expertise of the FDA rather than the courts. The notice also states that after reviewing the comments the FDA intends to revise the draft guidance, if appropriate, and issue it in final form. If the Court proceeds with this action and issues a decision that is contrary to the FDA's formal position on ECJ, it would disrupt the uniform application of the FDA's regulatory rules. *Figy v. Amy's Kitchen,* 2014 WL 1379915 at *3; *see United States v. Philip Morris USA Inc.,* 686 F.3d 832, 837 (D.C.Cir. 2012) (" 'The primary jurisdiction doctrine rests ... on a concern for uniform outcomes (which may be defeated if disparate courts resolve regulatory issues inconsistently)....' "). For this reason, courts find it appropriate to defer to an agency when, as here, the agency is in the process of making a determination on a key issue in the litigation. *Figy v. Amy's Kitchen,* 2014 WL 1379915 at *3.

In conclusion, applying the doctrine of primary jurisdiction allows the Court to defer to the FDA's expertise on food labeling and will ensure uniformity in administration of the regulations regarding ECJ. Therefore, the Court finds it appropriate to dismiss the action without prejudice pursuant to the doctrine of primary jurisdiction.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss will be GRANTED without prejudice.

## IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 2090045

## Footnotes

1    In *Kane v. Chobani,* No. 12–CV–02425–LHK, 2013 WL 5289253 (N.D.Cal. Sept. 19, 2013), the court ultimately dismissed plaintiffs' ECJ allegations for failure to sufficiently state a claim under Rule 8(a) and Rule 9(b) because plaintiffs did not adequately plead that they believed the yogurts contained "only natural sugars from milk and fruit and did not contain added sugars or syrups." *Id.* at *7.

2    The Court notes that the FDA's March 5, 2014 notice did not exist at the time that either party filed its pleadings, and therefore was not raised by either party. Per Federal Rule of Evidence 201, the Court takes judicial notice of the FDA's March 5, 2014 notice in the Federal Register.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 13 of 48 PageID #:898

Cheslow v. Continental Casualty Company, Not Reported in Fed. Supp. (2022)

2022 WL 1641888

2022 WL 1641888
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Linda CHESLOW, Plaintiff,
v.
CONTINENTAL CASUALTY COMPANY, Defendants.

No. 21 C 4010
|
Signed 05/24/2022

**Attorneys and Law Firms**

Jeffrey Goldenberg, Goldenberg Schneider, LPA, Cincinnati, OH, John M. DeStefano, III, Pro Hac Vice, Robert B. Carey, Pro Hac Vice, Hagens Berman Sobol Shapiro LLP, Phoenix, AZ, Daniel J. Kurowski, Hagens Berman Sobol Shapiro LLP, Chicago, IL, for Plaintiff.

Barack S. Echols, Brent R. Austin, Caroline Malone, Gregory M. Schweizer, Michael L. McCluggage, Eimer Stahl LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Virginia M. Kendall, United States District Judge

*1 Plaintiff Linda Cheslow brought claims against Defendant Continental Casualty Company ("Continental") alleging breach of contract and fraud claims. (Dkt. 1). Cheslow purchased long-term care insurance from Continental through her employer's group policy. Continental raised nationwide premiums at different rates and times based on varying state regulatory regimes. Cheslow argues the raising of premiums at different rates violated the terms of the contract and amounted to fraud due to Continental's statement that a change in premiums would only occur if "premiums for all other Insureds in the same premium class" rose and that premiums could not be changed due to "age or health." *Id.* For the reasons discussed below, Defendant's Motion to Dismiss [16] is granted in part and dismissed in part.

**BACKGROUND**

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States,* 761 F.3d 779, 785 (7th Cir. 2014). Unless otherwise noted, the following factual allegations are taken from Plaintiff's Complaint [1] and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher,* 844 F.3d 670, 675 (7th Cir. 2016).

Linda Cheslow, a citizen and resident of the State of California, purchased a certificate for long-term care insurance provided by Continental Casualty Company ("Continental") through her employer, Hoffman-LaRoche, Inc.'s long-term care group policy, effective June 1, 2008. (Dkt. 1 ¶¶ 1, 4, 8, 18). Long-term care insurance policies provide for the costs of assistance required due to disability or old age. (*Id.*). Unique from long-term disability insurance, which provides income protection in the event an individual becomes disabled, long-term care insurance provides for a range of services individuals may require if they are unable to care for themselves. (*Id.* at ¶ 12). For example, long-term care insurance may include coverage for assistance in a home or an assisted living facility, among other available services. (*Id.*). Individuals may purchase long-term care at a younger age to "secure a more favorable premium than they could otherwise obtain over the coming years." (*Id.*).

Continental issued long-term care insurance policies across the nation, including a group long-term care policy number 0010177TQ ("the Policy") offered to Hoffman-LaRoche, Cheslow's employer, with an effective date of November 2, 2002. (*Id.* at ¶ 15–16). The Policy Cheslow enrolled in provided her with a daily nursing home benefit of $250, a daily Alternate Care Facility benefit of $250, and a daily Community Based Care benefit of $150. (*Id.* at ¶ 20). Under the heading for "PREMIUM", the Policy certificate specifies:

> We cannot change the Insured's premiums because of age or health. We can, however, change the Insured's premiums based on his or her premium class, but only if We change the premiums for all other Insureds in the same premium class. A change may be made, as provided in the following paragraph, on any Premium Due Date after the end of the Premium Rate Guarantee Period. The Premium Rate Guarantee Period starts on

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 14 of 48 PageID #:899

Cheslow v. Continental Casualty Company, Not Reported in Fed. Supp. (2022)

2022 WL 1641888

the Participating Employer's Effective Date. The length of this period is stated in the Schedule of the Master Application.

**\*2** (*Id.* at ¶ 21). The Policy certificate does not include any additional definition of "premium class." (*Id.* at ¶ 24). The rate schedules for the Policy included rates ranging based on only age and benefit level. (*Id.*). The master policy includes tables of monthly and biweekly premium rates nationwide, without indicating differences based on state of residency. (*Id.* at ¶ 27). In contrast to the Policy Cheslow obtained, Continental also offered individual long-term care insurance coverage policies, one of which stated expressly, "We may change the premium rates. Any change will apply to all policies in the same class as Yours in the state where the policy was issued." (*Id.* at ¶ 37).

At the outset, Cheslow's Policy certificate included a monthly premium of $206.71 or an annual premium of $2,478.12. (*Id.* at ¶ 28). On September 13, 2016, Continental issued a letter to Cheslow indicating her premium would increase by 95.5% in two phases. (*Id.* at ¶ 29). The first phase would be a 70% increase on November 1, 2016, followed by a 15% increase on November 1, 2017. (*Id.*). After the first phase of a 70% increase, Cheslow was informed her new monthly premium payment would be an additional $72.71 each month at $279.42. (*Id.*). In response to the premium increase, Cheslow could react in one of three ways, according to the letter. (*Id.* at ¶ 30). First, she could continue her coverage by paying the new premium of $279.42 each month. (*Id.*). Second, she could reduce her level of coverage to "minimize the effect" of the increase. (*Id.*). Or third, she could execute a non-forfeiture benefit and discontinue premium payments, accepting "a drastically reduced maximum benefit under the certificate." (*Id.*). Cheslow was unable to pay the increased monthly premium and chose to take the second option, reducing her benefit in order to reduce her premium. (*Id.*).

The letter Continental sent in September 2016 also informed Cheslow that the premium rate increase would not be effective for everyone: "Continental ... must comply with the laws and regulations of the states in which certificates were issued, which vary by state. It is likely that the size and timing of the rate increases may vary by state." (*Id.* at ¶ 31). The rates did in fact vary by states. For example, in Washington D.C., Continental sought a 10% increase to take effect September

1, 2016, for insured individuals in Cheslow's premium class. (*Id.* at ¶ 32).

Cheslow is seeking to raise claims as a class action representing "[a]ll individuals who purchased or were insured under a Continental Casualty Company group policy for long-term care coverage delivered in New Jersey, whose group policy either states or was marketed using material that states that premiums will not increase unless they also increase for all other insureds or all other insureds in a premium class, age, category, or other specified category." (*Id.* at ¶¶ 38–39).

Plaintiff raises five claims for relief. The first count is breach of contract due to Continental's increasing premiums in a manner that was not uniform for all other insured individuals in the same premium class by raising premiums under the Policy at different rates and different times in different states. (*Id.* at ¶¶ 47–53). The second cause is breach of the implied covenant of good faith and fair dealing on the same basis. (*Id.* at ¶¶ 54–60). Third, Cheslow brings a cause of action for violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56: 8-1 *et seq.* ("NJCFA"), "through its unfair and deceptive practices in marketing and selling long-term care policies ..., including concealing its intent to raise premiums on a state-by-state basis at the time the coverage was sold." (*Id.* at ¶¶ 61–70). The fourth cause of action is fraudulent concealment based on Continental's "failure to disclose ... its intention to seek premium increases that varied in timing and amount from state to state ...." (*Id.* at ¶¶ 71–76). Finally, Cheslow raises a cause of action for declaratory and injunctive relief. (*Id.* at ¶¶ 77–81).

## LEGAL STANDARD

**\*3** "To survive a motion to dismiss under 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.' " *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams*, 742 F.3d at 728 (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). "[I]t is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief ... by providing allegations that 'raise a right to relief above the speculative level.' " *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007) (citing

Cheslow v. Continental Casualty Company, Not Reported in Fed. Supp. (2022)

2022 WL 1641888

*Twombly,* 550 U.S. at 555) (emphasis in original). The Court construes the complaint "in the light most favorable to the nonmoving party, accept[s] well-pleaded facts as true, and draw[s] all inferences in her favor." *Reynolds v. CB Sports Bar, Inc.,* 623 F.3d 1143, 1146 (7th Cir. 2010). "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago,* 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal,* 566 U.S. at 678).

## DISCUSSION

### A. Choice of Law for Common Law Claims (Counts I, II, and IV)

Both parties put forward arguments about which state's law applies to the common law claims in Counts I, II, and IV. (Dkt. 17; Dkt. 19). Illinois choice of law analysis guides this Court in a diversity jurisdiction complaint. *Mathis v. Metro Life Ins. Co.,* 12 F.4th 658 (7th Cir. 2021); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). Illinois choice of law analysis is required only if an outcome-determinative conflict exists between the laws of Illinois and the laws of another state. *W. Side Salvage, Inc. v. RSUI Indem. Co.,* 878 F.3d 219, 223 (7th Cir. 2017) (citing *Townsend v. Sears, Roebuck & Co.,* 879 N.E.2d 893, 898 (Ill. 2007)). Continental bears the burden of showing an outcome-determinative conflict exists. *Id.* (citing *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.,* 10 N.E.3d 902, 905 (Ill. 2014)) ("If the party fails to establish the existence of such a conflict, the court applies the law of the forum state.").

For Counts I and IV, neither party put forward an argument for an outcome-determinative conflict. (Dkt. 17; Dkt. 19). As such, the Court applies the forum law of Illinois to analyze the breach of contract claim and the fraudulent concealment claim. *W. Side Salvage, Inc.,* 878 F.3d at 219; *see also Gunn v. Cont'l Cas. Co.,* 968 F.3d 802, 808 (7th Cir. 2021). However, for Count II, both parties argue New Jersey law should apply. The responsibility lies with Continental to demonstrate an outcome-determinative conflict between the law of New Jersey and the law of Illinois on this count, and Continental has effectively done so. Illinois does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing, while New Jersey does in certain circumstances. *Compare Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Product, Inc.,* 212 F.3d 373, 381–82 (7th Cir. 2000), *with Seidenberg v. Summit Bank,* 791 A.2d 1068 (N.J. Super. App. Div. 2002).

This Court finds, as both parties argued, that New Jersey law should apply to the second claim. Illinois applies the "most significant relationship" test in line with the Restatement (Second) of Conflict of Laws (Am. Law Inst. 1971). *Barbara's Sales, Inc. v. Intel Corp.,* 879 N.E.2d 910, 919–20 (Ill. 2007). However, the Restatement typically enforces parties' choice of law in a contract. § 187. Plaintiff's Policy membership certificate includes a choice of law provision that New Jersey's law governs contract claims. (Dkt. 1 ¶ 46). Therefore, this Court will apply the laws of New Jersey to the second count.

### B. Count I: Breach of Contract Claim

**\*4** Continental allegedly breached the language of the contract in both the group policy and membership certificate providing that premium changes would be "based on his or her premium class, but only if we change the premiums for all other Insureds in the same premium class" by raising premiums at different rates and different times varying by states. (Dkt. 1 ¶ 21). The term "premium class" is not further defined anywhere in the policy. (*Id.* at ¶ 24). If a term is not defined, the Court construes it as an "average, ordinary, normal, reasonable person" would understand the term. *Gillen v. State Farm Mut. Auto. Ins. Co.,* 830 N.E.2d 575, 582 (Ill. 2005); *see also Newman,* 885 F.3d at 998. Plaintiff argues the plain meaning of the policy necessitates a finding that "premium class" is "the nationwide pool of insureds under the group insurance plan within a given age group" since rate schedules in the policy only showed variances due to age and benefit level, rather than by state of residence or place of purchase. (*Id.*). Cheslow relies on Continental's individual long-term care policy forms, which do indicate that premium increases may vary from state to state, for her interpretation as well. (*Id.* at ¶ 37); *see Toulon v. Cont'l Ca. Co.,* 877 F.3d 725, 731.

Continental argues Cheslow is incapable of proving breach of an actual promise. (Dkt. 17 at 6). Specifically, Continental points out the Policy "expressly permits rate increases" and prohibits rate increase based on "age or health" only. (*Id.*). Continental also states, "parties are presumed to know, and contract consistently with, existing law, and existing law is incorporated into contracts." (*Id.* at 7); *see also Braye v. Archer-Daniels-Midland Co.,* 676 N.E.2d 1295, 1303 (Ill. 1997).

Therefore, according to Continental, insured individuals are presumed to know state regulatory requirements prohibit

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 16 of 48 PageID #:901

Cheslow v. Continental Casualty Company, Not Reported in Fed. Supp. (2022)

2022 WL 1641888

imposition of a "nationwide" rate increase, and such requirements are incorporated into the policy. (Dkt. 17 at 8). Cheslow argues state regulatory regimes are irrelevant to "Continental's promises of a groupwide premium class based on age" since "[n]o statute or regulation mandated any premium increase, let alone increases that vary from one state to the next." (Dkt. 19 at 6).

Unambiguous terms of a contract must be applied "as written." *Am. Standard Ins. v. Allstate Ins. Co.*, 569 N.E.2d 162, 165 (Ill. App. Ct. 1st Dist. 1991). "Illinois treats insurance policies the same way as any other contract." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 998 (7th Cir. 2018) (citing *Hobbs v. Harford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). A contract term is not considered to be ambiguous "merely because the parties disagree on its meaning." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007). If a contract term is ambiguous, Illinois law construes the ambiguity "against the insurer." *Newman*, 885 F.3d at 999.

Continental argues a nationwide premium is not a "reasonable" interpretation of "premium class" since "[a]n interpretation of a contractual term that ignores governing law is not 'reasonable.' " (Dkt. 17 at 8); *see also Mitchell Buick & Oldsmobile Sales, Inc. v. McHenry Sav. Bank*, 601 N.E.2d 1360, 1365–66 (Ill. App. Ct. 2nd Dist. 1992). Plaintiff in the alternative claims Continental could raise premiums at a rate that matches the most restrictive state regulations across the board. (Dkt. 19). Continental claims historically, some states have not approved any increase in premium rates. (Dkt. 16 at 9). While the Court may consider extrinsic evidence to resolve a facial ambiguity, the reference by Continental to state regulations as a basis to dissuade the Court of dual reasonable interpretations is unpersuasive at this point. The term "premium class" is not defined; it is ambiguous and subject to multiple reasonable interpretations, including the interpretation put forth by the Plaintiff.

Two other courts in this district have considered this question and issued similar findings. [1] In *Sieving*, the district court found it plausible that Continental could apply nationwide rates matching the lowest rate approved in any state. 535 F. Supp. 3d at 770–71. In *Brown*, the district court also decided the term "premium class" was ambiguous, and Plaintiffs survived the motion to dismiss stage by presenting a plausible interpretation that would render Continental in breach. Case No. 21-cv-2349 at *10 – 11. This Court denies Defendant's motion as to Count I along the same reasoning.

### C. Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

**\*5**  Like the bases for the breach of contract claim, Plaintiff alleges Continental breached the implied covenant of good faith and fair dealing by failing "to exercise its discretion over rate increases reasonably, in a manner consistent with Cheslow's justified expectations." (Dkt. 19 at 5). New Jersey case law recognizes an independent cause of action for breach of the implied covenant of good faith and fair dealing in three situations: "(1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance." *Berlin Medical Assoc., P.A. v. CMI N. Jersey Operating Corp.*, 2006 WL 2162435 at *9 (N.J. Super. App. Div. 2006) (citing *Seidenberg*, 791 A.2d at 1076).

In *Berlin Medical Associates*, the court found plaintiffs' breach of the implied covenant of good faith and fair dealing claim was redundant in light of the surviving breach of contract claims. *Id.* at *10 ("We perceive no analytic reason why plaintiffs' surviving contract-based claims ... would not suffice ... to prove a just result."). In the present case, Cheslow reiterates the same set of facts for her claim of breach of implied covenant of good faith and fair dealing as she alleges for the breach of contract claim. Her surviving count for breach of contract sufficiently encapsulates her claims based on Continental breaching explicit terms in the agreement, and therefore, Count II is duplicative of Count I and dismissed as such.

### D. Count III: Violation of the NJCFA
The New Jersey Consumer Fraud Act ("NJCFA") prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ... or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby ...." N.J.S.A. 56:8-1, *et seq.* The elements of a

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 17 of 48 PageID #:902

Cheslow v. Continental Casualty Company, Not Reported in Fed. Supp. (2022)

2022 WL 1641888

claim under the NJCFA are: "(1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *New Jersey Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 176 (N.J. Super. App. Div. 2003) (Citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 465 (N. J. 1994)). The unlawful conduct may be "affirmative acts, knowing omissions, [or] regulation violations." *Cox*, 647 A.2d at 462. If the unlawful conduct is an affirmative act, intent is not a necessary element. *Id.* If the unlawful conduct is an omission, the plaintiff must demonstrate that the defendant acted with knowledge, and intent is an essential element. *Id.*

Cheslow argues Continental violated the NJCFA by affirmatively misrepresenting to insured individuals that the premium being charged "was a nationwide premium that could be raised only based on the age group of the insured" when in fact premiums were charged at different rates by state. (Dkt. 19 at 7). Continental argues application of the Second Restatement requires the Court apply consumer fraud laws of the state with the most significant relationship to a plaintiff's claims. (Dkt. 17 at 14 – 15). Therefore, Continental claims California fraud laws should apply since Cheslow is a California resident who purchased coverage in California from Continental, an Illinois-based insurer. (*Id.*).

Illinois applies section 148 to consumer fraud claims. *Gunn*, 968 F.3d at 802; *see also Barbara's Sales, Inc.*, 879 N.E.2d at 922–23. In tort claims, including unfair and deceptive consumer practices, the Second Restatement's presumptive rule is if the deception took place in the same place as the reliance, the law of that place applies. § 148(1). However, if the deception and reliance took place in different states, the court determines which jurisdiction has "the most significant relationship" to the case by reviewing a list of relevant contacts. § 148(2); *see also Gunn*, 968 F.3d at 809. The factors to consider are: "(a) the state where plaintiff acted in reliance upon defendant's representations, (b) the state where plaintiff received the representations, (c) the state where defendant made the representations, (d) the domicile, residence, place of incorporation, and place of business of the parties, and (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time." *Barbara's Sales*, 879 N.E.2d at 922–23. In this case, the only factor that may weigh towards applying New Jersey consumer protection laws is the final factor, "the place where a tangible thing which is the subject of the transaction between the

parties was situated at the time," namely the group Policy purchased by Cheslow's employer. *Id.*

**\*6** New Jersey applies the same analysis from section 148 of the Second Restatement for choice of law. The district court in New Jersey held "applying New Jersey law to out-of-state claims 'would frustrate the policies of each claimant's state,' even if 'New Jersey has an interest in deterring misconduct by corporations headquartered within its borders.' " *Gelis v. Bayerische Motoren Werke Aktiengesellschaft*, 2018 WL 6804506, at \*4 (D.N.J. Oct. 30, 2018) (quoting *Maniscalco v. Borhter Intern. (USA) Corp.*, 709 F.3d 202, 208 (3rd Cir. 2013)). In *Gelis*, the allegation was based on actions and misrepresentations by a Defendant with headquarters in New Jersey. In the present case, Cheslow's allegations are based on the group Policy being issued to her employer, based in New Jersey. (Dkt. 1).

This Court agrees with Continental that the nexus to New Jersey's consumer fraud protections is too attenuated to Cheslow's relationship with Continental and therefore dismisses the third count.

### E. Count IV: Fraudulent Concealment

The elements of common law fraud are "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Newman*, 885 F.3d at 1003. To support a claim of fraudulent concealment, "plaintiffs must allege that defendants concealed a material fact when they were under a duty to disclose that fact to plaintiffs." *Hirsch v. Feuer*, 702 N.E.2d 265, 273 (Ill. App. Ct. 1st Dist. 1998); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012). A "half-truth" may be sufficient for a claim of fraudulent concealment. *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 276 (Ill. App. Ct. 2nd Dist. 2015). More specifically, "A statement which is technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 969 (Ill. App. Ct. 1st Dist. 2004).

Like the other claims brought in this action, the claim for fraudulent concealment is based on Continental's group policy "suggesting that the premiums are based on age alone." (Dkt. 19 at 9–10). As further basis, Cheslow argues the letter Continental sent to insured individuals describing that

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 18 of 48 PageID #:903

Cheslow v. Continental Casualty Company, Not Reported in Fed. Supp. (2022)

2022 WL 1641888

increase to premiums would vary by state evinces Continental could have been forthright about the variance during the initial application process. (*Id.* at 10).

Continental argues Cheslow failed to specifically allege the "who, what, when, where, and how" of the alleged fraud in violation of Fed. R. Civ. P. 9(b). (Dkt. 17 at 11); *see United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC, 20 F.4th 295, 301 (7th Cir. 2021)* (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC, 836 F.3d 770, 776 (7th Cir. 2016)*). However, Cheslow did plead in particularity the "who, what, when, where, and how of the fraud." Specifically, Cheslow described in detail the origins of the Policy and communications surrounding the premium rates over the course of her membership in the group Policy.

Continental claims there was no material fact concealed since state regulations were a matter of public law. (Dkt. 17 at 12–13). As this Court stated, the varying state regulations do not conclusively dispose of Plaintiff's argument that Continental committed a breach of contract. Similarly, the range of state regulations "do not necessarily conflict with a promise of uniformity." *Sieving, 535 F.Supp.3d at 773.* It is possible based on the facts plead that Continental concealed a material fact when telling a "half-truth" that misled Plaintiff.

**\*7** Continental further argues no duty to disclose existed, citing *Toulon* for the premise that "a relationship between an insurer and insured does not ... give rise to a duty to disclose." (Dkt. 17 at 13); *see Toulon, 877 F.3d at 737-38.* However, a duty to disclose may arise if Continental told a "half-truth," at which point Defendant would become obligated to tell the full truth. *Toulon, 877 F.3d at 737.* Based on the complaint, Cheslow has put forward a plausible allegation that Continental's assurances about raising premiums by "premium class" without noting the increases would range based on state of residency could be considered a half-truth, and therefore give rise to a duty to disclose.

Finally, Continental questions Cheslow's pleading on the element of intentionality of the concealment. (Dkt. 17 at

14). Continental claims it is "not plausible" to allege it intentionally concealed information as the state regulatory regimes were public knowledge and presumably known by Plaintiff. (*Id.*). However, as this Court has determined, it is possible Plaintiff understood the Policy to envision raising premium rates nationwide at the same level and same time, and Defendant could have potentially raised all rates at the most restrictive level for uniformity. It is possible and sufficiently plead that Defendant may have intentionally withheld the material fact of raising premiums based on state of residency.

Similar to the first count, two other courts in this district have come to similar results. [2] This Court denies Defendant's motion as to Count IV along the same reasoning. Cheslow's complaint satisfies the pleading process stage and survives the motion to dismiss on this count.

### F. Count V: Declaratory and Injunctive Relief

Finally, Continental moves to dismiss the fifth count on the basis that "plaintiff has not alleged that [Continental] violated any legal rights, or that such a purported violation created a risk of irreparable harm." (Dkt. 17 at 15). As this Court has upheld two of the four other counts as viable claims, the Court denies Defendant's motion to dismiss Count V.

### CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss [16] is denied in part and granted in part. Plaintiff's claim in Count II for breach of implied covenant of good faith and fair dealing is dismissed as redundant. Plaintiff's claim in Count III for violation of the NJCFA is also dismissed. Plaintiff's claims in Counts I, IV, and V remain.

### All Citations

Not Reported in Fed. Supp., 2022 WL 1641888

### Footnotes

1    *Sieving v. Cont'l Cas. Co., 535 F. Supp. 3d 762 (N.D. Ill. Apr. 26, 2021)* (finding the definition of "premium class" was ambiguous under Illinois law and the insured party sufficiently alleged breach of contract due to

**Cheslow v. Continental Casualty Company, Not Reported in Fed. Supp. (2022)**

2022 WL 1641888

the increasing of premiums at varying rates state-to-state); *Brown et al. v. Cont'l Cas. Co.*, Case No. 21-cv-2349 (N.D. Ill. Mar. 15, 2022) (finding the term "premium class" as ambiguous, with Plaintiffs presenting a plausible argument for breach of contract due to the increasing of premiums at varying rates state-to-state).

2    *Sieving v. Cont'l Cas. Co.*, 535 F.Supp.3d (finding the omission that premium increases would vary by an insured's state of residency suffices as an alleged duty to disclose); *Brown et al.*, Case No. 21-cv-2349 (finding the omission that premium increases would vary by an insured's state of residency suffices as an alleged duty to disclose).

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 20 of 48 PageID #:905

Hood v. Wholesoy & Co, Modesto Wholesoy Company LLC, Not Reported in Fed....

2013 WL 3553979

2013 WL 3553979
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Janet HOOD, individually and on behalf
of all others similarly situated, Plaintiff,

v.

WHOLESOY & CO, MODESTO
WHOLESOY COMPANY LLC, The
Wholesoy Company, Tan Industries, Inc., Ken
Nordquist, and Ted Nordquist, Defendants.

Case No.: 12–cv–5550–YGR
|
July 12, 2013

ORDER GRANTING WHOLESOY'S
MOTION TO DISMISS

YVONNE GONZALEZ ROGERS, UNITED STATES
DISTRICT COURT JUDGE

*1 Pending before the Court is the Motion of Defendants
Wholesoy & Co., Modesto Wholesoy Company LLC, The
Wholesoy Company, Tan Industries, Inc., Ken Nordquist,
and Ted Nordquist (collectively "Wholesoy") to Dismiss
the class action complaint of Plaintiff Janet Hood. (Dkt.
No. 12.) Plaintiff brings this putative class action alleging
that Wholesoy's product labels do not comply with certain
requirements of the federal Food, Drug, and Cosmetics Act
("FDCA"), as adopted by the California Sherman Law, Cal.
Health & Safety Code section 109875, et seq. ("Sherman
Law"). Based upon those violations, Plaintiff asserts claims
under state and federal consumer protection statutes: the
California Unfair Competition Law, Bus. & Prof.Code section
17200 et seq. ("UCL"); the California False Advertising Law,
Cal. Bus. & Prof.Code section 17500 ("FAL"); the California
Consumers Legal Remedies Act, Cal. Civ.Code section 1750
et seq. ("CLRA"); the Song–Beverly Consumer Warranty
Act, Cal. Civ.Code section 1790 et seq. ("Song–Beverly"),
and the Magnuson–Moss Warranty Act, 15 U.S.C. section
2301 ("Magnuson–Moss"). Plaintiff also alleges a state law
claim for restitution based on unjust enrichment and quasi-
contract. Wholesoy brings its motion under Federal Rule
of Civil Procedure 12(b)(1) and 12(b)(6) on grounds of,
among other things, abstention under the primary jurisdiction
doctrine.

Having carefully considered the papers submitted and the
pleadings in this action, based upon the record before
the Court, and for the reasons set forth below, the Court
**GRANTS** Defendants' Motion to Dismiss and **DISMISSES
THIS ACTION WITHOUT PREJUDICE** under the
doctrine of primary jurisdiction.

I. REQUEST FOR JUDICIAL NOTICE

As a preliminary matter, Wholesoy requests that the Court
take judicial notice of sixteen documents. (Wholesoy's
Request for Judicial Notice in Support of its Motion to
Dismiss ("RJN"), Dkt. No. 13.) Plaintiff has not objected to
Wholesoy's RJN.

Wholesoy's request for judicial notice therefore is
**GRANTED** as to Wholesoy Exh. 1–13, and **DENIED** as to
Wholesoy Exhibits 14, 15 and 16. *See Hal Roach Studios,
Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19
(9th Cir.1990); *Branch v. Tunnell,* 14 F.3d 449, 454 (9th
Cir.1994) (overruled on other grounds in *Galbraith v. County
of Santa Clara,* 307 F.3d 1119, 1127 (9th Cir.2002). Exhibits
14 and 15 are letters *from* companies *to* the FDA concerning
a proposed rule on Evaporated Cane Juice, not official
documents directly relevant to the matters at issue. Likewise,
Exhibit 16 is not directly referenced by or relevant to the
complaint, and is improperly offered to prove the truth of facts
stated therein.

Similarly, the Court **GRANTS** judicial notice as to Plaintiff's
Exhibits 1–8 as proper subjects of judicial notice. *See
Fed.R.Evid. 201; Batwin v. Occam Networks, Inc.,* No. CV
07–2750 CAS (SHX), 2008 WL 2676364, at *2 n. 3 (C.D.Cal.
July 1, 2008) (taking judicial notice of letter from the SEC).

II. SUMMARY OF ALLEGATIONS

*2 Plaintiff alleges that Wholesoy's product labeling is false
and misleading because:

(1) the labeling fails to list "sugar" or "dried cane syrup" as an
ingredient, but instead lists "organic evaporated cane juice,"
in violation of FDA labeling rules; and

(2) Wholesoy's products fail to comply with the FDA standard
of identity for "yogurt," 21 CFR § 131.200, in that they do
not contain any form of milk defined therein. (Complaint,
Dkt. No. 1, at ¶¶ 5–15.) Plaintiff alleges claims arising
under California consumer protection statutes: a first cause

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 21 of 48 PageID #:906

Hood v. Wholesoy & Co, Modesto Wholesoy Company LLC, Not Reported in Fed....

2013 WL 3553979

of action for *unlawful* business practices under the UCL; a second cause of action for *unfair* business practices under the UCL; a third cause of action for *fraudulent* business practice under the UCL; a fourth claim under the FAL for *misleading and deceptive* advertising; a fifth cause of action for *untrue* advertising under the FAL; a sixth claim for violation of the CLRA for unlawful sale of misbranded products and misrepresentations regarding those product. Each of those claims is based, in turn, on Plaintiff's allegation that Wholesoy has violated multiple California Health & Safety Code sections which prohibit false or misleading statements on products and product packaging or labeling, as well as sale of misbranded food products. (Complaint ¶¶ 84–90.) Broadly, the first and fifth claims focus on the alleged falsity of the product labeling, the second, third, and fourth claims focus on the misleading aspect, and the sixth claim alleges both. In addition, she alleges an eighth and ninth claim for violation of federal and state consumer warranty statutes, as well as a claim for common law unjust enrichment/restitution.

Plaintiff alleges that she has purchased Wholesoy soy yogurt products since 2008. (Complaint ¶ 91.) She alleges that she read and reasonably relied on the labels of those products, including the listing of the ingredient "Organic Evaporated Cane Juice" and the representation that the products were "yogurt," before purchasing them. (Complaint ¶¶ 92–95.) Plaintiff alleges that these statements on Wholesoy's products were both: (1) unlawful, in that they did not comply with the applicable FDCA standards which are incorporated into California's Sherman Food, Drug and Cosmetic Act, California Health & Safety Code § 109875 *et seq.* (the "Sherman Law"); and (2) deceptive in that they misled Plaintiff and other similarly situated consumers into purchasing the products. Plaintiff alleges that she did not know and had no reason to believe that Wholesoy's products were misbranded and that she would not have bought the products if she had known the truth about them. (Complaint ¶¶ 96, 97.) She further alleges that Wholesoy's labeling, advertising and marketing were false and misleading and designed to increase sales. (Complaint ¶ 100.)

## A. "EVAPORATED CANE JUICE"

With respect to the use of the term "Evaporated Cane Juice," Plaintiff alleges that the FDA issued guidance in October 2009, and has sent warning letters to companies, advising that the use of the term was unlawful. (Complaint ¶¶ 49, 51, 63, 65.) The guidance issued in October 2009 states that it is "Draft Guidance" that "Contains Nonbinding

Recommendations," and is "Not for Implementation." (*See* Plaintiff's Opposition, Exhibit 6, "Guidance for industry: Ingredients Declared As Evaporated Cane Juice; Draft Guidance," Dkt. 17–7 [hereinafter "Draft ECJ Guidance"].) As a preamble to the statements therein, the Draft ECJ Guidance states that it:

> **\*3** does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statues and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance.

(Draft ECJ Guidance at 1.) The introduction states that:

> FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances [*sic* ] describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word should in Agency guidances means that something is suggested or recommended, but not required.

(Draft ECJ Guidance at 2.) The Draft ECJ Guidance then states that its intent

> is to advise the regulated industry of FDA's view that the term 'evaporated cane juice' is not the common or usual name of any type of sweetener, including dried cane syrup. Because cane syrup has a standard of identity defined by regulation in 21 CFR 168.130, the common or usual name

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 22 of 48 PageID #:907

Hood v. Wholesoy & Co, Modesto Wholesoy Company LLC, Not Reported in Fed....

2013 WL 3553979

for the solid or dried form of cane syrup is 'dried cane syrup.'

(Draft ECJ Guidance at 3.) [1] The Draft ECJ Guidance explains that since the definition of juice is liquid coming from fruits and vegetables, and sugar cane is not considered a "vegetable" by the agency in this sense, sweeteners derived from sugar cane syrup should not be listed by names suggesting they are juice. "FDA considers such representations to be false and misleading under section 403(a)(1) of the Act (21 U.S.C. 343(a)(1)) because they fail to reveal the basic nature of the food and its characterizing properties (*i.e.,* that the ingredients are sugars or syrups) as required by 21 CFR 102.5." Draft ECJ Guidance at 3.

On the other hand, the FDA has issued warning letters to companies listing "evaporated cane juice," as an ingredient notifying them that the FDA considers this to be a "violation" and stating that the "proper way to declare this ingredient can be found on the FDA website at:http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/ucm181491.htm," a website link which led to the Draft ECJ Guidance. (*See* Plaintiff's Exhibit 8, FDA Warning Letter to Hail Merry, LLC, dated October 23, 2012 ["your product lists "Evaporated Cane Juice" in the ingredient statement; however, evaporated cane juice is not the common or usual name of any type of sweetener."]; Exhibit 9, FDA Warning Letter to Bob's Red Mill Natural Foods, dated July 31, 2012 [same].) The FDA's July 2012 Regulatory Procedures Manual indicates that a warning letter "communicates the agency's position on a matter," in and that "Warning Letters are issued only for violations of regulatory significance." (*See* http://www.fda.gov/downloads/ICECI/ComplianceManuals/RegulatoryProceduresManual/UCM074330.pdf).

### B. "YOGURT"

Plaintiff alleges that in order for a product to call itself "yogurt," it must comply with the FDA's Standard of Identity for yogurt at 21 CFR § 131.200. Because Wholesoy's products labeled as "yogurt" do not contain the ingredients required by the FDA's Standard of Identity, namely any form of dairy milk, they are misbranded. (Complaint ¶¶ 9, 10, 73–77.) [2].

**\*4** That regulation provides that "[y]ogurt is the food produced by culturing one or more of the optional dairy

ingredients specified in paragraph (c) of this section with a characterizing bacterial culture that contains the lactic-acid producing bacteria, Lactobacillus bulgaricus and Streptococcus thermophilus." Instead, Wholesoy's products are plant-derived imitation products that have been developed and marketed in an effort to imply that the products contain the same nutritional quality of dairy products. (Complaint ¶ 71.) Therefore, Plaintiff contends, the use of the word "yogurt" in the labeling of Wholesoy's products renders the product misbranded and is inherently misleading to the reasonable consumer. Plaintiff asserts that it is a violation of law to label a product as "yogurt" when the product does not meet the standard of identity for yogurt stated in 21 CFR § 131.200. More importantly, it misleads consumers to label products as "yogurt" when those products do not have the same nutritional value contained in a true yogurt product.

Plaintiff further alleges that the FDA has sent warning letters to companies using the term "milk" to describe soy-based products that fail to meet the appropriate standards for use of that term. (Complaint ¶¶ 50, 79.) The Complaint quotes from an FDA warning letter sent to Lifesoy, Inc. on August 8, 2008, which stated, in relevant part:

> Your LIFESOY® Natural Soymilk Unsweetened (1/2 gallon) and LIFESOY® Natural Soymilk Sweetened (1 /2 gallon) products use the term "milk" as part of their common or usual name. Milk is a standardized food defined as the lacteal secretion, practically free from colostrum, obtained by the complete milking of one or more healthy cows [21 CFR 131.110]. Therefore, we do not consider "soy milk" to be an appropriate common or usual name because it does not contain "milk." We do consider "soy drink" or "soy beverage," however, as acceptable common or usual names for such products.

(Complaint, Exh. 1.) Plaintiff, in her opposition, cites additional FDA warning letters concerning labeling of products as "milk," "yogurt," or "cheese," that did not meet the applicable standards of identity. (Plaintiff's Oppo.,

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 23 of 48 PageID #:908

Hood v. Wholesoy & Co, Modesto Wholesoy Company LLC, Not Reported in Fed...

2013 WL 3553979

Exhibit 1, FDA Warning Letter to Fong Kee Tofu Company, Inc., Exhibit 2, dated March 7, 2012 (ordering company to substitute "soy drink" or "soy beverage" for soy milk because the product contains no milk); Exhibit 3, FDA Warning Letter to Bunker Hill Cheese Company, Inc., dated January 2, 2001 (ordering company to remove label "French Yogurt Cheese" from product because yogurt is a food that is defined by a standard of identity, and the product did not meet the standard of identity); Exhibit 4, FDA Warning Letter to Cytosport, Inc., dated June 29, 2011 (ordering company to remove the word "milk" from label of "Muscle Milk" because the product contains no milk); Exhibit 5, FDA Warning Letter to Guggisberg Cheese, Inc., dated February 23, 2009 (ordering company to remove labels "Yogurt Cheese" and "Vegetable Yogurt Cheese" because the products do not meet the standard of identity for yogurt.) Plaintiff contends these warning letters indicate that the FDA would not permit the use of the term "yogurt" in connection with "soy yogurt."

## III. ANALYSIS

Among other grounds, Wholesoy moves to dismiss or stay the Complaint based upon the doctrine of primary jurisdiction. Wholesoy argues that, because the FDA has regulatory authority over food labeling and the issues in this case require expertise or uniformity in administration, the Court should not "undermin[e], through private litigation, the FDA's considered judgments." *Pom Wonderful, LLC v. Coca–Cola Co.,* 679 F.3d 1170, 1178 (9th Cir.2012).

"The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency ... and is to be used only if a claim involves an issue of first impression or a particularly complicated issue Congress has committed to a regulatory agency." *Clark v. Time Warner Cable,* 523 F.3d 1110, 1114 (9th Cir.2008). A court traditionally weighs four factors in deciding whether to apply the primary jurisdiction doctrine: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Syntek Semiconductor Co. v. Microchip Tech., Inc.,* 307 F.3d 775, 781 (9th Cir.2002) (amended). "[T]he doctrine is a 'prudential' one, under which a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the

agency with regulatory authority over the relevant industry rather than by the judicial branch." *Clark,* 523 F.3d at 1114. "Normally, if the court concludes that the dispute which forms the basis of the action is within the agency's primary jurisdiction, the case should be dismissed without prejudice so that the parties may pursue their administrative remedies." *Syntek,* 307 F.3d at 782; *Astiana v. Hain Celestial Grp., Inc.,* 905 F.Supp.2d 1013, 1015 (N.D.Cal.2012) (if doctrine applies, court can either stay proceedings or dismiss the case without prejudice.)

**\*5** Thus, where determination of a plaintiff's claim would require a court to decide an issue committed to the FDA's expertise without a clear indication of how FDA would view the issue, courts of this district have repeatedly found that dismissal or stay under the primary jurisdiction doctrine is appropriate. *See Astiana v. Hain Celestial,* 905 F.Supp.2d. at 1016 (relying on *Pom Wonderful* to dismiss claims where the absence of FDA rules or policy statements would require court to make an independent determination that would "risk undercutting the FDA's expert judgments and authority"); *Ivie v. Kraft Foods Global, Inc.,* C–12–02554–RMW, 2013 WL 685372 at \*7 (N.D.Cal. Feb. 25, 2013) (applying primary jurisdiction to dismiss one of several claims where particular issue was subject of proposed new regulation as to which FDA issued public notice and heard comments); *see also All One God Faith, Inc. v. Hain Celestial Grp., Inc.,* C 09–3517 SI, 2012 WL 3257660 (N.D.Cal. Aug. 8, 2012) (finding application of primary jurisdiction doctrine appropriate where claims "would inevitably require the [c]ourt to interpret and apply federal organic standards, potentially create a conflict with those standards, and would intrude upon and undermine the USDA's authority"); *Gordon v. Church & Dwight Co.,* No. 09–5585 SI, 2010 WL 1341184, at \*2 (N.D.Cal. Apr. 2, 2010) (dismissing UCL, FAL, and CLRA claims on primary jurisdiction grounds where, *inter alia,* "the FDA has stated that it is still considering public comments and other data in connection with warnings similar to those that plaintiffs seek to have the court impose"); *Taradejna v. Gen. Mills, Inc.,* 909 F.Supp.2d 1128, (D.Minn.2012) (dismissing complaint under primary jurisdiction doctrine where FDA had issued a proposed rule on precise subject at issue, and decision by court could undermine national uniformity in labeling regarding what met standard of identity for "yogurt"); *cf. Janney v. Mills,* C 12–3919 PJH, 2013 WL 1962360 (N.D.Cal. May 10, 2013) (finding question of abstention under primary jurisdiction doctrine "a close one" where FDA had expressed varying positions on question of the term "natural" in food labeling, but denying request to

Hood v. Wholesoy & Co, Modesoy Company LLC, Not Reported in Fed...

2013 WL 3553979

abstain where FDA had "repeatedly declined" to take a clear position and shown a "relative lack of interest" in doing so, such that deferral to FDA would likely be futile).

The Court finds that the *Syntek* factors are met here and the primary jurisdiction doctrine applies. The FDA has regulatory authority over food labeling. *See* 21 U.S.C. § 341 *et seq.* The FDCA establishes a uniform federal scheme of food regulation to ensure that food is labeled in a manner that does not mislead consumers. *See* 21 U.S.C. § 341 *et seq.* Food labeling enforcement is a matter that Congress has indicated requires the FDA's expertise and uniformity in administration. Congress amended the FDCA through the passage of the Nutrition Labeling and Education Act (NLEA) to "clarify and to strengthen" the FDA's "legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about nutrients in foods." H.R.Rep. No. 101–538, at 7, *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337. No state may "directly or indirectly establish ... any requirement for the labeling of food that is not *identical* to the [FDCA]" 21 U.S.C. § 343–1(a) (emphasis supplied).

With respect to "evaporated cane juice," the Draft ECJ Guidance on which Plaintiff relies says expressly that it is not a "legally enforceable" standard, but only a suggestion. Given that statement, it is unclear why FDA subsequently has issued two warning letters citing that guidance. At a minimum, this indicates to the Court that the FDA's position is not settled. So far as it appears, FDA has not yet set a uniform enforcement standard. Thus, determination of Plaintiff's claim would require the Court to decide an issue committed to the FDA's expertise without a clear indication of how FDA would view the issue. *See Astiana v. Hain Celestial,* 905 F.Supp.2d at 1016 (absence of FDA rules or policy statements regarding use of "natural" for cosmetics); *Ivie,* 2013 WL 685372 at *7 (dismissing serving size claim where new regulation was pending before FDA); *Taradejna,* 909 F.Supp.2d at 1135 (dismissing complaint regarding standard of identity for "yogurt" where a proposed FDA rule would address the issue directly, once finalized).

Plaintiff also cites to the district court's decision in *Ivie* as support for its contention that the Draft ECJ Guidance establishes the FDA standard applicable here. There Judge Whyte found that the Draft ECJ Guidance was *unenforceable,* though nevertheless relevant to the issue of whether the labels in question were deceptive or misleading. *Ivie,* 2013 WL 685372 at * 12. Here, Plaintiff alleges that the use of the term "evaporate cane juice" is not merely misleading, but also

is unlawful. Yet Plaintiff offers no authority to support the contention that use of that term is unlawful, whether under enforceable FDA/Sherman Law standards or any others.

**\*6** Turning to the "yogurt" Standard of Identity, the FDA does not appear to have spoken at all as to whether "soy yogurt" should be subject to the same standards as dairy yogurt. It is not apparent to the Court whether the FDA would consider the addition of the word "soy" in front of yogurt to mean that the product was subject to that same Standard of Identity or, like "butter" versus "peanut butter," subject to a completely different standard. *Cf.* 21 C.F.R. § 164.150 (regulatory definition of "peanut butter") and 21 U.S.C. § 321a (statutory definition of "butter"). Many products contain soy and the need for the FDA to administer a comprehensive approach is compelling. *See, e.g.,* 21 C.F.R. § 139.117 [references to macaroni products with soy]; 21 C.F.R. § 172.379 [soy beverages, soy-based butter substitutes; soy-based cheese substitutes].

While Plaintiff points to two warning letters indicating that an analogous product, soy milk, was considered misbranded by the FDA under the standards applicable to [dairy] "milk," this does not provide clear guidance for food producers or the Court. Because it is unclear whether 21 C.F.R. § 131.200 is intended to apply to "soy yogurt" products, the Court finds it appropriate to leave that decision to the FDA in the first instance.

Plaintiff argues that abstention is not required here because the issues presented do not require any scientific or nutritional expertise to resolve. Unlike *Taradejna*, no real scientific analysis is required to say whether the products are misbranded. In *Taradejna*, the claims involved a question of whether a Greek-style yogurt could appropriately include Milk Protein Concentrate, "a form of ultrafiltered milk that typically 'retain[s] all protein components of milk' " under the standard of identity for yogurt. *See Taradejna,* 909 F.Supp.2d at 1130 (quoting 70 Fed.Reg. 60751, 60752 (Oct. 19, 2005)). The court there dismissed the complaint, ruling that the "FDA is in the best position to resolve any ambiguity about the standard of identity for yogurt" and that the FDA can "ensure national uniformity in labeling, utilizing the Agency's special expertise in this regard." *Id.* at 1134, 1135. Plaintiff argues that this case has no such scientific complexity since all that the Court must decide is that "soy yogurt" has no milk, and "evaporated cane juice" is really just sugar. Plaintiff's appeal to the simplicity of the decision belies the fact that the FDA has not come to any clear conclusion regarding either issue.

Hood v. Wholesoy & Co, Modesto Wholesoy Company LLC, Not Reported in Fed....

2013 WL 3553979

It also contradicts Plaintiff's allegations and arguments that labeling products as "yogurt" misleads consumers not simply because the products contain soy rather than dairy, but also because those products "do not have the same nutritional value" connoted by the use of the term "yogurt." (Plaintiff's Oppo. at 5:7–8; *see also* Complaint ¶¶ 71, 78.) In the absence of such a clear statement, should the Court go forward with consideration of the Complaint, it would find itself in a position of either having no set standard to apply, or announcing a standard and thereby overstepping its proper role.

Under these circumstances, based upon the record presented, the Court finds it is appropriate to defer to the authority and expertise of the FDA to say what the appropriate rules should be with respect to "soy yogurt" and "evaporated cane juice."

Rendering a decision based on what this Court believes the FDA might eventually decide on either of these issues "would usurp the FDA's interpretive authority." *Pom Wonderful,* 679 F.3d at 1176. Deference in this case is the appropriate course. *Pom Wonderful,* 679 F.3d 1170, 1176; *Clark,* 523 F.3d at 1114. Therefore, the Court **ORDERS** that Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE.** [3]

**\*7** This Order terminates Dkt. No. 12.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2013 WL 3553979

## Footnotes

1     FDA regulations require that manufacturers refer to foods by their "common or usual name." 21 C.F.R. § 101.4(a).

2     Wholesoy points out that the packaging for the products here features prominent labels stating "MADE WITH ORGANIC SOYBEANS," "DAIRY FREE," "made from single source U.S. grown organic soybeans," and "VEGAN." (RJN Exh. 1–12.)

3     Because the Court dismisses the claims on primary jurisdiction grounds, it does not reach the merits of Wholesoy's arguments for dismissal based upon preemption, lack of standing, or failure to state a plausible claim.

---

**End of Document**       © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 26 of 48 PageID #:911

Lebow v. Merrill Lynch, Pierce, Fenner & Smith, Inc., Not Reported in F.Supp. (1987)

1987 WL 12186

1987 WL 12186
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Gladys B. LEBOW, Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC. and Ralph S. Hoffman, Defendants.

No. 86 C 8196.
|
June 11, 1987.

*MEMORANDUM OPINION*

Motion to Dismiss

MAROVITZ, District Judge.

**\*1** On October 28, 1986, Plaintiff Gladys Brenner Lebow ("Lebow") filed with this court a five count complaint against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") and Ralph S. Hoffman ("Hoffman"). Count V of the original complaint was brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

Defendants filed a motion to dismiss on December 9, 1986. Defendants argued, in part, that Count V should be dismissed because plaintiff Lebow failed to allege the requisite RICO "enterprise." Plaintiff had alleged that her Cash Management Account ("CMA") qualified as the "enterprise."

On March 11, 1987, this court dismissed, without prejudice, Count V of the original complaint. Subsequently, plaintiff filed with this court her First Amended Complaint. Count V of the amended complaint is a new RICO claim against the defendants. Presently pending before this court is defendants' motion to dismiss Count V of the plaintiff's First Amended Complaint.

I.

In passing on a motion to dismiss, the court's consideration is limited to the pleadings; the complaint may not be "amended" by arguments in the briefs in opposition to the motion. *Car* *Carriers, Inc. v. Ford Motor Co.,* 745 F.2d. 1101, 1107 (7th Cir.1984). The court shall accept all well-pled allegations as true and construe all well-pled allegations favorably to the pleader. *Schuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683 (1974). The complaint will be dismissed only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102 (1957); *Hishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2233 (1984). However, the court is not bound to accept as true the plaintiff's legal characterizations of the facts. *Gomez v. Illinois State Board of Education,* 811 F.2d. 1030, 1033 (7th Cir.1987).

In the original complaint, plaintiff alleged, in relevent part, that she entered into agreements with Merrill Lynch and Bank One in order to obtain a CMA. Lebow also stated that the CMA was a securities margin account. Plaintiff contended that the CMA constituted a RICO enterprise. In this court's previous memorandum opinion, it was explicitly pointed out to the plaintiff that "an enterprise must consist of a person or group of persons. Consequently, a securities margin account cannot qualify as an enterprise." *Lebow v. Merrill Lynch,* No. 86 C 8196 (N.D.Ill. Apr. 15, 1987) (citing *Smith v. Bradley,* No. 86 Civ. 844, slip op. (S.D.N.Y. Dec. 18, 1986)).

Further, the court emphasized this point by repeating the statement that "[n]o conceivable reading of the statutory definition would support a conclusion that securities accounts qualify as 'enterprises.'" *Id.* (quoting *In re: Cantanella and E.F. Hutton & Co. Inc. Securities Litigations,* 583 F.Supp. 1388, 1426 (E.D.Pa.1984)). Accordingly, the court dismissed Count V. However, so as not to foreclose plaintiff from pleading a proper RICO cause of action, if one existed, this court granted the plaintiff leave to file an amended complaint in accordance with the ruling of this court.

**\*2** The court feels compelled to say that it was disappointed with the plaintiff's effort to amend the complaint. Instead of alleging that her CMA qualified as an enterprise, plaintiff now contends that her "investment portfolio" is the required enterprise. Amended Complaint at 22. This is incorrect. "Investment portfolio" is a "collective term for all securities held by one person or institution." "Portfolio," Black's Law Dictionary 1046 (5th ed. 1979). In fact, plaintiff admits as much in her response brief when she refers to her investment portfolio as "the sum of the plaintiff's investment and financial existence." Response Br. at 2. As such, since there is no way that plaintiff's "investment portfolio" is "a person or group of

1987 WL 12186

persons," plaintiff has once again failed to allege the requisite RICO enterprise.

In an apparent attempt to save Count V, plaintiff now alleges that her investment portfolio is "an association of the Plaintiff, Bank One and the Defendants MLPF & S and Hoffman...." Amended Complaint at 22. While it is true that a "group of individuals associated in fact" may qualify as an enterprise, 18 U.S.C. § 1964(4), mere reciting of "makeweight allegations" will not save an otherwise inadequately pled RICO pleading. *Lipin Enterprises, Inc. v. Lee,* 625 F.Supp. 1098, 1100 (E.D.Ill.1985), aff'd 803 F.2d 322 (1986); cf., *Gaines v. Lane,* 790 F.2d 1299, 1303 (7th Cir.1986) ("A litigant will not be able to bypass the strictures of Rule 12(b)(6) simply by alleging a constitutional challenge."). On the facts alleged, plaintiff's individuals and corporations is without merit. Thus, with no qualifying RICO enterprise alleged, this court must again grant defendants' motion to dismiss Count V for failure to state a claim upon which relief can be granted.

## II.

Defendants suggest in their reply brief that if Count V were to be dismissed, this court should not give the plaintiff leave to amend the RICO count. Leave to amend a complaint is governed by Rule 15(a), which states in part:

A party may amend his pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Fed.R.Civ.Proc. 15(a).

The right to amend a pleading is not absolute. *Jafree v. Barber,* 689 F.2d 640, 644 (7th Cir.1982). While the general policy of Rule 15(a) is that leave to amend should be liberally granted, the language of the rule "makes it clear that permission to amend is not given automatically but is allowed only 'when justice so requires.' " 6 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1487 (1971).

The standard to be used in applying Rule 15(a) was annunciated by the Supreme Court in *Foman v. Davis:*

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the

movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

 **\*3** *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962).

Further, "[t]he decision to deny or grant a motion to amend is within the discretion of the trial court." *Kleinhans v. Lisle Savings Profit Sharing Trust,* 810 F.2d 618, 625 (7th Cir.1987). This discretion "is particularly broad where the court has already given the plaintiff an opportunity to amend his complaint," *Fidelity Financial Corp. v. Federal Home Loan Bank of San Francisco,* 792 F.2d 1432, 1438 (9th Cir.1986), cert. den. ―― U.S. ――, 107 S.Ct. 949 (1987), and has been upheld in similar situations where the trial court previously put the plaintiff on notice of deficiencies in his complaint. *Denny v. Barber,* 576 F.2d 465, 471 (2d Cir.1978); *Kennedy v. Nicastro,* 517 F.Supp. 1157, 1162 (N.D.Ill.1981).

In the instant case, plaintiff has already been allowed to amend her complaint. When plaintiff's RICO claim was previously dismissed, this court ruled that a securities account cannot qualify as an enterprise because an enterprise must consist of a person or group of persons. In the face of this instruction in the law by this court, plaintiff filed an amended complaint which effectively does little more than replace the term "securities account" with "investment portfolio." As such, this court finds that the amended RICO count is totally defective and any further attempt by plaintiff to frame her "investment portfolio" as an association of the parties and Bank One would be futile, as far as this court's understanding of the law is concerned.

Defendants' suggestion that Count V be dismissed with prejudice and that plaintiff be denied leave to amend is well taken. However, this denial of leave to amend is only with regards to plaintiff's RICO claim, and not as to any other claims of the plaintiff.

## III.

In summation, Count V of the amended complaint is dismissed pursuant to Rule 12(b)(6) for failing to allege a RICO enterprise. This dismissal is with prejudice and plaintiff is denied leave to amend her complaint with regards to plaintiff's RICO claims against the defendants. Still pending

1987 WL 12186

before this court are Counts I through IV of the amended complaint.

**All Citations**

Not Reported in F.Supp., 1987 WL 12186

---

**End of Document**                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 29 of 48 PageID #:914

Legum v. Blue Cross Blue Shield Healthcare Plan of..., Not Reported in Fed....

2009 WL 10669646

2009 WL 10669646
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Edmond LEGUM, Plaintiff,
v.
BLUE CROSS BLUE SHIELD HEALTHCARE
PLAN OF GEORGIA, INC., Defendant.

CIVIL ACTION FILE NO. 1:09-CV-558-BBM
|
Signed 11/17/2009

**Attorneys and Law Firms**

Edmond Legum, Roswell, GA, pro se.

Jaime L. Theriot, Troutman Sanders, LLP, Atlanta, GA, for
Defendant.

## ORDER

BEVERLY B. MARTIN, UNITED STATES DISTRICT
JUDGE

**\*1** This matter is before the court on the Motion for
Summary Judgment [Doc. No. 8] filed by Defendant Blue
Cross Blue Shield Healthcare Plan of Georgia, Inc. ("Blue
Cross") and the Cross-Motion for Summary Judgment [Doc.
No. 11] filed by Plaintiff Edmond Legum ("Mr. Legum").

## I. Factual and Procedural Background

On a summary judgment motion, justifiable factual inferences
are generally construed in favor of the nonmovant. Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In this
case, however, Mr. Legum did not offer any response to Blue
Cross's Statement of Material Facts as to Which There Exists
No Genuine Issue to Be Tried. Pursuant to Local Rule 56.1B,
each of Blue Cross's facts will be deemed admitted. See LR
56.1B(2)(a)(2), N.D. Ga.; [1] see also Digioia v. H. Koch &
Sons, Div. of Wickes Mfg. Co., 944 F.2d 809, 811 n.6 (11th
Cir. 1991); Jones v. Gerwens, 874 F.2d 1534, 1537 n.3 (11th
Cir. 1989). Accordingly, in the following account of the facts,
the court has looked first to Mr. Legum's Complaint and
attached exhibits. The court has also looked to the Statement
of Material Facts as to Which There Exists No Genuine Issue
to Be Tried, provided by Blue Cross.

Mr. Legum is the President of the Ed-mond-How-ard
Network ("the Group"). The Group offers an employee health
welfare benefit plan, which is underwritten by Blue Cross.
The BlueChoice Option Master Contract ("the Plan") sets
forth the terms of the contract between the Group and Blue
Cross. Under the Plan, the Group is responsible for notifying
Blue Cross of any changes in coverage status if a Group
employee changes his or her coverage option.

Prior to 2006, Rebecca Legum was an employee of the
Group and enrolled as an individual Plan participant. After
Rebecca Legum married Henry Edwards ("Mr. Edwards"),
she changed her name to Rebecca Legum Edwards ("Ms.
Edwards"). In January 2006, the Group submitted an
application to Blue Cross to enroll a new employee, Mr.
Edwards, as a Plan participant. His wife was listed as a
dependent under Mr. Edwards's Plan participation. Blue Cross
made the requested enrollment for Mr. and Ms. Edwards, with
coverage effective as of March 1, 2006. The Group did not
inform Blue Cross that Ms. Edwards's individual participation
in the Plan should be terminated. Until May 2007, the Group
paid premiums for both Ms. Edwards's individual coverage
and her coverage as a dependent under Mr. Edwards's Plan
participation.

**\*2** In late April 2007, the Group requested a refund on
the premium payments made for Ms. Edwards's individual
coverage for the period from March 2006 through May 2007.
In early May 2007, the Group sent Blue Cross a notice
of cancellation of individual health insurance coverage for
Ms. Edwards, retroactively effective as of March 1, 2006.
Later that month, Blue Cross refunded the premium payments
for three months—March 2007, April 2007, and May 2007.
However, Blue Cross claimed that, under § 4.14 of the Plan,
it did not need to refund premiums paid prior to March 2007.
Section 4.14 provides as follows: "Refunds with respect to
a Group's request, based on circumstances including, but not
limited to, retroactive terminations of employees from the
Group, will be limited to a maximum period of three months.
Any eligible funds for the employee coverage will be sent to
the Group."

Mr. Legum originally filed this action on December 31,
2008 in the Magistrate Court of Fulton County, seeking the
sum of $4724. On March 2, 2009, Blue Cross removed the
case to this court under 28 U.S.C. §§ 1441, 1446 and 29

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 30 of 48 PageID #:915
Legum v. Blue Cross Blue Shield Healthcare Plan of..., Not Reported in Fed....

2009 WL 10669646

U.S.C. § 1132. Blue Cross filed its Motion for Summary Judgment on August 19, 2009. Blue Cross's Motion for Summary Judgment included both a statement of material facts and an affidavit from Sharon Mos (the "Mos Affidavit") authenticating an attached copy of the Plan. On September 10, 2009, Mr. Legum filed his Cross-Motion for Summary Judgment. Mr. Legum's Cross-Motion did not include any affidavits, exhibits, or a statement of material facts.

The parties' pleadings and cross-motions for summary judgment provide a sufficient basis upon which to adjudicate Mr. Legum's claim. Mr. Legum's request for a hearing is therefore denied.

## II. Legal Standard

Summary judgment is appropriate only when the pleadings and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute over a fact will preclude summary judgment if the dispute "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A court must deny summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Although in considering a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," id. at 255, the nonmovant must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Indeed, the nonmovant must present affirmative evidence beyond mere allegations to show that a genuine issue of material fact does exist. Anderson, 477 U.S. at 256–57. Furthermore, the court must evaluate the evidence "through the prism of the substantive evidentiary burden" at trial. Id. at 254.

## III. Analysis

The parties dispute the applicability of § 4.14 of the Plan; whether § 4.14 is unconscionable; whether Mr. Legum is entitled to reimbursement under a theory of unjust enrichment; and whether Mr. Legum's claim is barred under the voluntary payment doctrine. Each of these issues will be considered in turn.

### A. Applicability of § 4.14 of the Plan

Blue Cross argues that the Plan's language is plain and unambiguous, and that the contract must therefore be enforced as written. In particular, Blue Cross contends that § 4.14 unambiguously provides that, upon retroactive termination of an employee's coverage, the Group is entitled to a refund of premium payments for a maximum of three months. Because Blue Cross has already refunded three months' worth of premium payments, Blue Cross asserts that the Group has received all that it is entitled to receive under the Plan.

Mr. Legum argues to the contrary that § 4.14 does not control because that section applies only to refunds for coverage purchased under the terms of the contract. Mr. Legum observes that there is no provision in the Plan for an individual to be double covered or to receive additional coverage for double payments. In other words, Mr. Legum contends that Blue Cross accepted payments for a service that it does not offer.

**\*3** The Plan provides that it is "governed by the laws and regulations of the State of Georgia." (Mos. Aff. Ex. 1, § 4.16.) Under Georgia law, "[w]here the terms of a contract are plain and unambiguous, the construction of the contract is a question of law for the trial court." Garvin v. Smith, 235 Ga. App. 897, 899, 510 S.E.2d 863, 864 (1999). There is no jury question raised unless, after the application of all applicable rules of construction, an ambiguity remains. See Farm Supply Co. of Albany, Inc. v. Cook, 116 Ga. App. 814, 816, 159 S.E.2d 128, 130 (1967). "The cardinal rule of contract construction is to ascertain the parties' intent." Museum Tower Condo. Ass'n v. Children's Museum of Atlanta, Inc., 297 Ga. App. 84, 87, 676 S.E.2d 448, 450 (2009). "It is well established ... that if the language of a contract is clear and unambiguous, the terms of the agreement are controlling and [a] court should look no further to determine the intention of the parties." Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc., 274 Ga. App. 738, 743, 618 S.E.2d 673, 678 (2005) (citation and internal quotations omitted).

In this case, the Plan's language is clear and unambiguous. By its own terms, § 4.14 applies to "[r]efunds with respect to a Group's request." (Mos. Aff. Ex. 1, § 4.14.) The contractual provision places no other limitations on the circumstances under which a Group can request a refund, although it does explain that the circumstances may include "retroactive terminations of employees from the Group." (Id.) Mr. Legum has not denied that it was the Group that requested the refund. Mr. Legum therefore cannot avoid the application of

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 31 of 48 PageID #:916

Legum v. Blue Cross Blue Shield Healthcare Plan of..., Not Reported in Fed....

2009 WL 10669646

§ 4.14, which plainly indicates that "[r]efunds with respect to a Group's request ... will be limited to a maximum period of three months." (Id.) Blue Cross has already refunded three months of payments, and Mr. Legum is not entitled to receive any additional refunds under § 4.14.

**B. Unconscionability**
Mr. Legum contends in the alternative that, even if § 4.14 does apply, its enforcement is unconscionable. In particular, Mr. Legum argues that Blue Cross is seeking to enforce a standardized insurance contract in order obtain thousands of dollars from the Group, a small business, without providing anything in exchange.

Blue Cross argues to the contrary that the contract is not unconscionable. Blue Cross points out that Mr. Legum is presumed to have read the Plan, which clearly explains that refunds are limited to a maximum period of three months, and that the Group is responsible for notifying Blue Cross of any changes in employees' coverage status.

In Georgia, "the basic test for determining unconscionability is 'whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.' " NEC Techs., Inc. v. Nelson, 267 Ga. 390, 391, 478 S.E.2d 769, 771 (1996) (quoting U.C.C. § 2-302 cmt. 1). It is not clear from Mr. Legum's briefs whether he contends that § 4.14 is procedurally or substantively unconscionable. Either way, his argument is not persuasive.

"Procedural unconscionability addresses the process of making the contract...." Id. at 392, 478 S.E.2d at 771. Factors to be considered in determining whether a contract is procedurally unconscionable include "the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." Id., 478 S.E.2d at 772.

In this case, the evidence shows that the Group is a small company, with only four employees at the time that it entered into the contract with Blue Cross. (See Mos. Aff. Ex. 1, Group Master Application.) The Group's size is offset by the fact that § 4.14 is written in clear language and printed in the same font style as the rest of the contractual provisions. Blue Cross did not attempt to hide § 4.14 or make it less conspicuous than

the other sections. Neither are the terms of § 4.14 particularly oppressive: the Group is given three months to discover any mistakes and request a refund. Mr. Legum has offered no evidence that can be used to assess the other factors.[2] There is therefore not enough information in the record to support a finding of procedural unconscionability.

**\*4** Substantive unconscionability, unlike procedural unconscionability, "looks to the contractual terms themselves." NEC Techs., 267 Ga. at 392, 478 S.E.2d at 771. When assessing substantive unconscionability, "courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." Id., 478 S.E.2d at 772.

In this case, Mr. Legum argues that § 4.14 is commercially unreasonable and that the Group bears all of the risk because § 4.14 allows Blue Cross to retain payments in exchange for nothing. However, as the Georgia Supreme Court has noted, the relevant time frame for an unconscionability inquiry is "the time of the making of the contract." Id. at 391, 478 S.E.2d at 771. When Blue Cross and the Group entered into the Plan, neither side could reasonably have anticipated that the Group would fail to inform Blue Cross that Ms. Edwards's individual coverage should be terminated or that the Group would pay extra premiums for fifteen months without realizing its error. It is not commercially unreasonable or contrary to public policy to impose a time limit on a party's ability to seek a refund under a contract. On the contrary, a reasonable time limit gives the party an incentive to discover its mistake and request a refund earlier. In addition, the allocation of risks is not so uneven as to require a finding that § 4.14 is substantively unconscionable. Under § 2.2 of the Plan, "the [G]roup must notify [Blue Cross] of changes in coverage status for all affected Members who change the type of coverage option." (Mos. Aff. Ex. 1, § 2.2.) If the Group had adhered to its contractual obligations and promptly notified Blue Cross of the change in Ms. Edwards's coverage status, it would not have borne *any* risk under § 4.14.

In short, § 4.14 is neither procedurally nor substantively unconscionable. Unconscionability does not nullify the applicability of § 4.14 in this case.

**C. Unjust Enrichment**
Mr. Legum also asserts that he can recover the overpayments under a theory of unjust enrichment. In response to Blue

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 32 of 48 PageID #:917

Legum v. Blue Cross Blue Shield Healthcare Plan of..., Not Reported in Fed....

2009 WL 10669646

Cross's argument that unjust enrichment is only available where there is no express contract, Mr. Legum contends that the transactions at issue are outside the scope of the Plan.

Mr. Legum's argument is not convincing. The Group paid premiums on Ms. Edwards's individual coverage so that Ms. Edwards could receive benefits under the Plan. The Group also paid premiums on Mr. and Ms. Edwards's family coverage so that Ms. Edwards could receive benefits as a dependent under the Plan. The plain terms of the Plan required the Group to pay premiums in order for Ms. Edwards and the Group's other employees and dependents to receive coverage. (See, e.g., Mos. Aff. Ex. 1, art. 6, ¶ 2 (providing that an employee's coverage ends automatically at the end of the grace period if the Group does not pay the subscription charges for that employee).) Thus, the transactions at issue were within the scope of the Plan.

In Georgia, "[t]he law of unjust enrichment applies ... only when there is no express contract between the parties." CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Group, Inc., 283 Ga. App. 686, 691, 642 S.E.2d 393, 398 (2007). Because the payment of premiums was governed by the Plan, an express contract, the theory of unjust enrichment claim is not applicable in this case.

### D. Voluntary Payment Doctrine

**\*5** In its combined Brief in Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply Brief in Support of its Motion for Summary Judgment, Blue Cross argues for the first time that Mr. Legum's claim is barred by the voluntary payment doctrine. Ordinarily, "[t]his court will not consider arguments raised for the first time in a reply brief." United States v. Ga. Dep't of Natural Res., 897 F. Supp. 1464, 1471 (N.D. Ga. 1995) (Forrester, J.) (citing United States v. Oakley, 744 F.2d 1553, 1556 (11th Cir. 1984); United States v. Benz, 740 F.2d 903, 916 (11th Cir. 1984)). In this case, however, Mr. Legum had an opportunity to address the voluntary payment doctrine when he filed his Reply to Defendant's Opposition to Plaintiff's Cross-Motion to Summary Judgment. The court will therefore proceed to consider the merits of Blue Cross's argument.

The common law voluntary payment doctrine is codified at O.C.G.A. § 13-1-13, which provides in relevant part:

> Payments of claims made through ignorance of the law or where all of the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property.

O.C.G.A. § 13-1-13. Blue Cross contends that the voluntary payment doctrine bars Mr. Legum's claim because all the facts were known: Mr. Legum had constructive knowledge that the Group was paying premiums for both Ms. Edwards's individual Plan participation and her coverage as a dependent under her husband's Plan participation. In addition, Blue Cross points out that Mr. Legum has not offered any evidence showing "misplaced confidence," "artifice, deception, or fraudulent practice" by Blue Cross, or "urgent and immediate necessity" for the recovery of the Group's voluntary payments.

Mr. Legum argues to the contrary that Blue Cross has ignored Gulf Life Insurance Co. v. Folsom, 256 Ga. 400, 349 S.E.2d 368 (1986). In Gulf Life, the Supreme Court of Georgia interpreted O.C.G.A. § 13-1-13 in light of O.C.G.A. § 23-2-32(b), which provides that "[r]elief may be granted even in cases of negligence by the complainant if it appears that the other party has not been prejudiced thereby." O.C.G.A. § 23-2-32(b). Construing the two statutory provisions together, the Gulf Life court held:

> In an action for money had and received, the plaintiff generally can recover a payment mistakenly made when that mistake was caused by his lack of diligence or his negligence in ascertaining the true facts and the other party would not be prejudiced by refunding the payment—subject to a

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 33 of 48 PageID #:918

Legum v. Blue Cross Blue Shield Healthcare Plan of..., Not Reported in Fed....

2009 WL 10669646

weighing of the equities between the
parties by the trier of fact.

Id. at 406, 349 S.E.2d at 373. Mr. Legum asserts that a
weighing of the equities would not allow Blue Cross to retain
the money paid by the Group.

Although Part III.A. of this Opinion has already explained
why Mr. Legum's request for additional refunds is not
permitted under § 4.14 of the Plan, the court concludes
alternatively that the voluntary payment doctrine bars Mr.
Legum's claim. The voluntary payment doctrine "applies both
to one who pays money with knowledge of all the facts and
to one who pays by mistake without a valid reason for failing
to ascertain the truth—or, in other words, to cases involving
both actual and constructive knowledge on the part of the
payor." Applebury v. Teachers' Ret. Sys. of Ga., 275 Ga. App.
194, 194–95, 620 S.E.2d 452, 453 (2005). In this case, Mr.
Legum has not contested that he had at least constructive
knowledge of (1) the Group's application to enroll Mr.
Edwards as a new Plan participant, with Ms. Edwards as
his dependent; (2) the Group's failure to inform Blue Cross
that Ms. Edwards's individual coverage should be terminated;
and (3) the fact that, from March 2006 to May 2007, the
Group paid premiums for both Ms. Edwards's individual
coverage and her coverage as a dependent under her husband's
Plan participation. Mr. Legum thus had knowledge of all the
material facts at the time of the overpayments. Nonetheless,
Mr. Legum has not offered any explanation for the Group's
failure to contact Blue Cross about the overpayments until
late April 2007. Mr. Legum has thus failed to "prove that the
payment was not voluntarily made because certain material
facts were not known at the time of payment or a valid reason
existed for failure to determine the truth." Liberty Nat'l Life
Ins. Co. v. Radiotherapy of Ga., P.C., 252 Ga. App. 543, 547,
557 S.E.2d 59, 63 (2001) (citation omitted).

**\*6** Mr. Legum's reliance on Gulf Life is unavailing. The
Gulf Life court held that summary judgment under O.C.G.A.
§ 13-1-13 was not appropriate in that particular case, because
the plaintiff's overpayment was due solely to a negligent
computer programming error and "the issue of what is a
valid reason for failing to ascertain the truth, is ordinarily a
question for the jury." Gulf Life, 256 Ga. at 404, 349 S.E.2d
at 372. Later courts have interpreted Gulf Life to stand for
the proposition that summary judgment should not be granted
where "a factual question remains as to whether the payor
was negligent in failing to learn of the facts that would have

precluded payment." Applebury, 275 Ga. App. at 195, 620
S.E.2d at 454 (citing Gulf Life, 256 Ga. at 404, 349 S.E.2d at
372). Trial courts are "also bound to consider the other side of
the balance as well—that is, whether the defendant payee 'has
acted in good faith and in good conscience with the person
paying the money.' " Id. (citing Gulf Life, 256 Ga. at 405, 349
S.E.2d at 372).

In this case, however, Mr. Legum has not put forth any
evidence suggesting that "a factual question remains as to
whether the payor was negligent in failing to learn of the
facts that would have precluded payment." Id. As noted
above, Mr. Legum has offered no explanation for why it
took the Group more than a year to notice the overpayments
and contact Blue Cross about the change in Ms. Edwards's
coverage status. There is thus no issue of negligence for the
jury to decide. Similarly, Mr. Legum has not provided any
evidence suggesting that Blue Cross acted in bad faith. On the
contrary, the evidence shows that once Blue Cross received
Mr. Legum's refund request, Blue Cross acted promptly to
refund the three months' worth of payments that the Group is
entitled to under § 4.14 of the Plan.

The Gulf Life court also found that a jury issue may exist
where "circumstances have so changed that it would be
inequitable to require full restitution." Gulf Life, 256 Ga.
at 405, 349 S.E.2d at 372–73. However, this portion of the
Gulf Life analysis is inapplicable to the present case, because
neither party has offered evidence regarding any changes in
Blue Cross's circumstances.

In short, even if § 4.14 of the Plan did not bar Mr. Legum from
receiving refunds for premiums paid prior to March 2007, the
voluntary payment doctrine would prevent Mr. Legum from
obtaining the relief that he seeks.

### IV. Summary

For the foregoing reasons, Blue Cross's Motion for Summary
Judgment [Doc. No. 8] is GRANTED, and Mr. Legum's
Cross-Motion for Summary Judgment [Doc. No. 11] is
DENIED. Judgment shall be entered in Blue Cross's favor.
This case is DISMISSED.

IT IS SO ORDERED, this 17th day of November, 2009.

### All Citations

Not Reported in Fed. Supp., 2009 WL 10669646

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 34 of 48 PageID #:919

Legum v. Blue Cross Blue Shield Healthcare Plan of..., Not Reported in Fed....

2009 WL 10669646

## Footnotes

1       Local Rule 56.1B(2)(a)(2) provides as follows:

      This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1B.(1).

      LR 56.1B(2)(a)(2), N.D. Ga.

2       Mr. Legum cites a Georgia Supreme Court case for the proposition that " '(s)tandardized contracts such as insurance policies, drafted by powerful commercial units and put before individuals on the "accept this or get nothing" basis, are carefully scrutinized by the courts for the purpose of avoiding enforcement of "unconscionable" clauses.' " Strickland v. Gulf Life Ins. Co., 240 Ga. 723, 725, 242 S.E.2d 148, 149 (1978) (quoting 6A Arthur Linton Corbin, Corbin on Contracts § 1376, at 21 (1962)). In this case, however, nothing in the record suggests that Mr. Legum was faced with an "accept this or get nothing" choice. There is no evidence that a refusal to contract with Blue Cross would have prevented Mr. Legum from finding another company willing to underwrite his employee health welfare benefit plan.

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tyler v. Bank of New York Mellon, Not Reported in Fed. Supp. (2020)

2020 WL 2735367

2020 WL 2735367
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Timothy R. TYLER and Stephanie M. Tyler, Plaintiffs,
v.
BANK OF NEW YORK MELLON, et al., Defendants.

No. 19 CV 7863
|
Signed 05/26/2020

**Attorneys and Law Firms**

Jesse R. Tyler, Tyler Law Offices, Chicago, IL, for Plaintiffs.

David F. Pustilnik, Esbrook Law LLC, Natalie Burris, Winston & Strawn LLP, Chicago, IL, for Defendants Bank of America Corp, Bank of New York Mellon.

Michael McGivney, Ryan Matthew Holz, Locke Lord, LLP, Chicago, IL, for Defendant Residential Credit Solutions, Inc.

**MEMORANDUM OPINION AND ORDER**

Manish S. Shah, United States District Judge

 **\*1**  Plaintiffs Timothy and Stephanie Tyler tried to modify the mortgage on their home. They allege that their loan servicers, defendants Bank of America and Residential Credit Solutions, among others, promised them a modification under the federal Home Affordable Modification Program if they met certain conditions. But the loan servicers failed to offer a HAMP modification and instead threatened to foreclose on the Tylers' home. The Tylers bring claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, as well as claims of unjust enrichment and promissory estoppel. Bank of America moves to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), and RCS moves to dismiss under Rule 12(b)(6). For the reasons discussed below, the motions are granted.

**I. Legal Standards**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the jurisdictional sufficiency of the complaint. *Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017). In evaluating a facial attack on standing in a 12(b)(1) motion, I accept all well-pleaded factual allegations

as true and draw all reasonable inferences in favor of the plaintiffs. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). If the attack is a factual one, I may look beyond the jurisdictional allegations of the complaint and examine extrinsic evidence. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, I construe all factual allegations as true and draw all reasonable inferences in the plaintiffs' favor. *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018).

On a 12(b)(6) motion, I may only consider allegations in the complaint, documents attached to the complaint, documents that are both referred to in the complaint and central to its claims, and information that is subject to proper judicial notice. *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). RCS and Bank of America attach the following documents to their motions, which I consider because they are referenced in and central to the complaint: a letter from Bank of America transferring the loan to RCS, [8-1] at 2; [18-4] at 2; two letters from RCS approving the Tylers for a trial loan modification, [8-4] at 2; [18-6] at 2, 5; the signed modification agreement, [8-5] at 2–8; [18-7] at 2–12; [18-8] at 2–10; a letter from RCS denying the Tylers a permanent modification, [8-6] at 2; [18-9] at 2; a letter transferring the loan to Ditech, [18-5] at 2; and an executed loan modification agreement with Ditech. [8-3] at 2; [18-10] at 2–7. The Tylers do not object to consideration of these exhibits.

**II. Background**

 **\*2**  In 2006, Timothy Tyler purchased a home in Matteson, Illinois. [1] at 2 ¶ 1.[1] He obtained a mortgage with Countrywide Mortgage. [1] at 2 ¶ 1. Two years later, Shapiro Kreisman and Associates, LLC initiated a foreclosure action against Timothy and Stephanie Tyler. [1] at 2 ¶ 2.

In 2009, the Tylers started a loan modification process with Bank of America. [1] at 2 ¶ 3.[2] Over the next six years, the Tylers' account was transferred multiple times to different

Tyler v. Bank of New York Mellon, Not Reported in Fed. Supp. (2020)

2020 WL 2735367

loan servicers. [1] at 2 ¶ 4. Throughout that time, Bank of America and RCS refused to give the Tylers a loan modification under HAMP. [1] at 2 ¶ 5. [3]

In December 2015, the Tylers entered into a loan modification agreement with RCS, acting on behalf of Bank of America. [1] at 2 ¶ 7. They received a letter stating that Bank of America was the master servicer and made all decisions about modification and enforcement. [1] at 2 ¶ 6. The new loan had a $5,110 monthly payment, and interest and fees added to the principle. [1] at 2 ¶ 7. That month, the Tylers made three disputed payments meant to cover their October, November, and December payments, totaling $15,326.88. [1] at 2 ¶ 8. In February 2016, RCS told the Tylers that they were ineligible for all modification programs available on their mortgage. [1] at 2 ¶ 8.

In April 2016, Ditech took over servicing the Tylers' mortgage. [1] at 3 ¶ 9. Ditech told the Tylers that Bank of America had rejected the December 2015 loan modification, and that the Tylers should apply for a new modification. [1] at 3 ¶ 9. The Tylers were also told that they had forfeited their previous three payments. [1] at 3 ¶ 9.

The next month, Ditech, on behalf of Bank of America, requested additional documentation to complete the loan modification review, which the Tylers provided. [1] at 3 ¶ 10. The Tylers took the request for additional information as a promise that, if they provided the requested documents, they would obtain a more favorable loan using the HAMP method. [1] at 3 ¶ 10. The Tylers allege that the defendants knew the couple would rely on their request for additional documents, but did not plan to offer them a HAMP modification. [1] at 3 ¶ 10. The defendants did not offer the Tylers a modification under HAMP, and tried to sell the house as part of the foreclosure action. [1] at 3 ¶ 10.

**\*3** In July 2016, Shapiro Kreisman and Associates, LLC threatened to sell the house and presented a false affidavit in court that assessed attorney's fees and costs, insurance, preservation costs, interest, and taxes incurred on the property, bringing the Tylers' total mortgage to more than $600,000. [1] at 3 ¶ 11. The value of their home was $270,000. [1] at 3 ¶ 11.

That same month, RCS took over servicing the loan. [1] at 3 ¶ 12. RCS approved a loan modification with a new monthly payment of $2,491.70. [1] at 3 ¶ 12. In October 2016, the Tylers entered into another loan modification agreement

with Ditech. [1] at 3 ¶ 14. Around the same time, the Tylers received a letter stating that their property would be sold. [1] at 3 ¶ 13. The Tylers have continued to pay under the terms of the agreement with Ditech. [1] at 3–4 ¶ 14. [4]

Because of the Tylers' reliance on the defendants' promises, the defendants made more than $400,000. [1] at 4 ¶ 15. The Tylers hired two attorneys and incurred more than $10,000 in legal fees. [1] ¶ 16.

The Tylers filed their first complaint on September 6, 2018, under the docket number 18-cv-06120 (N.D. Ill.). Dkt. No. 18-cv-06120, [2]. That complaint named Bank of New York Mellon, Bank of America Corp., and Shapiro Kreisman as defendants, and brought breach-of-contract, promissory-estoppel, ICFA, and Fair Debt Collection Practices Act claims. On February 14, 2019, the Tylers filed an amended complaint naming the two Bank of America entities, RCS, and Ditech Financial, LLC as defendants. Dkt. No. 18-cv-06120, [25]. That complaint brought breach-of-contract, promissory-estoppel, and ICFA claims. Bank of America and RCS moved separately to dismiss the complaint. Dkt. No. 18-cv-06120, [33], [41]. On June 11, 2019, the Tylers filed a third amended complaint, naming the same four defendants. Dkt. No. 18-cv-06120, [47]. That complaint dropped the breach-of-contract claims, but added claims for unjust enrichment against each defendant, in addition to the ICFA and promissory-estoppel claims. RCS and Bank of America again moved to dismiss. Dkt. No. 18-cv-06120, [50], [52], [55]. On October 28, 2019, I dismissed the complaint without prejudice for lack of subject-matter jurisdiction because the Tylers had not adequately alleged Ditech's citizenship, despite being repeatedly told to do so. Dkt. No. 18-cv-06120, [62]. Because the court lacked jurisdiction, I did not reach any of the arguments RCS and Bank of America raised to dismiss the complaint on the merits.

On November 29, 2019, the Tylers filed the complaint at issue here, naming both Bank of America entities and RCS as defendants and bringing six claims. They bring one claim each against Bank of America and RCS under the ICFA (Counts I and IV), and one claim each of promissory estoppel (Counts II and V) and unjust enrichment (Counts III and VI). RCS and Bank of America move separately to dismiss all claims. [5]

### III. Analysis

2020 WL 2735367

### A. Standing

**\*4** Bank of America moves under Rule 12(b)(1) to dismiss Stephanie Tyler as a plaintiff. Since she was not a party to the mortgage, Bank of America says she does not have standing to assert any claims.

To establish Article III standing, a plaintiff must show that she suffered a concrete and particularized injury, caused by the actions of the defendant, that would likely be redressed by a favorable decision. *Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 382 (7th Cir. 2020). The injury-in-fact standard requires a plaintiff to allege that the injury is both concrete and particularized. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545 (2016). And the plaintiff must demonstrate standing for each claim she brings. *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015).

It's unclear whether Bank of America intended its standing argument to be a facial or factual challenge; its brief notes both that the court should accept all well-pleaded allegations as true (referring to a facial challenge), but also observes that the court can look beyond the complaint (apparently referring to a factual challenge), and it relies on an extrinsic exhibit to make its argument. [18] at 12–13, 14–15. The Tylers treat Bank of America's argument as a facial challenge. [20] at 9–10.

Facially, the complaint sufficiently alleges that both plaintiffs suffered a redressable injury caused by defendants. The Tylers allege that they were both injured by the defendants promising them a HAMP modification but refusing to deliver, while simultaneously threatening to foreclose on the home; as a result of the defendants' behavior, the Tylers say they incurred costs, fees, and interest that accrued over time, paid attorneys to fight the foreclosure, and suffered emotional damage from the impending foreclosure. The complaint asserts that both members of the couple lived in the house, were involved in pursuing a modification, and financially contributed to paying the fees and costs that accrued. The complaint sufficiently alleges that both Stephanie and Timothy Tyler suffered an injury, and they would both be made whole by a judicial determination in their favor. *See, e.g.*, *Reverse Mortg. Sols., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 365 F.Supp.3d 931, 941 (N.D. Ill. 2019) (finding plaintiff suffered an injury in fact where she faced "risk of displacement in the pending foreclosure action").

As a factual matter, Bank of America relies exclusively on the mortgage itself. Stephanie Tyler did not sign the note, and signed the mortgage to waive her homestead rights. [18-1] at 5; [18-2] at 16. Ordinarily, when a defendant produces evidence calling standing into question, "the presumption of correctness" afforded to a complaint's allegations "falls away." *Apex Digital*, 572 F.3d at 444 (quoting *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998)). The plaintiff must come forward with "competent proof that standing exists." *Id.*

Here, although the Tylers have not come forward with proof of standing, the pertinent facts are not in dispute. Bank of America's evidence is consistent with the complaint, which states that Timothy Tyler was the one who bought the house. [1] at 2 ¶ [1]. That Stephanie Tyler did not sign the mortgage does not mean she did not suffer an injury in the ensuing years as a result of the defendants' pattern of conduct. She lived in the house, was named as a defendant in the foreclosure action, and says she financially contributed to defending against foreclosure, as well as paid some of the costs and fees that the couple incurred from the defendants prolonging the modification process. Bank of America has offered nothing to suggest that Timothy Tyler alone bore those costs, and the mortgage by itself is inadequate to create a factual dispute about standing. *See Apex Digital*, 572 F.3d at 446 ("Although the district court is duty-bound to demand proof of jurisdiction when resolving factual disputes, it need not make such a demand when no factual dispute exists." (citation omitted)).

**\*5** Whether viewed as a facial or factual challenge, Stephanie Tyler alleges injury from defendants' conduct that would be redressed by a favorable decision. She has standing to assert the claims.

### B. Statute of Limitations

Bank of America argues that the ICFA and unjust-enrichment claims against it are barred by the claims' respective statutes of limitations. Ordinarily, a complaint need not anticipate affirmative defenses, such as untimeliness. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). Dismissal of a complaint based on the statute of limitations is appropriate only when "it is plain from the complaint" that the defense "is indeed a bar to the suit." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010). To warrant dismissal, the statute-of-limitations defense must be "ironclad." *Foss v. Bear, Stearns & Co.*, 394 F.3d 540, 542 (7th Cir. 2005).

2020 WL 2735367

### 1. ICFA

The ICFA imposes a three-year statute of limitations. 815 ILCS 505/10a(e). In Illinois, when a federal district court dismisses a claim with a statute of limitations for lack of subject-matter jurisdiction, and the statute of limitation expires while the case is pending, the plaintiff may file a new action within one year of the judgment. 735 ILCS 5/13-217. The Tylers filed their original complaint, which contained its ICFA claims, on September 6, 2018. The Tylers filed the complaint at issue here one month after I dismissed the original case for lack of jurisdiction. So any ICFA claim that accrued before September 2015 would be untimely. A claim accrues under the ICFA when the plaintiff "knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 441 (7th Cir. 1994) (quoting *Knox Coll. v. Celotex Corp.*, 88 Ill.2d 407, 415 (1981)).

The Tylers allege that Bank of America's involvement in the conduct underlying their ICFA claim came from Ditech and RCS acting as "agents" of Bank of America. [1] at 2 ¶ 3; 4 ¶ 2. The only individualized allegation against Bank of America is that the Tylers received a letter in December 2015 stating that all decisions regarding modification of their loan "fell under the authority of the master servicer, Bank of America." [1] at 2 ¶ 6. And when Ditech took over the loan in April 2016, Ditech allegedly told the Tylers that Bank of America had rejected their December 2015 loan modification request, and they should apply again. Bank of America argues that it stopped servicing the Tylers' mortgage on September 16, 2013. It attaches a letter to the Tylers, dated August 27, 2013, stating that Bank of America was transferring the loan to RCS the following week. [18-4] at 2. The Tylers allege that Bank of America remained involved in their mortgage until either September or December of 2016, "through its agents." [20] at 4. I take the Tylers to be arguing that, although Bank of America, N.A. was no longer servicing the loan after 2013, RCS and Ditech were working as agents of Bank of New York Mellon, the loan's investor during the relevant time period. To determine whether Bank of America or Bank of New York Mellon acted within the applicable limitations period, it is necessary to first consider whether they may be held liable for the actions of another entity on this complaint.

**\*6** A complaint relying on an agency relationship must plead facts that, if proven, could establish the existence of an agency relationship. *Bogenberger v. Pi Kappa Alpha Corp., Inc.*, 2018 IL 120951, ¶ 28; *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 498 (1996). A "mere allegation of agency is insufficient." *Bogenberger*, 2018 IL 120951, ¶ 28. Rather, the plaintiff must show that: (1) a principal-agent relationship existed; (2) the principal controlled or had the right to control the conduct of the agent; and (3) the alleged conduct of the agent fell within the scope of the agency. *Id.*

Agency may be either actual or apparent, and actual authority may be express or implied. *Zahl v. Krupa*, 365 Ill.App.3d 653, 660–61 (2d Dist. 2006). An agent has express authority when the principal explicitly authorizes the agent to perform a particular act, and the agent acts on the principal's behalf and subject to the principal's control. *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020); *Zahl*, 365 Ill.App.3d at 660–61. Implied authority is actual authority proved by circumstantial evidence, or authority that is inherent in an agent's position. *Zahl*, 365 Ill.App.3d at 660–61. Apparent authority arises when the principal holds the agent out as possessing the authority to act on its behalf, and a reasonably prudent person would assume the agent to have this authority. *Id.*; *see also Warciak*, 949 F.3d at 357 (apparent authority exists where a third party reasonably relies on the principal's manifestation of authority over the agent).

The Tylers' complaint does not plausibly allege that RCS and Ditech were acting as agents of Bank of America or Bank of New York Mellon. They do not allege that the banks expressly authorized RCS or Ditech to act on their behalf, that the banks held out RCS or Ditech as working on their behalf, or that RCS or Ditech consented to acting under the banks' control. The Tylers have thus not pleaded express authority. They fare no better on implied authority. Agency is not inherent in the relationship between the banks, as the loan's investor, and Ditech and RCS, as the loan's servicers. A loan servicer could conceivably be an agent of an investor, but that relationship is not automatic; a plaintiff must establish that the relationship exists. *See Sak v. CitiMortgage, Inc.*, 940 F.Supp.2d 802, 804–05 (N.D. Ill. 2013) (rejecting argument that loan servicer was mortgage owner's agent because record did not show adequate control); *cf. Advance Mortg. Corp. v. Concordia Mut. Life Ass'n*, 135 Ill.App.3d 477, 481 (1st Dist. 1985) (agency existed between investor and loan servicer because written agreement established the relationship). And the complaint alleges no circumstantial evidence that would support an inference of implied agency. The Tylers received a letter stating that Bank of America, as the master servicer, made all decisions about loan modification. But that assertion

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 39 of 48 PageID #:924

Tyler v. Bank of New York Mellon, Not Reported in Fed. Supp. (2020)

2020 WL 2735367

alone cannot support the assertion that RCS and Ditech worked on behalf of Bank of America—as alleged, the letter says nothing about RCS, Ditech, or any other servicer. And at the same time, the complaint contradicts itself by blaming RCS directly for denying the Tylers' requests for a HAMP modification.

The Tylers cannot plausibly plead apparent authority, either. No reasonable person could believe that the banks exercised authority over RCS or Ditech. Bank of America explicitly told the Tylers that once it transferred the loan to RCS, RCS would make any decisions about loan modification. Bank of America's transfer letter stated that, while the loan's investor or owner determined which modification programs RCS could offer, any decisions regarding the Tylers' qualification for loan modification programs "will now be made by Residential Credit Solutions." [18-4] at 3. The Tylers knew it was solely up to RCS to approve or deny their request for a loan modification, and no reasonable person could believe otherwise. While the Tylers allege that Ditech said Bank of America denied one of their loan modification requests, which arguably could support the impression that Bank of America controlled Ditech's decision, "[s]tatements by an agent are insufficient to create apparent authority." *Warciak*, 949 Ill.3d at 357. The allegation establishing agency would have to come from Bank of America itself, not Ditech. All told, the Tylers have offered only "mere allegation[s] of agency," and they have failed to allege facts suggesting they could prove any agency relationship existed. *See Bogenberger*, 2018 IL 120951, ¶ 30 (plaintiff failed to allege that principal had control over agent or that agent's actions fell within scope of agency relationship); *Connick*, 174 Ill.2d at 498 (same, where complaint contained only "mere legal conclusions" and no facts to suggest that alleged agent had actual or apparent authority to act on principal's behalf).

*7 Because the Tylers have failed to allege an agency relationship, the banks can be liable only for their own conduct. The Tylers' complaint does not allege that the banks committed any act within the applicable limitations period. Thus, it is plain from the face of the complaint that the statute of limitations bars the Tylers' ICFA claim against Bank of America and Bank of New York Mellon. Count I is dismissed as untimely.

*2. Unjust Enrichment*

A claim for unjust enrichment in Illinois must be brought within five years of accrual. *Blanchard & Assocs. v. Lupin Pharm., Inc.*, 900 F.3d 917, 922 (7th Cir. 2018) (citing 735 ILCS 5/13-205). Unjust enrichment occurs when the defendant "retained a benefit to the plaintiff's detriment." *Id.* (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 160 (1989)).

The Tylers brought an unjust-enrichment claim for the first time in their third amended complaint, filed on June 11, 2019, in case number 18-cv-6120. So Bank of America argues that the unjust-enrichment claim must have accrued after June 11, 2014. I disagree. An amendment to a pleading relates back to the date of the original pleading when the law that provides the applicable statute of limitations (here Illinois law) allows relation back, or the amendment adds a claim that arose out of the same conduct, transaction, or occurrence as the original claim. *Fed. R. Civ. P.* 15(c)(1)(A)–(B). Since there is "no meaningful distinction ... between Illinois law on relation back" and *Rule* 15, the outcome under either state or federal law is the same. *Hahn v. Walsh*, 762 F.3d 617, 635 n.37 (7th Cir. 2014); *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 515 (7th Cir. 2011) ("Under Illinois law as under federal law, an amendment relates back when it arises out of the same transaction or occurrence set up in the original pleading." (quoting *Phillips v. Ford Motor Co.*, 435 F.3d 785, 788 (7th Cir. 2006))); *Lawler v. Univ. of Chi. Med. Ctr.*, 2017 IL 120745, ¶ 20; *Bryson v. News Am. Publications, Inc.*, 174 Ill.2d 77, 108 (1996).

The Tylers' unjust-enrichment claim is based on the same course of conduct that they allege in their ICFA claim. So the claim relates back to their original pleading, filed on September 6, 2018. Any unjust-enrichment claim must have accrued after September 6, 2013. Bank of America transferred the loan ten days later. It is not clear from the complaint that Bank of America could not have retained some unjust benefit in that time period, so the unjust-enrichment claim is not obviously time-barred. At this stage of the case, I can't resolve the timeliness of the claim.

### C. Failure to State a Claim

Both Bank of America and RCS argue that the complaint has failed to state a claim. At the outset, the complaint fails to state any claim against Bank of America for the same reasons discussed above with regard to the statute of limitations: the Tylers do not attribute any of the alleged actions to Bank of America itself, and they have failed to plead any facts that could, if proven, establish an agency relationship between

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 40 of 48 PageID #:925

Tyler v. Bank of New York Mellon, Not Reported in Fed. Supp. (2020)

2020 WL 2735367

Bank of America and any other entity. Count I is dismissed as both untimely and for failure to state a claim, and Counts II and III (promissory estoppel and unjust enrichment against the banks) are dismissed for failure to state a claim.

RCS and Bank of America also urge dismissal on the basis that the complaint is incoherent and fails to distinguish between defendants. I disagree. To be sure, a complaint that is based on a theory of "collective responsibility" must be dismissed, because each defendant is "entitled to know what he or she did." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). While the complaint refers to the defendants collectively in spots, it adequately puts the defendants on notice of who allegedly did what, and when. The complaint distinguishes between the modification agreements the Tylers considered or entered into with RCS and Ditech respectively, and explains when RCS and Ditech each serviced the loan. Though Ditech is not a party, it was allegedly working as Bank of America's proxy and, if the claims against Bank of America weren't dismissed, the allegations would sufficiently notify Bank of America of the conduct it is accused of doing through Ditech. The complaint is not dismissed for failing to meet Rule 8(a)'s notice requirement.

## 1. ICFA

 **\*8** The Illinois Consumer Fraud Act protects customers against "fraud, unfair methods of competition, and other unfair and deceptive business practices." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019) (quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403 416 (2002)); *Benson*, 944 F.3d at 645–46. To state a claim for an ICFA violation, a plaintiff must plead that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages, meaning pecuniary loss. *Vanzant*, 934 F.3d at 736; *Benson*, 944 F.3d at 647. The plaintiffs must also plead causation— that "but for the defendant's deceptive or unfair conduct," they would not have been damaged. *Vanzant*, 934 F.3d at 739.

An ICFA claim may be based on a deceptive act, an unfair act, or both. *Id.* at 738. The two types of claims are distinct, and different pleading standards apply to them. *Id.* If the claim is based on deception, Rule 9(b)'s heightened standard for pleading fraud applies. *Id.* The plaintiff must plead with particularity the "who, what, when, where, and how" of the alleged fraud. *Id.* A practice is deceptive if it "creates

a likelihood of deception or has the capacity to deceive." *Benson*, 944 F.3d at 646 (quoting *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001)).

If the claim is based on unfair conduct, only Rule 8 applies. *Vanzant*, 934 F.3d at 739. To determine whether a practice is unfair, courts consider three factors: whether the practice offends public policy; whether it's immoral, unethical, oppressive, or unscrupulous; or whether it causes substantial injury to consumers. *Id.* A plaintiff need not satisfy all three factors; a practice may be unfair because of the degree to which it meets one of the criteria or because it meets all three to a lesser extent. *Vanzant*, 934 F.3d at 739; *Benson*, 944 F.3d at 647.

The complaint appears to allege that the defendants' conduct was both deceptive and unfair, but the Tylers' brief argues only that the conduct was deceptive. The Tylers' theory is that the defendants lured them into thinking they would receive a HAMP loan modification. Instead, the defendants rejected the Tylers' requests for a HAMP modification, offered them exorbitant loan modifications, and threatened to foreclose upon and sell the property. As I read the complaint, the Tylers' theory of misconduct sounds in unfairness. But in the interest of completeness, I address both theories, beginning with whether the Tylers have stated a claim for deceptive conduct.

The Tylers' allegations cannot survive the heightened pleading standards of Rule 9(b). They have not identified any concrete lies that they were told, who made those misrepresentations, or when and where they were made. They do not identify any specific instance in which a representative from RCS falsely said they would receive a HAMP modification. Without specifically identifying the who, what, when, where, or how of any alleged deception, their ICFA claim based on deception fails. *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (dismissing complaint where plaintiff failed to provide "the specific names, dates, times, or content of the misrepresentations"). [6]

Moreover, the Tylers' complaint alleges that multiple loan servicers serviced their loan over the course of several years, including Bank of America, RCS, and Ditech. But the Tylers do not distinguish among defendants in identifying who made deceptive comments to them. While the complaint provides the defendants adequate notice of their alleged wrongdoing for Rule 8 purposes, under Rule 9(b), a plaintiff must identify "the identity of the person making the misrepresentation." *Id.*

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 41 of 48 PageID #:926

Tyler v. Bank of New York Mellon, Not Reported in Fed. Supp. (2020)

2020 WL 2735367

(quoting *Uni*Quality Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992)). In cases with multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation." *Id.* (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)). Where a complaint "lump[s] together multiple defendants," it cannot survive the heightened pleading standard of 9(b). *Id.* (quoting *Vicom*, 20 F.3d at 777–78). The Tylers have failed to state an ICFA deception claim.

**\*9** The Tylers' unfairness theory fares no better. As noted above, an unfair practice is one that offends public policy; is immoral, unethical, oppressive, or unscrupulous; or causes substantial injury to consumers. (Or to some degree, all three.) The Tylers have not adequately pleaded that RCS's conduct falls into any of those categories. For example, conduct is immoral, unethical, oppressive, or unscrupulous for ICFA purposes if it leaves the consumer "with little choice but to submit to it." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1002–03 (7th Cir. 2018). But the Tylers do not plausibly allege that RCS unfairly deprived them of alternatives. They allege the opposite. RCS offered the Tylers a non-HAMP modification and sent them a trial period plan. [8-4] at 2. If the Tylers had remained in compliance with the TPP, RCS would have "provide[d] [them] with a Modification Agreement." [18-6] at 2. The Tylers sent the TPP back and wrote next to their signatures, "Under objection/non compliant Hamp I Hamp II and or similar loan modification program." [18-6] at 5. Likewise, the Tylers signed the modification agreement a few months later, but wrote next to their signatures, "In dispute noncompliance with HAMP tier 1 and tier 2." [18-8] at 2–10; [8-5] at 2–8. RCS thus denied the Tylers a loan modification because they had rejected the terms of the proposed deal. [18-9] at 2; [8-6] at 2. RCS did not deprive the Tylers of alternatives; they retained their ability to choose between that modification and their existing mortgage, and they chose to reject the proposed modification. They suffered minimal consequences as a result, as they ended up entering into a more favorable HAMP modification with Ditech a few months later. Where the Tylers felt secure in rejecting RCS's offer and holding out for a better one, they cannot plausibly say that RCS presented them with an impossible choice. *See, e.g.*, *Golbeck v. Johnson Blumberg & Assocs., LLC*, No. 16-CV-6788, 2017 WL 3070868, at \*14 (N.D. Ill. July 19, 2017) (dismissing ICFA claim where plaintiff rejected TPP offers because it was "hard to view" the offers as oppressive "if Plaintiff declined them"). More generally, it wasn't oppressive or unscrupulous for RCS to deny the Tylers a loan modification when the Tylers had twice rejected the non-HAMP loan modification that RCS offered.

The Tylers fail to plead the other unfairness factors as well. To show that an allegedly unfair practice offends public policy, a plaintiff may show that the practice violates statutory or administrative rules that establish a standard of conduct, or administrative directives, such as HAMP servicing guidelines, that do not themselves provide a right of action. *See Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 740–41 (7th Cir. 2017); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 575 n.4 (7th Cir. 2012). For example, a plaintiff might plead that a loan servicer's outright refusal to consider him for a HAMP modification was unfair because it violated HAMP guidelines. *See David v. Bayview Loan Servicing, LLC*, No. 15-CV-9274, 2016 WL 1719805, at \*6 (N.D. Ill. Apr. 29, 2016); *Boyd v. U.S. Bank, N.A.*, 787 F.Supp.2d 747, 753–54 (N.D. Ill. 2011). But here, RCS considered the Tylers' application, found they did not qualify for a HAMP modification, and offered the Tylers an alternative modification instead, which the Tylers in turn rejected. The complaint does not suggest that such conduct violated any HAMP guideline, or any other statute or administrative rule, and the Tylers do not argue that it did.

Finally, the Tylers cannot show that RCS's conduct caused a substantial injury to consumers. To do so, they must allege that the injury was (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) one that consumers themselves could not reasonably have avoided. *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 834 (7th Cir. 2014). The Tylers have made no such allegation. And they cannot state a substantial injury, since they entered into a favorable HAMP modification with Ditech shortly after RCS rejected them.

The Tylers have not stated a claim for deceptive or unfair conduct by RCS. But, to the extent amendment could salvage their claim, I disagree with the argument that the Tylers have not sufficiently pleaded that the defendants' conduct caused them pecuniary loss. The Tylers allege that, as a result of RCS denying them a HAMP modification, and the pending foreclosure action against their home, they spent $10,000 on attorneys, and had to pay the costs, fees, and interest that accrued. That is sufficient at this stage to plead that RCS caused the Tylers pecuniary loss. *See Wigod*, 673 F.3d at 575–76 (finding plaintiff's allegation that she "incurred costs and fees, lost other opportunities to save her home," and "suffered

2020 WL 2735367

a negative impact to her credit," among other things, stated a pecuniary injury under ICFA).

Finally, RCS argues that the complaint should be dismissed because the ICFA was intended to remedy widespread consumer injury, so "purely private disputes" are not actionable. [8] at 9–10. [7] I disagree. The Illinois legislature amended the ICFA in 1990 to specify that the Act does not require "proof of public injury, a pattern, or an effect on consumers generally." *Athey Prods. Corp. v. Harris Bank Roselle,* 89 F.3d 430, 436 (7th Cir. 1996) (citing 815 ILCS 505/10a(a)); *see also A. Kush & Assocs., Ltd. v. Am. States Ins. Co.,* 927 F.2d 929, 939 (7th Cir. 1991). So a plaintiff suing under the ICFA may "state a claim based upon a single, isolated injury," and based "solely upon the plaintiff's own injury." *Athey,* 89 F.3d at 436. That the Tylers did not allege an injury affecting consumers more generally is irrelevant. The ICFA may remedy a single error affecting only the plaintiff, and that is what the Tylers alleged here. A loan servicer's conduct with regard to a single plaintiff's modification request can be unfair or deceptive under ICFA. *See, e.g., Wigod,* 673 F.3d at 574.

**\*10** Although the Tylers have plausibly alleged that RCS's conduct caused their damages, they have failed to plead that that conduct was unfair or deceptive under the ICFA. The ICFA claim against RCS is dismissed.

### 2. Unjust Enrichment

The Tylers also bring claims of unjust enrichment against RCS and Bank of America. There is no stand-alone claim for unjust enrichment in Illinois. *Benson,* 944 F.3d at 648. Rather, unjust enrichment is a condition that can be brought about by unlawful conduct, such as fraud or duress. Alternatively, unjust enrichment may be based on an implied contract. *Toulon,* 877 F.3d at 741–42. If the unjust-enrichment claim rests on the same conduct alleged in another claim, then the unjust-enrichment claim is tied to the related claim and stands or falls with that claim. *Horist v. Sudler & Co.,* 941 F.3d 274, 281 (7th Cir. 2019); *see Vanzant,* 934 F.3d at 740 (noting unjust-enrichment claim was "tied to the fate of the claim under the Consumer Fraud Act").

Here, as the Tylers concede, their unjust-enrichment claim is based on the same conduct that forms the basis for their ICFA claim. Because the Tylers have failed to state a claim under the ICFA, they have also failed to state a claim for unjust

enrichment. *See Benson,* 944 F.3d at 648 (dismissing unjust enrichment claim where plaintiff failed to state a claim under ICFA); *Toulon,* 877 F.3d at 742 (same).

Further, the Tylers cannot state a claim for unjust enrichment based on an implied contract because an actual contract—the mortgage—governed their relationship with RCS. Where an actual contract governs the relationship of the parties, unjust enrichment does not apply. *Toulon,* 877 F.3d at 742; *see also Blanchard,* 900 F.3d at 921 (unjust enrichment does not apply "when an actual contract governs the parties' relationship"). Count VI is dismissed.

### 3. Promissory Estoppel

To plead promissory estoppel, the Tylers must plausibly allege that: (1) defendants made an unambiguous promise to them; (2) they relied on that promise; (3) that reliance was expected and foreseeable by defendants; and (4) they relied on the promise to their detriment. *Firestone Fin. Corp. v. Meyer,* 796 F.3d 822, 827 (7th Cir. 2015); *Wigod,* 673 F.3d at 566. Reliance must be reasonable and justifiable. *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC,* 664 F.3d 131, 138 (7th Cir. 2011).

The Tylers say the defendants promised them that, if they made timely payments during the trial period and provided additional documentation to RCS, RCS would offer them a permanent loan modification under HAMP. [20] at 9. The Tylers say they relied to their detriment on this promise by continuing to make their monthly payments and forgoing other remedies, such as selling or refinancing their home. [1] at 6 ¶ 16; 10 ¶¶ 38, 42. Although they eventually received a permanent HAMP modification, the Tylers allege that they suffered increased fees and charges from not obtaining one sooner. [1] at 6–7 ¶ 17; 10–11 ¶ 43. [8]

**\*11** The Tylers' allegation that RCS unambiguously promised them a HAMP modification if they complied with the terms of the trial period is squarely refuted by the other allegations in the complaint and the exhibits RCS submitted. When RCS approved the Tylers for a trial period plan, it explicitly stated, "you are not eligible" for a HAMP modification. RCS approved the Tylers for a non-HAMP modification instead. The Tylers cannot plausibly plead that RCS unambiguously promised them a HAMP modification, when RCS said the opposite. And the Tylers' own complaint pleads that RCS denied them a HAMP modification. None

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 43 of 48 PageID #:928

Tyler v. Bank of New York Mellon, Not Reported in Fed. Supp. (2020)

2020 WL 2735367

of the other communications between RCS and the Tylers contain any promise that the Tylers would receive a HAMP modification, and it is not plausible that RCS made such a promise—contradicting itself—in some other document. *See, e.g., Lesniak v. Bank of Am., N.A.*, 169 F.Supp.3d 766, 771 (N.D. Ill. 2015) (dismissing promissory-estoppel claim where plaintiff's assertion that Bank of America promised her a HAMP modification "cannot be reconciled with her allegation that Bank of America *denied* her request for a HAMP modification").

The Tylers appear to allege that they relied on a promise of a HAMP modification specifically, not a promise of any modification. At the same time, the trial period plan told the Tylers that if they remained in compliance with the TPP and met certain conditions, such as providing RCS documents, and RCS determined that the Tylers qualified at the end of the trial period, RCS would send them a modification agreement. [18-6] at 5. Those are the same conditions the Tylers say they were told to comply with to obtain a HAMP modification. But the agreement contained no such promise. And in any event, the TPP itself was not an unambiguous promise of modification, as the modification hinged on the Tylers complying with the trial plan, and RCS confirming that they still qualified. That may have been a "provisional willingness to make a future commitment," but it was not an unambiguous promise. *See Taylor v. JPMorgan Chase Bank, N.A.*, No. 17-3019, 2020 WL 2079164, at *6 (7th Cir. Apr. 30, 2020) (dismissing promissory estoppel claim under Indiana law where TPP stated lender would modify mortgage "if" plaintiff "qualified"). And finally, the Tylers could not have relied on the TPP, because they sent it back by writing "under objection / noncompliance HAMP I, HAMP II and or similar loan modification program." [18-6] at 5. Any reliance on a promise they flatly rejected was unreasonable, so their promissory-estoppel claim fails for that reason as well. [9]

**D. Leave to Amend**

Unless it is certain that amendment is futile, leave to amend should be freely given after an initial dismissal. *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 941 (7th Cir. 2018). It would be futile for the Tylers to amend the claims against Bank of America and Bank of New York Mellon. Nothing in the Tylers' brief or complaint suggests that the Tylers can state a claim against the banks. Counts I, II, and III are dismissed with prejudice. Likewise, amending the promissory-estoppel claim against RCS would be futile, because the record is clear that RCS did not promise the Tylers a HAMP modification when it offered them the trial plan, so Count V is dismissed with prejudice.

*12 The court will give the Tylers one more opportunity to plead a viable ICFA claim against RCS. Although this was the Tylers' fourth complaint, it was the first time the complaint was tested on its merits. Counts IV and VI are dismissed without prejudice.

**IV. Conclusion**

Defendants' motions to dismiss are granted. The claims against Bank of America and Bank of New York Mellon are dismissed with prejudice. The promissory-estoppel claim against RCS is dismissed with prejudice. The ICFA and unjust-enrichment claims against RCS are dismissed without prejudice, with leave to amend. If an amended complaint is not filed by June 16, 2020, the dismissal will convert to one with prejudice and the clerk will enter final judgment.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2735367

---

**Footnotes**

1    Unless otherwise noted, bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. Facts are taken from the complaint. The complaint includes several separately numbered sections, so citations include the page number of the complaint.

Case: 1:23-cv-15379 Document #: 50-1 Filed: 03/01/24 Page 44 of 48 PageID #:929

Tyler v. Bank of New York Mellon, Not Reported in Fed. Supp. (2020)

2020 WL 2735367

2    The Tylers treat Bank of New York Mellon and Bank of America, N.A. as a single entity throughout the complaint. According to Bank of America, Bank of New York Mellon was the loan's investor throughout the time period at issue in the complaint, while Bank of America, N.A. serviced the loan until 2013. [18] at 9.

3    As part of legislation passed in response to the 2008 financial crisis, Congress created an initiative to help homeowners and reduce foreclosures. *Taylor v. JPMorgan Chase Bank, N.A.*, No. 17-3019, 2020 WL 2079164, at *1 (7th Cir. Apr. 30, 2020) (citing 12 U.S.C. § 5219(a)(1)). The program offered banks incentives to allow homeowners to refinance their mortgages through programs such as HAMP. *Id.* Only certain borrowers were eligible for a HAMP modification, which involved a two-step process. *Id.* Qualified borrowers first entered a trial period plan with the lender, making reduced payments. *Id.* If the borrower complied with the terms of the TPP, the lender would offer a permanent modification. *Id.* HAMP itself does not create a private federal right of action for borrowers against servicers. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 559 n.4 (7th Cir. 2012).

4    On April 3, 2015, the Circuit Court of Cook County entered a judgment of foreclosure against the Tylers. [18-11] at 2. On December 5, 2016, the court vacated that judgment and dismissed the action. [18-11] at 2.

5    The court has diversity jurisdiction over this action. The Tylers are residents of Illinois. [1] at 1 ¶ 1. Bank of New York Mellon's citizenship is New York. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006) (a national banking association's citizenship for diversity purposes is the state where its main office is located, as set forth in its articles of association). Bank of America is incorporated in Delaware with its principal place of business in North Carolina. The proper Bank of America entity may be Bank of America, N.A., a national banking association with its main office (and thus citizenship) in North Carolina. Residential Credit Solutions is incorporated in Delaware with its principal place of business in Texas. [1] at 1–2 ¶¶ 2–4.

6    To the extent the Tylers rely on an allegedly false affidavit filed by Shapiro Kreisman and Associates, LLC, that law firm is not a party to this case, so its false statement cannot sustain an ICFA deception claim. [1] at 3 ¶ 11; [20] at 7.

7    The Tylers do not respond to this argument, or to a number of other arguments the defendants make in their motions to dismiss, so any argument the Tylers' might make is waived. *See Lee v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 912 F.3d 1049, 1054 (7th Cir. 2019). I address the arguments in the interest of completeness.

8    The complaint offers more detailed allegations about a promise that Ditech allegedly made. *See* [1] at 3 ¶¶ 9–10. But Ditech is not a defendant, so those allegations cannot state a promissory-estoppel claim. And, for the reasons already stated, Ditech was not acting as Bank of America's agent.

9    The statute of frauds would not defeat the promissory-estoppel claim at this stage of the case. The statute of frauds is an affirmative defense, and as noted above, a complaint need not anticipate affirmative defenses. The Tylers say RCS and Bank of America promised them a modification "by way of Loan Modification agreements." That presumably means they received a written, not oral promise. Under Illinois law, a writing may be considered signed "even if it merely contains something which manifests that the instrument has been executed or adopted by the party to be charged by it." *CB Bloomington Prop., LLC v. Frontier N., Inc.*, 2018 IL App (4th) 170603-U, ¶ 17 (quoting *Just Pants v. Wagner*, 247 Ill.App.3d 166, 173 (1st Dist. 1993)). Nothing in the complaint suggests that the Tylers were engaging in oral communications with RCS, and the complaint does not allege that the promise was oral. The application of the statute of frauds is not plain from the complaint.

Wyant v. Dude Products, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 621815

2022 WL 621815
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Arlene WYANT, et al. individually and on
Behalf of all others similarly situated, Plaintiffs,
v.
DUDE PRODUCTS, INC., Defendant.

Case No. 21-cv-00682
|
Signed 03/03/2022

**Attorneys and Law Firms**

Nick Suciu, III, Pro Hac Vice, Milberg Coleman Bryson Phillips Grossman, PLLC, Bloomfield Hills, MI, Brittany Scott, Neal J. Deckant, Frederick John Klorczyk, III, Bursor & Fisher, P.A., Walnut Creek, CA, Carl V. Malmstrom, Wolf Haldenstein Adler Freeman & Herz LLC, Chicago, IL, for Plaintiffs Arlene Wyant, Dexter Cobb.

Frederick John Klorczyk, III, Bursor & Fisher, P.A., Walnut Creek, CA, for Plaintiff Josefina Darnall.

Christine Elizabeth Skoczylas, Brian W. Lewis, Cristina Alma McNeiley, Paul T. Olszowka, Barnes & Thornburg LLP, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHARON JOHNSON COLEMAN, United States District Judge

*1 Plaintiffs Arlene Wyant, Dexter Cobb, and Josefina Darnall ("Plaintiffs") on behalf of themselves and all others similarly situated bring this action against Dude Products, Inc. ("Dude Products") for violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq. (Count I); violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq. (Count II); violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq. (Count III); violation of New York's Gen. Bus. Law § 349 (Count IV); violation of New York's Gen. Bus. Law § 350 (Count V); Breach of Express Warranty (Count VI); Breach of Implied Warranty (Count VII); violation of Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/1, et seq. (Count VIII); and violation of State Consumer Fraud Acts (Count IX). Currently

before the Court is Defendant's motion to dismiss [21] under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the following reasons, the Court grants in part and denies in part Defendant's motion.

## Background

Defendant Dude Products ("Defendant") markets and sells Dude Wipes (the "Wipes"), a line of disposable hygiene wipes. At issue is Defendant's advertisement of the product as a flushable wipe. According to Plaintiffs, Dude Wipes are not flushable because they do not disperse in a reasonable amount of time after flushing or clear sewage systems without causing clogs.

The First Amended Complaint ("Complaint") contains three variations of Dude Wipes packaging. The first and second describe the product as "†FLUSHABLE WIPES" and "FLUSHABLE† WIPES," respectively followed by "†SEE SIDE PANEL" and "†FOR FLUSHING, SEE SIDE PANEL." [1] (Dkt. 18 at ¶ 17). The side panel disclaimer states:



The named plaintiffs are individuals who purchased the Wipes in Illinois, California, and New York. None of the named plaintiffs read the side panel disclaimer before purchasing. Each solely relied upon the front label's flushability claim. After flushing the Wipes, Plaintiffs experienced problems with their home plumbing systems.

## Legal Standard

A Rule 12(b)(1) motion challenges federal jurisdiction, including Article III standing, and the party invoking jurisdiction bears the burden of establishing the elements necessary for subject matter jurisdiction, including standing. Thornley v. Clearview AI, Inc., 984 F.3d 1241, 1244 (7th Cir. 2021); Int'l Union of Operating Eng'rs v. Daley, 983 F.3d 287, 294 (7th Cir. 2020). Under Rule 12(b)(1), the Court accepts all well-pleaded factual allegations as true and construes all reasonable inferences in the plaintiff's favor when a defendant has facially attacked standing. Prairie Rivers Network v. Dynegy Midwest Generation, LLC, 2 F.4th 1002, 1007 (7th Cir. 2021).

Wyant v. Dude Products, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 621815

 **\*2** A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *Skinner v. Switzer*, 562 U.S. 521, 529, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011). When considering dismissal of a complaint, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam). To survive a motion to dismiss, plaintiff must "state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A complaint is facially plausible when the plaintiff alleges enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

## Discussion

### 1. Standing

*Injunctive Relief*

Defendant argues that Plaintiffs do not have standing to seek injunctive relief. To establish standing under Article III, a plaintiff must show: (1) she suffered an injury-in-fact; (2) that is fairly traceable to the defendant's conduct; and (3) that is likely to be redressed by a favorable judicial decision. *Cothron v. White Castle Sys., Inc.,* 20 F.4th 1156, 1160 (7th Cir. 2021). To establish an injury-in-fact for injunctive relief, "a plaintiff must show that the defendant's conduct will likely cause it to suffer damages in the future." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 741 (7th Cir. 2014) (quoting *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 9, 909 N.E.2d 848, 857 (1st Dist. 2009)). Past exposure to unlawful conduct is insufficient. *Id.*

Defendant argues that because no consumer would repurchase a product she believes is deficient, Plaintiffs cannot establish risk of future harm. See *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 702 (N.D. Ill. 2020) (Seeger, J.) ("There is no risk of 'fool me twice,' so there is no basis for an injunction."). Plaintiffs respond that they remain interested in purchasing Dude Wipes if Defendant "ensured the products were actually flushable." (Dkt. 18 at ¶¶ 11, 13, 14). This argument is not persuasive. "Once a plaintiff knows that a product is deficient, he or she is unlikely to purchase it again, and therefore unlikely to sustain future harm." *Geske*, 503 F. Supp. 3d at 702; *see also In re Herbal Supplements Mktg. and Sales Pracs. Litig.*, 15-cv-5070, 2017 WL 2215025, at \*7 (N.D. Ill. May 19, 2017) (St. Eve, J.) (collecting cases). Plaintiffs therefore lack standing to pursue injunctive relief.

*Restitution and Disgorgement*

Defendant next argues that the Court must dismiss Plaintiffs' restitution and disgorgement claims under the UCL (Count II) and FAL (Count III) because Plaintiffs have not pled that they lack an adequate remedy at law. In *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020), the Ninth Circuit held that a plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL and CLRA." Plaintiffs contend that the Ninth Circuit's holding in *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007 (9th Cir. 2020), decided one month after *Sonner*, warrants a different result.

Here, *Sonner* controls and the *Moore* court's cursory statement is inapposite. In *Moore*, the Court concluded that the remedies under the UCL, FAL and CLRA are "cumulative with one another, not with separate legal remedies." *Shay v. Apple Inc.*, No. 20CV1629-GPC(BLM), 2021 WL 1733385, at \*4 (S.D. Cal. May 3, 2021) (quoting *In re Subaru Batter Drain Prod. Liab. Litig.*, No. 20-cv-03095, 2021 WL 1207791, at \*28 (D.N.J. Mar. 31, 2021)). So far, all district courts confronted with this issue have followed *Sonner* and rejected application of the footnote in *Moore*. *Id.* (collecting cases). Because Plaintiffs do not allege that they lack an adequate remedy at law, their claims for restitution and disgorgement (Counts II and III) are dismissed.

*State Consumer Fraud Acts*

 **\*3** Next, Defendant challenges Plaintiffs' Nationwide Class and Consumer Fraud Multi-State Subclass. Plaintiffs bring Count IX for violation of state consumer fraud acts on behalf of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington residents. Because the named plaintiffs have not suffered an injury in states other than Illinois, California, and New York, Defendant argues that Plaintiffs do not have standing to bring the claims under other states' laws. Plaintiffs respond that this is a question best reserved for the Court's ruling on Rule 23 class certification.

As an initial matter, this is not an issue of Article III standing, but rather what is referred to as statutory standing. *See Muir v. Nature's Bounty (DE)*, No. 15-cv-9835, 2018 WL 3647115, at \*7 (N.D. Ill. 2018) (Pallmeyer, J.). Courts in this district are

Wyant v. Dude Products, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 621815

split on whether to resolve this question at the pleading stage. *See McDonnell v. Nature's Way Prod., LLC*, No. 16 C 5011, 2017 WL 1149336, at *5 (N.D. Ill. Mar. 28, 2017) (Ellis, J.) (collecting cases). Because this challenge goes to the heart of the named plaintiffs' capacity to represent the class members' state-law claims and not standing, the Court agrees with the line of cases holding that it is "better addressed at the class-certification stage." *Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2020 WL 1863296, at *4 (N.D. Ill. Apr. 14, 2020) (Guzmán, J.).

At this stage of the litigation, the Court recognizes that it may be improper for the parties "to engage in wide-ranging discovery premised on a prospect as to which there is substantial doubt—namely, [plaintiffs'] ability to assert causes of actions created by other states for the benefit of other individuals injured in those other states." *Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1001–02 (N.D. Ill. 2017) (Tharp, J.). The Court anticipates that it will stay discovery on state-law claims for states in which no named plaintiff resides until the Court rules on class certification or "some other ground has been advanced to provide reasonable assurance that there will be a valid basis to pursue such discovery in this case." *Id.* at 1002.

### 2. Failure to State a Claim

*Consumer Protection and False Advertising Claims*
Defendant moves to dismiss Plaintiffs' claims under state consumer protection and false advertising laws (Counts I-V, VIII, and IX) for failure to state a claim. To state a claim under the consumer protection statutes, Plaintiffs must plausibly allege that the packaging is likely to deceive reasonable consumers. *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020) (applying the reasonable consumer standard to California, Illinois, and New York law, among others). This standard "requires a probability that a significant portion of the general consuming public or of target consumers, acting reasonably in the circumstances, could be misled." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)). A statement is deceptive if "it is likely to mislead a reasonable consumer in a material respect, even if it is not literally false." *Id.*

First, Defendant argues that the Court must view the front label claims in conjunction with the side panel disclaimer. *Bell*, 982 F.3d at 477. Defendant argues that the disclaimer language destroys Plaintiffs' claims that the packaging

contains an actionable deceptive misrepresentation. Plaintiff responds that under *Bell*, the Court cannot presume as a matter of law that reasonable consumers would examine the fine print disclaimer. *See id.* Even if they would, Plaintiffs argue that whether reasonable consumers would be deceived is a question of fact and improper for consideration on a motion to dismiss.

**\*4** Even if reasonable consumers referenced the side panel to assess the front label's assertion, the disclaimer language does not destroy Plaintiffs' claims. *See Bell*, 982 F.3d at 483 (quoting *Beardsall*, 953 F.3d at 977) (restating the Seventh Circuit's skepticism "that an asterisk pointing to [the label's] fine print could save virtually any deceptive slogan ..."). Unlike the cases cited by Defendant, this is not a case in which viewing the disclaimer "would have dispelled the deception on which [Plaintiffs'] claims are based." *Killeen v. McDonald's Corp.*, 317 F. Supp. 3d 1012, 1013 (N.D. Ill. 2018) (Bucklo, J.). A consumer directed to the disclaimer would find that "Flushing [is] OK" under the specific conditions listed. (Dkt. 18 at ¶ 19). This directly contradicts the Plaintiffs' allegation that Dude Wipes are never flushable, which the Court must take as true. *Erickson*, 551 at 94. Therefore, Plaintiffs have plausibly alleged that the packaging is likely to deceive reasonable consumers that the Wipes are flushable. Whether consumers indeed understood the Wipes to be flushable remains a question of fact. *Bell*, 982 F.3d at 480 ("These questions may not be answered as a matter of law simply because lawyers can construe an ambiguous claim in a way that would not be deceptive.").

Defendant also argues that Plaintiffs' claims for violation of the Illinois and New York consumer protection statutes (Counts IV and VIII) should be dismissed because they are duplicative of Plaintiffs' breach of warranty claim (Count VI). *See, e.g., Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 169, 835 N.E.2d 801, 844 (2005) ("A breach of contractual promise, without more, is not actionable under the Consumer Fraud Act."). But affirmative misrepresentation to induce consumers to purchase products can support a claim under the ICFA. *See Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 400 (7th Cir. 2011) (For the proposition that "affirmative acts of misrepresentation" transform a "simple breach of contract multiplied over a prospective plaintiff class."). Because Plaintiffs allege that Defendant knowingly and intentionally misrepresented the Wipes as flushable to sell more goods, Counts IV and VII allege more than a simple breach of contract. *See Bakopoulos v. Mars Petcare US, Inc.*, No. 20 CV 6841, 2021 WL 2915215, at *6 (N.D. Ill. July

2022 WL 621815

12, 2021) (Shah, J.). The Court denies the motion to dismiss Counts I, IV, V, VIII, and IX.

*Express Warranty and Implied Warranty of Merchantability*
Defendant argues that Plaintiffs' breach of express warranty claim fails on the same grounds as the consumer protection statutes—that Plaintiffs cannot allege they relied on a warranty that the product was flushable in light of the side panel disclaimer. Because Defendant reasons that the breach of express warranty claim must rise and fall with its arguments as to the consumer protection and false advertising claims, the Court declines to dismiss Count VI for the reasons stated above.

Defendant moves to dismiss Plaintiffs' breach of implied warranty of merchantability claim because Plaintiffs have not alleged that Dude Wipes are unfit for their ordinary use. Even if the Wipes are not flushable, Defendant argues, consumers may still use them for their intended purpose—personal hygiene. Merchantable goods must be, among other things, "fit for the ordinary purpose for which such goods are use; and ... conform to the promises or affirmation of fact made on the container or label if any." 810 ILCS 5/2-314; *see also* Cal. Civ. Code § 1792 (same). "A breach of the warranty of merchantability occurs if the product lacks 'even the most basic degree of fitness for ordinary use.' " *Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009) (quoting *Mocek v. Alfa*

*Leisure, Inc.*, 114 Cal. App. 4th 402, 406, 7 Cal. Rptr. 3d 546 (2003)).

Plaintiffs do not adequately respond to Defendant's argument regarding the Wipes' fitness for their ordinary use. Instead, Plaintiffs hang their merchantability argument on the Wipes' failure to "conform to the promise or affirmations of fact made on the ... label." In contrast, the Complaint alleges that the Wipes "were not of the same average grade, quality, and value as similar goods sold under similar circumstance," and therefore, "would not pass without objection in the trade or industry under the contract description." (Dkt. 18 at ¶¶ 111, 112). Because a "plaintiff may not amend his complaint in his response brief," Count VII is dismissed without prejudice. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011).

**Conclusion**
**\*5** For the foregoing reasons, Counts II, III, and VII are dismissed without prejudice. The motion to dismiss [21] Counts I, IV, V, VI, VIII, and IX is denied.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 621815

---

**Footnotes**

1      The Complaint includes a third packaging variation that does not use a dagger or asterisk to qualify the term "flushable." Plaintiffs do not clarify whether this packaging includes a disclaimer or whether the variation demands an alternative analysis.

---

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.