**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| W.E.B PRODUCTION & FABRICATING, INC., individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br>v.<br><br>INSURANCE COMPANY OF THE WEST,<br><br>*Defendant*. | Case No. 1:23-cv-15379<br><br>**JUDGE: HON. SHARON JOHNSON COLEMAN**<br><br>**JURY TRIAL DEMANDED**<br><br>**PUBLIC REDACTED VERSION** |

**SECOND AMENDED CLASS ACTION COMPLAINT**

## INTRODUCTION

1. Plaintiff W.E.B. Production & Fabricating, Inc. ("Plaintiff") brings this action on behalf of itself and all others similarly situated against Defendant Insurance Company of the West ("Defendant" or "ICW"). This case concerns Defendant's fraudulent practice of charging Plaintiff and the putative Class (defined below) certain workers' compensation insurance premiums that are both unlawful and also impermissible under Defendant's insurance agreements with Plaintiff and the Class (the "Policies"). This is because the premiums were not determined using a lawful methodology publicly filed with the Illinois Department of Insurance ("Insurance Department") and approved by the Director of the Insurance Department (the "Director"), as also required by the Policies.

2. Instead, the premiums were calculated using an illegal, undisclosed method that Defendant did not file with the Insurance Department or receive approval for from the Director. Defendant also took numerous steps to fraudulently conceal these illegal practices from insureds and regulators, including by creating false pretextual records to cover up its illegal practices.

3. This illicit process to calculate and falsely record the basis for premiums is referred to herein as the "Pretextual Method." The known details of Defendant's secret multi-step, computer-driven Pretextual Method, and the arcane insurance laws governing workers' compensation insurance premiums in Illinois, are complex and unavoidably require considerable explanation. But at bottom, this case concerns how Defendant illegally determined a single portion of the final insurance premiums it charged Plaintiff and the Class.

4. Specifically, Defendant secretly used the unlawful Pretextual Method, instead of the method it claimed to (and was required to) use, to determine Plaintiff's and the Class's minimum "Schedule Rating Modification" ("SRM") multiplier ("SRM Multiplier"), and any

consequent increased portion of Plaintiff's premiums determined by the SRM Multiplier (the "SRM Charge").[1] Defendant then took various steps to attempt to cover its tracks and give the impression that the required method approved by the Director had been used.

5. As explained further *infra*, ¶¶ 42-52, prior to the commencement of an insured's policy they are provided with an estimated total premium which is made up of a number of separate charges. The estimated total premium is first based on the estimated payroll for the insureds' employees and the types of work the employees are expected to perform (the "Base Premium"). The Base Premium is then multiplied by a number of factors to calculate various estimated charges that make up the total estimated premium. These charges include the estimated SRM Charge, which is essentially determined by multiplying the Base Premium by the SRM Multiplier. *See infra*, ¶ 49.

6. At the end of an insured's policy period, Defendant performs an audit of the insured's business including its records concerning, among other things, the actual payroll and job tasks of the insured's employees during the policy period. At this point the insured's estimated premiums are adjusted and the final premiums are calculated, including the final SRM Charge portion of the premiums. *See infra*, ¶ 51. This final SRM Charge can make up a significant portion of an insured's total final premium.

7. Defendant is strictly limited by law, and by its Policies with Plaintiff and the Class, in how it must calculate any premiums it chooses to charge, including the SRM Multipliers and consequent final SRM Charges. As detailed further *infra*, ¶¶ 37-38, prior to being able to charge

---

[1] As discussed herein, an SRM Multiplier below 1.00 can cause a reduction in total premiums. *See infra*, ¶ 55. Plaintiff's claims encompass only those Policies where a final SRM Charge was assessed. *See infra*, ¶ 188 (Class limited to Illinois insureds whose final premiums were calculated using SRM Multiplier above 1.00).

its insureds *any* premiums, Defendant is required by law to publicly file its *complete method* of calculating *all aspects* of its insureds' premiums, including the SRM Multipliers and SRM Charges, with the Department of Insurance. Then after the complete method is filed it cannot be used until approved by the Director.

8. Defendant's Policies with Plaintiff and the Class also explicitly represent that Defendant will follow these and any other legal requirements in calculating any premiums charged, including that all premiums will be determined by (a) Defendant's manuals of *rules*, *rates*, *rating plans* and classifications filed with and approved by the Director; and (b) by using the *proper* classifications *and rates* that *lawfully apply* to each insured. Finally, the Policies guarantee that Defendant will refund any portion of premiums charged that are calculated in an unlawful or otherwise improper manner. *See infra*, ¶¶ 40-43.

9. Defendant knowingly and intentionally violated each of these legal requirements, breached multiple terms of its Policies with Plaintiff and the Class, and fraudulently concealed its *true* illegal method of calculating SRM Multipliers and final SRM Charges, the Pretextual Method.

10. Defendant has filed "Schedule Rating Plans" with the Department of Insurance purporting to detail the methodology it would use to calculate the SRM Multipliers, and consequent final SRM Charges, of Illinois insureds. *See infra*, ¶¶ 53-60. In each of these Schedule Rating Plans since at least May 2009, each approved by the Director, Defendant has represented that insureds' SRM Multipliers would be determined *solely* by Defendant's underwriters' assessment of *only* the specific "Schedule Rating Modification Factors" ("SRM Factors") detailed in the Schedule Rating Plans. The SRM Factors are a set of limited and defined criteria relating *only* to an insured's *own* business and business practices when compared to other similar businesses. The Schedule Rating Plans require Defendant's underwriters to assess each SRM

Factor anew for each policy period and apply "Schedule Credits" (for characteristics of the business reducing the risk of workers' compensation claims compared to similar businesses) or "Schedule Debits" (for characteristics of the business increasing the risk of claims compared to similar businesses) to each SRM Factor as appropriate. The SRM Multiplier is calculated, according to the Schedule Rating Plans, by totaling the Schedule Credits and Schedule Debits.

11. Defendant has further represented in each of its Schedule Rating Plans since at least May 2009 that all Schedule Debits and Schedule Credits applied by Defendant "shall be based on evidence that is contained in the file of [Defendant] at the time the schedule debit or credit is applied." The Schedule Rating Plans further require that the Schedule Credits or Schedule Debits applied by Defendant, and the evidence supporting such application, must be recorded on a "Schedule Rating Worksheet." The Schedule Rating Plans finally provide that "[t]he effective date of any schedule debit or credit shall not be any date prior to the receipt in the insurer's office of the evidence supporting the debit or credit."

12. These above representations were false when made, and Defendant knew they were false. As detailed herein, since at least [redacted], and [redacted], instead of calculating insureds' SRM Multipliers and consequent SRM Charges by using the precise method disclosed in Defendant's publicly filed Schedule Rating Plans, Defendant instead has secretly used a different unlawful, unfiled and unapproved methodology, the Pretextual Method. The Pretextual Method consists of multiple steps, each of which is detailed herein based largely on Defendant's own records produced in this litigation.

13. **First**, when an application is submitted for an insurance policy, Defendant [redacted]

[redacted].

14. **Second**, once the XLDP [redacted] the SRM Multiplier, and the consequent SRM Charge, are the only "flexible" elements of insureds' final premiums that are not based on objective, unchanging metrics, and therefore can be manipulated in order to reach higher premiums than Defendant's rating plans approved by the Director would otherwise permit.

15. **Third**, [redacted]

[2] [redacted]

[3] [redacted]).

[redacted] *See infra*, ¶¶ 88-94. Crucially, this is entirely contrary to the method Defendant represents it will use to determine the SRM Multipliers in its filed and approved Schedule Rating Plans, which states the underwriters *alone* will to determine the SRM Multiplier by making an independent assessment of each SRM Factor (and *only* the SRM Factors) without reference to any other considerations, including [redacted]. Under the approved Schedule Rating Plans, the underwriters are then required to add up the SRM Factor credits and debits, *whatever they end up amounting to*, to determine the SRM Multiplier to be applied to the insured's Base Premium. But instead, Defendant secretly *mandates*, without consideration of *any* of the SRM Factors, [redacted].

16. **Fourth**, Defendant fraudulently seeks to conceal these prior steps, and its use of the Pretextual Method, by [redacted].

17. [redacted]

[redacted]

18. [redacted]

19. One of Defendant's key employees also admitted certain aspects of Defendant's nationwide use of the Pretextual Method in an administrative hearing before the California Insurance Commissioner, as detailed in the Commissioner's decision issued in *In the Matter of the Appeal of Professional Packers & Forwarders, Inc.*, No. AHB-WCA-18-23 (Cal. Ins. Comm'r, January 4, 2019) (the "*Professional Packers* Decision," attached as Exhibit A). *See infra*, ¶¶ 107-09. There the Commissioner held, as detailed further herein, that Defendant breached certain provisions of the California Insurance Code that mirror Illinois Insurance Regulations Plaintiff

alleges were violated in this case.[4]

20. Even after the *Professional Packers* Decision was issued, [redacted]

21. This complaint also demonstrates other ways that Defendant has consistently sought, in other ways, to fraudulently conceal its use of the Pretextual Method from insureds and regulators. *See infra*, ¶¶ 128-40. As just one example, [redacted] *See infra*, ¶ 131 (emphasis added).

22. Defendant's records also show it had knowledge of its wrongdoing because, [redacted]

[4] Defendant's Schedule Rating Plans filed in California are largely the same as the Illinois Schedule Rating Plans at issue here. And as explained herein, Defendant utilizes the same Pretextual Method, including the XLDP, in both California and Illinois, as well as other states where ICW Defendant is permitted to apply an SRM Multiplier to insureds' policies. *See infra*, ¶ 87.

[redacted]

23. [redacted]

24. These actions by Defendant breached multiple provisions of its Policies with Plaintiff and the Class, *see infra*, ¶¶ 40-43; and violated various Illinois Statutes and administrative provisions relating to insurance. *See infra*, ¶¶ 141-43. Defendant's conduct also violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA"), and amount to fraudulent concealment and fraud. *See infra*, ¶¶ 224-69.

25. Plaintiff, on behalf of itself and the Class, seeks restitution and damages, including punitive damages, as well as attorneys' fees, costs and pre- and post-judgment interest stemming from Defendant's illegal actions.

**PARTIES**

26. Plaintiff W.E.B Production & Fabricating, Inc. is a full-service welding, fabricating, and structural steel erecting company. Plaintiff was incorporated in Illinois and at all relevant times has had its headquarters in Cook County, Illinois. Plaintiff is therefore a domiciliary

and citizen of Illinois.

27. Plaintiff purchased workers' compensation insurance policies from Defendant effective for the periods January 28, 2018 through January 28, 2019 ("2018 Policy"), January 28, 2019 through January 28, 2020 ("2019 Policy"), January 28, 2021 through January 28, 2022 ("2021 Policy") and January 28, 2022 through January 28, 2023 ("2022 Policy").[5]

28. Defendant Insurance Company of the West sells worker's compensation insurance throughout Illinois, including in Cook County. Defendant is incorporated in California with its headquarters at 15025 Innovation Drive, San Diego, California.

29. Defendant reported in its 2023 Annual Statement that it earned $1,016,828,784 in workers' compensation insurance premiums nationwide, accounting for most of the total $1,112,082,050 in premiums earned from all lines of insurance. $37,574,424 of the earned workers' compensation premiums were from Illinois insureds.

30. Defendant has stated that one of its "Values" is "Integrity – Act with integrity, respect, care and trust."[6] Defendant has also marketed itself as a provider of workers' compensation insurance that charges higher overall premiums but supposedly provides more total value overall, in contrast to carriers that offer the "lowest price" which "most likely [will provide] rock bottom service." As Defendant explained on its website:

> When choosing a workers' compensation insurance company, you might start by looking for the lowest price. Yet if you go with rock bottom pricing, you'll most likely get rock bottom service. This can quickly lead to more injuries, less productivity, out-of-control claim costs and a rise in your work comp premiums. Choosing a carrier based solely on price can easily end up costing you a lot more!

---

[5] The 2018 Policy, 2019 Policy, 2021 Policy and 2022 Policy are attached as Exhibits A-D, respectively.

[6] https://www.icwgroup.com/about/mission-values/ (last viewed November 20, 2023). At some point after the filing of the initial complaint in this action, Defendant appears to have removed this statement from its website.

> When choosing the best workers' compensation insurance carrier for your business, make sure you focus on the total value received for your work comp dollar. By doing so, you'll build a solid work comp program that keeps your workers safe and your costs down.[7]

## JURISDICTION AND VENUE

31. This Court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest, and minimal diversity exists. Plaintiff is a citizen of Illinois and Defendant is a citizen of California where it is incorporated and has its principal place of business.

32. This Court has personal jurisdiction over Defendant because, *inter alia*, Defendant (a) marketed its insurance products in Illinois; (b) sold workers' compensation insurance policies to Illinois residents; and therefore (c) derived substantial revenue from Illinois and availed itself of the privilege of doing business in Illinois.

33. Venue is proper in this District because Defendant conducts substantial business in this District and throughout the State of Illinois, and because a substantial part of the events upon which this action is based occurred in this District.

## SUBSTANTIVE ALLEGATIONS

### I. Legal Requirements Governing Defendant's Calculation of Premiums

34. Illinois has a "file and approve" system for workers' compensation insurance where each insurer charges its own rates but is subject to close scrutiny and approval by the Insurance Department to protect workers and their employers (the insureds).

---

[7] https://web.archive.org/web/20240718110011/https://www.icwgroup.com/workers-compensation/ (last viewed June 24, 2024). Defendant has made this or similar statements on its website since at least July 1, 2014. *See* https://web.archive.org/web/20140701071532/http://www.icwgroup.com/workers-compensation/ (last viewed January 6, 2025).

35. A file and approve system like the one used in Illinois has the purposes of, *inter alia*, preventing monopolistic practices, ensuring that carriers charge adequate rates to cover their losses, providing public access to rate information and curtailing discriminatory pricing.

36. As explained by the Seventh Circuit in *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666 (7th Cir. 2015), "Illinois heavily regulates how workers' compensation insurers formulate their rates." *Id.* at 670 (citations omitted). Insurers are subject to numerous statutory and regulatory requirements including that they pre-file with the Director the complete method they will use to calculate every aspect of their insurance rates (*i.e.* premiums) before charging such rates, including any rating plan and/or schedule rating plan the insurer plans to use.

37. For example, 215 ILCS 5/457(1) requires that "[e]very company shall prefile with the Director every manual of classifications, *every manual of rules and rates*, every *rating plan* and *every modification of the foregoing which it intends to use*." *Id.* (emphasis added). The Illinois Administrative Code further requires that workers' compensation insurers "shall file the following materials with the Illinois Department of Insurance . . . All Manuals -- Every manual of classifications, every *manual of rules*, every *rating plan*, every *schedule rating plan* . . . and every modification of any such manual or plan used in this State or intended for use in this State." 50 Ill. Adm. Code 2902.30 (emphasis added). Pursuant to 215 ILCS 5/457(3), filings "shall be open to public inspection as soon as filed." *Id.* 215 ILCS 5/457(4) also requires that a "filing shall not be effective *nor used* until approved by the Director." *Id.* (emphasis added).

38. These foundational principles of Illinois workers' compensation insurance law were put more succinctly by [redacted]

[redacted]

39. Illinois insurers are also obligated to be truthful in their communications with their insureds, potential insureds and the Insurance Department. 215 ILCS 5/467 provides that "[n]o person, company or organization shall willfully withhold information from, or knowingly give false or misleading information to the Director, any statistical agency designated by the Director, any rating organization, or any company which will affect the rates or premiums chargeable under this Article." 215 ILCS 5/149(1) requires in pertinent part that "[n]o [insurance] company doing business in this State, and no officer, director, agent, clerk or employee thereof, broker, or any other person, shall make, issue or circulate or cause or knowingly permit to be made, issued or circulated any . . . *verbal or written statement of any sort* misrepresenting the terms of any policy issued or to be issued by it or any other company or the benefits or advantages promised thereby." *Id.* (emphasis added).

## II. Defendant's Representations in the Policies Concerning the Calculation of Premiums and Policyholders' Entitlement to Refunds of Improper or Illegal Premiums

40. Defendant's Policies with Plaintiff and each member of the Class include the following terms whereby Defendant represents (a) how it will calculate insureds' estimated and final premiums (including various components of the premiums like the final SRM Charges); (b)

the limitations on what premiums Defendant can charge (and in what circumstances), and on what charges insureds are required to pay; and (c) that Defendant will refund any improper or illegal premiums.

41. First, the Policies' "**Disclosure Provision**" warrants that "[all] premium for this policy *will be determined* by our manuals of *rules*, *rates*, *rating plans* and classifications. We may *change our manuals* and apply the changes to this policy *if authorized by law or a governmental agency regulating this insurance*." Ex. B at 12 (emphasis added). As discussed further *infra*, Defendant breached this term of the Policies by charging Plaintiff and the Class final SRM Charges based on SRM Multipliers that were not determined by any of Defendant's filed "manuals of rules, rates, rating plans and classifications," filed with and approved by the Director, including Defendant's Schedule Rating Plans which falsely purport to show how the SRM Multipliers and consequent final SRM Charges would be calculated.

42. Second, the Policies' "**Lawful Provision**" states that "[t]he premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the *proper* classifications *and rates* that *lawfully apply* to the business and work covered by this policy." Ex. B at 12 (emphasis added). As discussed further *infra*, Defendant breached this provision by charging Plaintiff and the Class final SRM Charges *not* determined by proper classifications and rates that lawfully apply to Plaintiff and the Class, and instead by using the undisclosed and otherwise illegal Pretextual Method.

43. Third, the Policies' "**Refund Provision**" provides that "final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.

**If the final premium is more than the premium you paid to us, you must pay us the balance. *If it is less, we will refund the balance to you.*"** Ex. B at 12 (emphasis added). As discussed further *infra*, Defendant breached this term of the Policies by not refunding Plaintiff and the Class the illegal and improper final SRM Charges.

## III. Defendant's *Claimed* Method of Calculating Insureds' SRM Multipliers and Final SRM Charges

### A. The Process of Applying for and Obtaining Workers' Compensation Insurance from Defendant and the Basics of Premium Pricing

44. Illinois Employers seeking workers' compensation insurance from Defendant, or seeking to renew a policy with Defendant, must first provide Defendant with extensive information regarding the nature of its business including, among other things, the applicant's estimated payroll, prior loss history and the types of work its employees perform. Defendant collects this information by using, *inter alia*, the "ACORD" interface through which prospective insureds digitally submit information and respond to questions regarding their business and potential risk factors.

45. Assuming an applicant is not rejected outright based on certain factors, Defendant will provide the applicant with a quote including the *estimated* total annual premium for the policy as well as the various estimated sub charges that make up the total estimated premium. If the applicant's total estimated premium is above a certain amount, the quote can be "manually written" to include an estimated SRM Charge.[8]

46. The quote would look similar to the following page from Plaintiff's 2018 Policy

---

[8] For applicants with estimated premiums below a certain threshold, Defendant has a separate, fully automated procedure for reviewing the applicants' information and providing an "Instant Quote" of the estimated premium. Policies priced using the Instant Quote method are not at issue in this complaint.

(attached as Exhibit B):

EXTENSION OF INFORMATION PAGE

CLASSIFICATIONS SCHEDULE

| St Loc | Code No. | Classifications | | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|---|---|
| | | TOTAL CLASS PREMIUM | | | | $ 47,795.00 |
| | 0930 | BLANKET WAIVER | 1.02 | | | $ 956.00 |
| | 9812 | INCREASED LIMITS OF LIABILITY | 1.014 | | | $ 669.00 |
| | | TOTAL SUBJECT PREMIUM | | | | $ 49,420.00 |
| | 9898 | EXPERIENCE PREMIUM | 1.55 | | | $ 27,181.00 |
| | | TOTAL MODIFIED PREMIUM | | | | $ 76,601.00 |
| | 9889 | SCHEDULE MODIFICATION | 1.25 | | | $ 19,150.00 |
| | | STANDARD TOTAL | | | | $ 95,751.00 |
| | 0063 | PREMIUM DISCOUNT | .9185 | | | $ -7,804.00 |
| | 0900 | EXPENSE CONSTANT | | | | $ 160.00 |
| | 9740 | TERRORISM | .03 | | | $ 210.00 |
| | 9741 | CATASTROPHE (OTHER THAN CERTIFIED ACTS OF TERRORISM) | .01 | | | $ 70.00 |
| | | TOTAL ESTIMATED PREMIUM | | | | $ 88,387.00 |
| | 0000 | IL WC COMM OPERATIONS FUND SURCHARGE | 1.0101 | | | $ 893.00 |
| | | TOTAL | | | | $ 89,280.00 |
| POLICY TOTAL ESTIMATED COST | | | | | | $ 89,280.00 |

47. The first line item above, the "Total Class Premium," is the *estimated* "Base Premium" to which each of the subsequent multiplicative factors are applied. The Base Premium is calculated in an objective manner by multiplying (a) the amount of estimated payroll for each anticipated type of work to be performed by (b) that type of work's "classification code," a multiplier proposed by Defendant in its public rate filings and required to be approved by the Director. In general, the value of each classification code is based on the risk of the type of work covered by the code. For example, the classification code for an iron worker will carry a significantly higher multiplier than the code associated with a clerical worker. All of the estimated

premium calculated by each classification code is then totaled to create the estimated Total Class Premium / Base Premium. For example, the estimated Base Premium for Plaintiff's 2018 Policy was calculated based on Defendant's determination that the following four classification codes would apply to the following amounts of estimated payroll:

| St Loc | Code No. | Classifications | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|---|
| ILLINOIS 0001-01 | | W E B PRODUCTION & FABRICATION INC<br>FEIN # [redacted]<br>SIC CODE 3446<br>NAIC CODE 332323<br><br>448 N ARTESIAN AVE<br>CHICAGO IL 60612 | | | |
| | 3040 | IRON OR STEEL - FABRICATION - IRONWORKS - SHOP - ORNAMENTAL & DRIVERS. | $ 150,000 | 8.54 | $ 12,810.00 |
| | 5102 | DOOR AND WINDOW INSTALLATION - ALL TYPES - RESIDENTIAL AND COMMERCIAL | $ 275,000 | 12.52 | $ 34,430.00 |
| | 8742 | SALESPERSONS OR COLLECTORS - OUTSIDE | $ 100,000 | .31 | $ 310.00 |
| | 8810 | CLERICAL OFFICE EMPLOYEES NOC | $ 175,000 | .14 | $ 245.00 |

*See* Ex. B at 5.

48. This estimated Base Premium is then multiplied by various factors, including an "experience rating" factor which sets the "Experience Premium,"[9] a "Premium Discount" and the SRM Multiplier at issue here to reach the total estimated premium. *See supra*, ¶ 46.

49. The only factor at issue in this litigation, the SRM Multiplier reflected in the above quote as the estimated "Schedule Modification," *see id.*, resulted in an estimated SRM Charge of

[9] The Experience Premium, also known as the Experience Modification or "xMod," is a mathematical expression of how insureds' prior losses are to be considered in pricing. The xMod is calculated for each insured by the National Council on Compensation Insurance ("NCCI") using a uniform methodology for all Illinois insureds, and Defendant cannot unilaterally change the xMod or use a different amount.

$19,150.00 for the 2018 Policy. *See id.* Using the 2018 Policy as an example, the estimated SRM Charge is calculated by multiplying the SRM Multiplier (1.25 for the 2018 Policy above) by the sum of the "Total Subject Premium" times the "Experience Premium" or "xMod."[10] Then additional multiplicative credits or debits are applied to this sum, resulting in the total estimated premium. *See supra*, ¶ 46.

50. Importantly here, the SRM Multiplier is the *only* component of the estimated total premium that is determined in a purportedly subjective manner and therefore could be manipulated by an unscrupulous insurer to charge insurance premiums at rates they otherwise would not be permitted to charge under approved rate filings. But under the Schedule Rating Plans that Defendant purports to use (but does not), an insured's SRM Multiplier must be solely determined by an underwriter's subjective analysis of a limited set of SRM Factors, and the SRM Factors relate only to certain characteristics of the *insured's* businesses, [redacted]

51. After the applicant receives the quote for review, coverage does not commence until the applicant agrees to the quote and the policy is "bound" by Defendant. At this point the insured still does not know what total premiums they will ultimately pay, including what the final SRM Charges will be, and only knows the estimated charges. This is because, as explained in the Policies, the actual, final premium, and its final components, are not determined until after the policy ends and an audit is conducted: "The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy." Ex. B at 12. The final premium,

---

[10] $49,420 * 1.55 * 1.25.

and its constituent charges, are determined by Defendant using "[i]nformation developed by [an] audit" of "all [the insured's] records that relate to [the] policy." *Id.*

52. Only after a policy has concluded and the audit is conducted is the actual, final SRM Charge calculated in the same manner as for the estimated SRM Charge. The delay and uncertainty in the determination of the ultimate final premium highlights the outsized importance of Defendant lawfully, transparently and correctly calculating all estimated rates and charges at the inception of a policy.[11]

### B. Defendant Falsely Claims to Calculate the SRM Multiplier, and Final SRM Charges, By Using the Method in its Filed and Approved Schedule Rating Plans

53. Defendant has filed various Schedule Rating Plans with the Insurance Department purporting to detail how Defendant will calculate its insureds' SRM Multipliers and consequent final SRM Charges. Each of Defendant's Schedule Rating Plans filed with the Insurance Department since the one effective May 1, 2009, are materially the same as the most recent version effective November 1, 2017, as shown here:

[11] For example, Plaintiff's estimated Base Premium for its 2019 Policy was $42,475.00, while the final post-audit Base Premium ended up being $72,078.00. This means that, due to Defendant's assessment of a 1.25 SRM Multiplier for the policy period, Plaintiff's estimated SRM Charge of approximately $9,880.00 for the 2019 Policy almost doubled into a final SRM Charge of approximately $16,769.00. *See infra*, ¶ 152.

**INSURANCE COMPANY OF THE WEST**
**WORKERS' COMPENSATION SCHEDULE RATING PLAN**
**STATE OF ILLINOIS**

The premium for a risk may be modified in accordance with the following, subject to a maximum modification of plus 75% or minus 50% to reflect characteristics of the risk which distinguish it from average for the classification and/or type of business.

| | Range of Modifications | | |
|---|---|---|---|
| | Credit | | Debit |
| A. Class Fit – How the insured's operations compare to those normally contemplated within their class code(s). | 25% | to | 25% |
| B. Condition of Premises – Judgment based on the condition of the insured's facilities. | 25% | to | 25% |
| C. Risk Management / Safety – Judgment based on measures taken or not taken to effectively control exposures to loss. | 20% | to | 20% |
| D. Employee Benefits – Judgment based on employer provided benefits or lack thereof. | 20% | to | 20% |
| E. Medical Facilities – Judgment based on the proximity of the insured's locations to the nearest medical facility. | 20% | to | 20% |
| F. Wages – Judgment based on comparison of the insured's average paid wages to state-wide average wages for the class code(s). | 20% | to | 20% |
| G. Time in Business – Judgment based on the insured's level of experience and maturity within their industry. | 20% | to | 20% |
| H. Location of Operations – Judgment based on the propensity for an above or below average level of claims litigation at the insured's location. | 20% | to | 20% |
| I. Financial Condition – Judgment based on the strength or weakness of the insured's financial condition. | 20% | to | 20% |
| J. Management – Judgment based on the insured's management attitude towards safety and the relationship they have with their employees. | 25% | to | 25% |

SCHEDULE RATING

1. This plan is available to any risk that meets the minimum manual premium size of $1,500. This plan is effective November 1, 2017 on new and renewal policies incepting on or after that date.

2. The Total Schedule Rating Factor will be applied to an experience rated risk in a multiplicative manner, after application of the experience modification, and before the application of premium discount. (1 + Total Schedule Rating Modification) = Total Schedule Rating Factor.

3. All schedule debits and all schedule credits shall be based on evidence that is contained in the file of the insurer at the time the schedule debit or credit is applied. Such information must be repeated on the schedule rating worksheet. Each policy (either new or renewal) will have a separate evaluation.

4. The effective date of any schedule debit or credit shall not be any date prior to the receipt in the insurer's office of the evidence supporting the debit or credit.

5. The derivation of the schedule factor must be made available to the insured upon request.

54. The Schedule Rating Plans first provide that Defendant "may" apply an SRM

Multiplier (called the "Total Schedule Rating Factor" in the Schedule Rating Plan above) to the premiums of an insured for whom the charge is "available," namely insureds who meet a minimum manual premium size. If Defendant *chooses* to apply an SRM Multiplier to an insured's premiums, the Schedule Rating Plans make clear that Defendant must calculate the SRM Multiplier (and any consequent final SRM Charges) in the exact manner set forth in the Schedule Rating Plans.

55. The Schedule Rating Plans next represent that any SRM Multipliers "will" be calculated by totaling the Schedule Credits and Schedule Debits applied by Defendant's underwriters to each SRM Factor. The SRM Multiplier increases or decreases the total amount of final premium due, all else being equal, depending on whether the SRM Multiplier is positive or negative. For example, if an insured's final Base Premium is $100,000, and they are assigned an SRM Multiplier of 1.50, the insured's final premium (all else again being equal) would be $150,000, with $50,000 of the final premium being attributable to the final SRM Charge. As such, the final SRM Charge can make up a significant portion of the total cost of an insured's final premium. For example, Plaintiff paid Defendant approximately $78,855.00 in final SRM Charges over the four policy periods at issue. *See infra*, ¶¶ 144-64.

56. Each of the Schedule Rating Plans also represent that insureds' SRM Multipliers will be calculated *solely* based on the application of Schedule Credits and Schedule Debits to the ten SRM Factors identified in the Schedule Rating Plans, which consist of limited and defined criteria relating *only* to an insured's *own business and business practices* when compared to other similar businesses. *See id.* Each of the SRM Factors, such as Class Fit,[12] Condition of Premises and Risk Management/Safety, "reflect characteristics of the risk[13] which distinguish it from

[12] "Class Fit" is based on how an insured's operations compare to other businesses whose employees perform similar tasks.

[13] "Risk" is a common term for a potential insured or an insured.

average for the classification and/or type of business."[14] And crucially, under the Schedule Rating Plans the determination of the Schedule Credits and/or Schedule Debits to be applied to any policy must be made *solely* by Defendant's underwriters using their judgment with respect to each narrow SRM Factor.[15]

57. Schedule Credits, somewhat confusingly, are represented by negative percentages and are to be granted when an insured's business or business practices are less likely to incur loss claims than the average similar business with respect to the SRM Factor. For example, if an insured provided employee benefits that were better than what an average similar business provides, the insured should receive a Schedule Credit for the "Employee Benefits" SRM Factor that would, all else being equal, reduce the insured's total final premium by lowering the SRM Multiplier. By contrast, if an insured provided less benefits to its employees than the norm, it should receive a Schedule Debit that would increase its final premium by increasing the SRM Multiplier.[16] To simplify, under the Schedule Rating Plans *better* business practices *decrease* the SRM Multiplier (and consequent final premium).

58. Each Schedule Rating Plan also represents that any Schedule Credits or Schedule Debits applied by Defendant, and the evidence supporting such Schedule Credits and Schedule

---

[14] Each Illinois Schedule Rating Plan since May 1, 2009, lists these same ten SRM Factors.

[15] In Defendant's Amended Responses and Objections to Plaintiff's First Set of Requests for Admission ("RFA Responses," attached as Exhibit G), Defendant admitted that "each SCHEDULE RATING PLAN effective between August 1, 1997 and [the present] required that the SCHEDULE CREDITS and SCHEDULE DEBITS for each SCHEDULE RATING MODIFICATION [Factor] be determined for each POLICY solely based on the judgment of the applicable underwriter(s) of the POLICY." *Id.* at 13-14. For the Court's reference, Plaintiff's First Set of Requests for Admission are attached as Exhibit F.

[16] Under the Schedule Rating Plans an insured could receive an SRM of 1.50 by being assigned total combined Schedule Debits of 50% without any corresponding offsetting Schedule Credits. This could occur, for example, if an insured received a 25% Schedule Debit for "Class Fit" and a 25% Schedule Debit for "Condition of Premises," resulting in a total of 50% Schedule Debits, or a 1.50 SRM.

Debits, "must" be separately recorded on a "Schedule Rating Worksheet." The following exemplar of the Schedule Rating Worksheet was filed by Defendant with its current 2017 Schedule Rating Plan:

**ICW**
**WORKERS' COMPENSATION SCHEDULE RATING WORKSHEET**
**STATE OF ILLINOIS**

INSURED: ______________________ POLICY NUMBER: ______________
POLICY EFFECTIVE DATE: ______________

| | Range of Modifications | | | Schedule Rating Modification |
|---|---|---|---|---|
| | Credit | | Debit | |
| Class Fit<br>Comments: | 25% | To | 25% | |
| Condition of Premises<br>Comments: | 25% | To | 25% | |
| Risk Management / Safety<br>Comments: | 20% | To | 20% | |
| Employee Benefits<br>Comments: | 20% | To | 20% | |
| Medical Facilities<br>Comments: | 20% | To | 20% | |
| Wages<br>Comments: | 20% | To | 20% | |
| Time in Business<br>Comments: | 20% | To | 20% | |
| Location of Operations<br>Comments: | 20% | To | 20% | |
| Financial Condition<br>Comments: | 20% | To | 20% | |
| Management<br>Comments: | 25% | To | 25% | |
| **Total Schedule Rating Modification**<br>**(Maximum modification plus 75% or minus 50%)**<br>**Modification must be rounded to the nearest whole %.** | | | | **0%** |

***If additional space is needed for comments, please attach separate sheet of paper.**

59. Each Schedule Rating Plan filed by Defendant since May 2009 further represent that

a. all Schedule Debits and Schedule Credits applied by Defendant "shall be based on evidence that is contained in the file of the insurer at the time the schedule debit or credit is applied";

b. in determining the Schedule Debits and Schedule Credits for an insured, "[e]ach policy (either new or renewal) will have a separate evaluation"; and

c. "The effective date of any schedule debit or credit shall not be any date prior to the receipt in the insurer's office of the evidence supporting the debit or credit." *See supra*, ¶ 53.

60. Defendant was required by law to calculate any SRM Multipliers, and any consequent final SRM Charges assessed to Plaintiff and the Class, using only the precise methodology in the above Schedule Rating Plans filed with and approved by the Director. Defendant also represented in its Policies with Plaintiff and the Class that it would only charge premiums, and portions of premiums like the final SRM Charge, calculated using proper and lawful methodologies contained in its approved rate filings. *See supra*, ¶¶ 40-43. But as detailed herein, for years Defendant has instead secretly determined the SRM Multipliers and final SRM Charges using the undisclosed and illegal Pretextual Method, which focuses largely on [redacted]

61. As the first of numerous examples of Defendant's internal records documenting its deceptive behavior, the following is [redacted]

17 [redacted]

[redacted]

62. [redacted]

## IV. The Pretextual Method: Defendant's *Actual* Fraudulent Method for Calculating Insureds' SRM Multipliers and Final SRM Charges and Covering it Up

63. From as early as [redacted], Defendant has secretly calculated insureds' SRM Multipliers, and consequent final SRM Charges, using the unfiled and unapproved Pretextual Method instead of the methodology Defendant falsely claims to use in its approved Schedule

Rating Plans. Plaintiff is still seeking to uncover the full details of Defendant's multi-phased Pretextual Method through ongoing discovery. However, Plaintiff herein provides a substantial overview of how Defendant has illegally, and in violation of the Policies, charged Plaintiff and the Class impermissible final SRM Charges using the following complex scheme.

**A. The Purpose of the Pretextual Method**

64. The Pretextual Method [redacted]

65. [redacted]

18 [redacted]

[redacted]

66. [redacted]

[19] [redacted] (Emphasis added).

[redacted]

67. However, this is [redacted] to Defendant's representations in the Schedule Rating Plans and elsewhere that any SRM Multipliers and final SRM Charges would be calculated "solely based on the judgment of" the individual underwriter of the policy – [redacted]:

> **REQUEST FOR ADMISSION NO. 90**
>
> Admit that each SCHEDULE RATING PLAN effective between November 1, 2017 and the present required that the SCHEDULE CREDITS and SCHEDULE DEBITS for each SCHEDULE RATING MODIFICATION CATEGORY be determined for each POLICY solely based on the judgment of the applicable underwriter(s) of the POLICY.
>
> **RESPONSE TO REQUEST FOR ADMISSION NO. 90**
>
> Defendant admits this Request.
>
> **REQUEST FOR ADMISSION NO. 91**
>
> Admit that each SCHEDULE RATING PLAN effective between May 1, 2009 and October 31, 2017 required that the SCHEDULE CREDITS and SCHEDULE DEBITS for each SCHEDULE RATING MODIFICATION CATEGORY be determined for each POLICY solely based on the judgment of the applicable underwriter(s) of the POLICY.
>
> **RESPONSE TO REQUEST FOR ADMISSION NO. 91**
>
> Defendant admits this Request.

Ex. G at 13-14.

68. [redacted]

[redacted]

### B. Steps 1 and 2 of the Pretextual Method: The XLDP [redacted]

69. The first phase of the Pretextual Method involves Defendant [redacted]

#### 1. The Development of the XLDP

70. The initial version of the XLDP [redacted] was

created sometime in 2002. [redacted][20]

71. Defendant's current President and CEO, Kevin Prior, contributed to the creation and development of the XLDP first as a member of the actuarial department, and then after being named CEO in 2004. [redacted]

[redacted]

(Emphasis added).

72. [redacted]

[20] The XLDP has also been referred to as [redacted]. Defendant may have used other programs or methodologies to further the Pretextual Method, and Plaintiff reserves its right to amend its complaint to include any such additional information uncovered through ongoing discovery.

[redacted]

### 2. The Mechanics of the XLDP

73. [redacted]

[redacted]

74. [redacted]

75. [redacted]

---

[redacted]

[redacted]

76. [redacted]

77. [redacted]

78. [redacted] the SRM Multiplier, and the consequent SRM Charge, are the only "flexible" elements of an insured's

---

[22] That case, *Mak Construction Inc. v. Insurance Company of the West*, Case No. 37-2022-00037382-CU-BC-CTL ("*Mak Construction*"), is pending in San Diego Superior Court.

[23] [redacted]

premiums that are not ultimately determined based on objective metrics, like the amount of payroll an insured paid to its employees during a policy period. Therefore, the SRM Multiplier can be improperly and illegally used to [redacted] that otherwise would not be attainable under Defendant's rate filings approved by the Director. [redacted].

79. But as explained herein, the Schedule Rating Plans represent that the SRM Multiplier will only be determined by underwriters and based solely on their assessment of the limited SRM Factors, with [redacted] not being one of them. The Schedule Rating Plans also say nothing about Defendant setting an [redacted]. And as Defendant has *admitted* in this litigation, the Schedule Rating Plans are silent with respect to Defendant's use of the XLDP and application of the Maximum Credit Available to policies:

**REQUEST FOR ADMISSION NO. 267**

Admit that ICW's SCHEDULE RATING PLANS do not disclose the existence of the XLDP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 267**

Defendant admits this Request.

**REQUEST FOR ADMISSION NO. 268**

Admit that ICW's SCHEDULE RATING PLANS| do not disclose ICW's use of the MAXIMUM CREDIT AVAILABLE field.

**RESPONSE TO REQUEST FOR ADMISSION NO. 268**

Defendant admits this Request.

*See* Ex. G at 32.

80. Once the XLPD calculates the Maximum Credit Available, it is provided to Defendant's underwriters through SNAP, the computer program that the underwriters use for various purposes, including quoting and issuing policies. As admitted by Defendant in its RFA Responses, the XLDP "supplied the information that populated the SNAP field labeled 'Maximum Credit Available'" since at least August 2009:

**REQUEST FOR ADMISSION NO. 56**

Admit that between January 1, 2020 and February 29, 2024, the XLDP calculated the MAXIMUM CREDIT AVAILABLE for each APPLICANT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 56**

Defendant admits that xLDP supplied the information that populated the SNAP field labeled "Maximum Credit Available" during this time period. The remainder this Request is denied.

**REQUEST FOR ADMISSION NO. 57**

Admit that between January 1, 2008 and December 31, 2019, the XLDP calculated the MAXIMUM CREDIT AVAILABLE for each APPLICANT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 57**

Defendant admits that xLDP supplied the information that populated the SNAP field labeled "Maximum Credit Available" from August 2009 to December 31, 2019. The remainder of this Request is denied.

Ex. G at 9.

81. Significantly, the Maximum Credit Available, [redacted], is generated by the XLDP *without any input from the underwriters* concerning the appropriate SRM Factors or bases for such factors. In other words, and as admitted by Defendant in its RFA Responses, the XLDP determines the Maximum Credit Available [redacted] before the underwriters even have a chance to consider the appropriate Schedule Credits or Debits to be applied to the appropriate SRM Factors:

**REQUEST FOR ADMISSION NO. 170**

Admit that between January 1, 2020 and February 29, 2024, the XLDP calculated the MAXIMUM CREDIT AVAILABLE for a POLICY prior to ICW's underwriters entering any data for that POLICY into the SCHEDULE RATING WORKSHEET PAGE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 170**

Defendant admits that xLDP supplied the information that populated the SNAP field labeled "Maximum Credit Available" for a policy prior to ICW's underwriters entering data for that policy into the Schedule Rating Worksheet Page in SNAP during this time period. The remainder of this Request is denied.

**REQUEST FOR ADMISSION NO. 171**

Admit that between January 1, 2008 and December 31, 2019, the XLDP calculated the MAXIMUM CREDIT AVAILABLE for a POLICY prior to ICW's underwriters entering any data for that POLICY into the SCHEDULE RATING WORKSHEET PAGE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 171**

Defendant admits that xLDP supplied the information that populated the SNAP field labeled "Maximum Credit Available" for a policy prior to ICW's underwriters entering data for that policy into the Schedule Rating Worksheet Page in SNAP from August 2009 to December 31, 2019. The remainder of this Request is denied.

**REQUEST FOR ADMISSION NO. 173**

Admit that between January 1, 2020 and February 29, 2024, the XLDP calculated the MAXIMUM CREDIT AVAILABLE for a POLICY without taking into account any information for that POLICY entered into the SCHEDULE RATING WORKSHEET PAGE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 173**

Defendant admits that xLDP supplied the information that populated the SNAP field labeled "Maximum Credit Available" for a policy without input of data from the Schedule Rating Worksheet Page. The remainder of this Request is denied.

**REQUEST FOR ADMISSION NO. 174**

Admit that between January 1, 2008 and December 31, 2019, the XLDP calculated the MAXIMUM CREDIT AVAILABLE for a POLICY without taking into account any information for that POLICY entered into the SCHEDULE RATING WORKSHEET PAGE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 174**

Defendant admits that xLDP supplied the information that populated the SNAP field labeled "Maximum Credit Available" for a policy without input of data from the Schedule Rating Worksheet Page from August 2009 to December 31, 2019. The remainder of this Request is denied.

Ex. G at 22-23.

82. [redacted]

[redacted]

83. [redacted]

[redacted]

84. [redacted]

---

24 [redacted]

[redacted]

85. [redacted]

25 [redacted]

26 [redacted] *See supra*, ¶ 38.

[redacted]

86. [redacted]

[redacted]

87. The above processes, including the use of the XLDP, the Maximum Credit Available and SNAP, [redacted].[27]

C. **Step 3 of the Pretextual Method:** [redacted]

88. [redacted]

[27] While Defendant's headquarters are in San Diego, California, it has offices across the country (including Illinois) and employs a single XLDP and SNAP system to write policies for insureds in all states Defendant sells insurance.

[redacted]

89. [redacted]

90. [redacted]

91. [redacted]

28 [redacted]

[redacted]

92. [redacted]

[redacted]

93. [redacted]

[redacted]

[redacted]

94. [redacted]

29 [redacted]

30 [redacted]

[redacted]

**D. Step 4 of the Pretextual Method:** [redacted]

95. [redacted]

[redacted]

**REQUEST FOR ADMISSION NO. 34**

Admit that between January 1, 2020 and February 29, 2024, SNAP did not require ICW's underwriters to complete the SCHEDULE RATING WORKSHEET PAGE before being able to bind a POLICY.

**RESPONSE TO REQUEST FOR ADMISSION NO. 34**

Defendant admits this Request.

**REQUEST FOR ADMISSION NO. 35**

Admit that between January 1, 2008 and December 31, 2019, SNAP did not require ICW's underwriters to complete the SCHEDULE RATING WORKSHEET PAGE before being able to bind a POLICY.

**RESPONSE TO REQUEST FOR ADMISSION NO. 35**

Defendant admits that SNAP did not require its underwriters to complete the schedule rating worksheet page before being able to bind a policy from August 2009 to December 31, 2019. Defendant denies the remainder of this Request.

*See* Ex. G at 5; *see also supra*, ¶ 51 (once policy is bound it is agreed to by the parties).

96. [redacted]:

[redacted]

97. [redacted]

98. [redacted]

[redacted]

99. [redacted]

[31] [redacted]

[redacted]

100. [redacted]

[redacted]

101. [redacted]

[redacted]

102. [redacted]

103. [redacted]

[redacted]

104. [redacted]

105. [redacted]

[redacted]

106. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

107. This comports with what the California Insurance Commissioner found in the *Professional Packers* Decision, that Defendant "pretextually assign[s] ***artificial values not based on any evidence*** to the factors from the [Schedule Rating Plans] ***so that they equal the predetermined [SRM Multipliers]***." Ex. A at 9-10 (emphasis added). The California Insurance Commissioner based this determination not on any understanding or awareness of the XLDP or the Maximum Credit Available [redacted], but instead on the admission of Stacey McAdam during her sworn testimony in the proceedings that:

> typically what we do is we -- in this case, let's say, *we have the 41 scheduling rating factor* on Pro Pack for the 2016 year, what we would have done is we would have ***arrived at our pricing***, *the plus 41 in this case*, the surcharge of 41. And ***then*** what we do with [the Schedule Rating Plan] is we look at what supporting documentation do we have in our file that ***supports our reason for debiting the account the plus 41*** instance.

(Emphasis added). What McAdam describes here is the third and fourth steps of the Pretextual Method described herein.

108. The California Insurance Commissioner concluded as a matter of law that Defendant's actions violated the California Insurance Code, because, *inter alia,* "[California]

Insurance Code section 11735[32] and the policy behind it required that [Defendant] file the methodology it uses to determine the [SRM Multiplier]. The statute does not permit [Defendant] to *file one process and instead use another unfiled method*." Ex. A at 14 (emphasis added). The California Insurance Commissioner held that the final SRM Charges were unlawful and void, and accordingly severed the final SRM Charge from Professional Packers' policy. *See id.* at 20. Defendant did not appeal the decision.[33]

109. Defendant reiterated its true method of calculating the SRM Multipliers nationwide in its post-hearing brief in the *Professional Packers* matter, where Defendant explained that it assigned Professional Packers an SRM Multiplier of 41 by using the "*exact same process* ***for all policyholders***": Defendant "*determined premium* by looking at the most recent *4 years of loss experience* giving more weight to the last year, the *total number of claims*, the *total number of indemnity claims*, the payroll, the *adequacy of the experience modification* and the class fit." (Emphasis added).

---

[32] Section 11735(a) of the California Insurance Code requires that "[e]very insurer shall file with the commissioner all rates and supplementary rate information that are to be used in this state." Section 11735(b) mandates in pertinent part that "[a]ll rates, supplementary rate information, and any supporting information for rates filed under this article, as soon as filed, shall be open to public inspection at any reasonable time." Section 11730 of the Insurance Code defines "supplementary rate information" to include any "minimum premium, policy fee, rating rule, rating plan, and any other similar information needed to determine the applicable premium for an insured." In other words, all information necessary for an insured to determine (or later confirm) the precise manner in which their premium was calculated is "supplementary rate information," and therefore must be filed with the California Insurance Commissioner under Section 11735(a), and open to public inspection under Section 11735(b).

These provisions of the California Insurance Code mirror provisions of the Illinois laws and Administrative Code provisions cited herein including 215 ILCS 5/457(1), which requires insurers to prefile "every manual of classifications, every manual of rules and rates, every *rating plan* and every modification of the foregoing *which it intends to use*." *Id.* (emphasis added).

[33] Upon information and belief, the *Professional Packers* Decision has not been made available to the public through the CDI's website and is only able to be obtained through a public records request to the CDI.

110. As discussed further *infra*, ¶¶ 116-17, after the California Insurance Commissioner issued the *Professional Packers* Decision, [redacted]

111. [redacted]

112. [redacted]

---

34 [redacted]

[redacted]

113. [redacted]

114. [redacted]

[redacted]

115. [redacted]

[redacted]

116. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

117. [redacted]

[redacted]

[redacted]

[redacted]

118. [redacted]

119. [redacted]

120. [redacted]

[redacted]

121. [redacted]

[redacted]

122. [redacted]

123. [redacted]

[redacted]

124. [redacted]

[redacted].[35]

[redacted]

125. [redacted]

[35] [redacted] *See infra*, ¶¶ 172-75.

[redacted]

126. [redacted]

[redacted]

127. Defendant has never made any effort to create systems, or train its underwriters, to determine the SRM Factors, and consequent SRM Multipliers, by using the methodology in its approved Schedule Rating Plans.

**E. Additional Evidence of Defendant's Efforts to Fraudulently Conceal its Use of the Pretextual Method from Insureds and Regulators**

128. Defendant's records provide additional evidence of its strenuous efforts over many years to fraudulently conceal its use of the Pretextual Method from its insureds and regulators. For example, [redacted]

[redacted]

[redacted]

129. [redacted]

[redacted]

130. [redacted]

36 [redacted]

[redacted]

131. [redacted]

[redacted]

132. [redacted]

[redacted]

133. [redacted]

37 [redacted]

[redacted]

[redacted]

[redacted]

134. [redacted]

[redacted]

[redacted]

135. [redacted]

38 [redacted]

39 [redacted]

40 [redacted]

[redacted]

136. [redacted]

41 [redacted]

[redacted]

137. [redacted]

[42] Plaintiff is unaware of Defendant having submitted any proposed Schedule Rating Plans in any state that disclose [redacted] or that disclose any other aspect of the Pretextual Method.

138. [redacted] Defendant has since *admitted* in this litigation that, during the putative class period, (a) prospective insureds' prior loss history was considered by the XLDP in its calculations generally and in calculating the Maximum Credit Available; and (b) prospective insureds' SRM Multipliers and Maximum Credits Available were determined, in part, based on their prior loss history:

**REQUEST FOR ADMISSION NO. 59**

Admit that between January 1, 2020 and February 29, 2024, the XLDP considered APPLICANTS' loss history in its calculations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 59**

Defendant admits this Request.

**REQUEST FOR ADMISSION NO. 60**

Admit that between January 1, 2008 and December 31, 2019, the XLDP considered APPLICANTS' loss history in its calculations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 60**

Defendant admits that xLDP considered Applicant's loss history in its calculations from August 2009 to December 31, 2019. Defendant denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 62**

Admit that between January 1, 2020 and February 29, 2024, the XLDP considered APPLICANTS' loss history in calculating the MAXIMUM CREDIT AVAILABLE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 62**

Defendant admits this Request.

**REQUEST FOR ADMISSION NO. 63**

Admit that between January 1, 2008 and December 31, 2019, the XLDP considered APPLICANTS' loss history in calculating the MAXIMUM CREDIT AVAILABLE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 63**

Defendant admits that xLDP considered Applicants' loss history in calculating the maximum credit available from August 2009 to December 31, 2019. Defendant denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 80**

Admit that between January 1, 2020 and February 29, 2024, an APPLICANT'S SCHEDULE RATING MODIFICATION was determined, in part, based on the APPLICANT'S loss history.

**RESPONSE TO REQUEST FOR ADMISSION NO. 80**

Defendant admits this Request.

**REQUEST FOR ADMISSION NO. 81**

Admit that between January 1, 2008 and December 31, 2019, an APPLICANT'S SCHEDULE RATING MODIFICATION was determined, in part, based on the APPLICANT'S loss history.

**RESPONSE TO REQUEST FOR ADMISSION NO. 81**

Defendant admits that an Applicant's Schedule Rating Modification was determined, in part, based on the Applicant's loss history from August 2009 to December 31, 2019. Defendant denies the remainder of this Request.

> **<u>REQUEST FOR ADMISSION NO. 83</u>**
>
> Admit that between January 1, 2020 and February 29, 2024, an APPLICANT'S MAXIMUM CREDIT AVAILABLE was determined, in part, based on the APPLICANT'S loss history.
>
> **<u>RESPONSE TO REQUEST FOR ADMISSION NO. 83</u>**
>
> Defendant admits this Request.
>
> **<u>REQUEST FOR ADMISSION NO. 84</u>**
>
> Admit that between January 1, 2008 and December 31, 2019, an APPLICANT'S MAXIMUM CREDIT AVAILABLE was determined, in part, based on the APPLICANT'S loss history.
>
> **<u>RESPONSE TO REQUEST FOR ADMISSION NO. 84</u>**
>
> Defendant admits that an applicant's maximum credit available was determined, in part, based on the applicant's loss history from August 2009 to December 31, 2019. Defendant denies the remainder of this Request.

*See* Ex. G at 10-11, 12-13.

139. As none of Defendant's Schedule Rating Plans stated or disclosed that it would consider a prospective insured's prior loss history as an SRM Factor in determining the insured's SRM Multiplier (or consequent final SRM Charges), [redacted].

140. Finally, as detailed *infra*, ¶¶ 165-87, [redacted]

### F. Defendant Violated Various Insurance Code Provisions by Using the Undisclosed Pretextual Method

141. Defendant violated 215 ILCS 5/457 by using the secret, unfiled and unapproved Pretextual Method to determine Plaintiff's and the Class Members' SRM Multipliers and final SRM Charges. *See* 215 ILCS 5/457(1) ("Every company shall prefile with the Director every manual of classifications, every manual of rules and rates, every rating plan and every modification of the foregoing which it intends to use."); 215 ILCS 5/457(4) (a "filing shall not be *effective nor used until approved* by the Director."). *See also* 50 Ill. Adm. Code 2902.30 ("workers' compensation insurers "shall file the following materials with the Illinois Department of Insurance . . . All Manuals -- Every manual of classifications, every manual of rules, every rating plan, every *schedule rating plan* . . . and every modification of any such manual or plan used in this State or intended for use in this State.") (emphasis added).

142. Defendant also violated additional insurance statutes through its misrepresentations discussed herein, including in its Policies and the Schedule Rating Plans, and through its attempts to conceal its true illegal actions. *See* 215 ILCS 5/467 ("No person, company or organization shall willfully withhold information from, or knowingly give false or misleading information to the Director, any statistical agency designated by the Director, any rating organization, or any company which will affect the rates or premiums chargeable under this Article."); 215 ILCS 5/149(1) ("No [insurance] company doing business in this State, and no officer, director, agent, clerk or employee thereof, broker, or any other person, shall make, issue or circulate or cause or knowingly permit to be made, issued or circulated any estimate, illustration, circular, or verbal or written statement of any sort misrepresenting the terms of any policy issued or to be issued by it or any other company or the benefits or advantages promised thereby.").

143. To be clear, Plaintiff does not allege that the *content* of the Schedule Rating Plans

Defendant *actually filed* with the Director (and which were approved by the Director) was illegal. In other words, Plaintiff does not challenge the legality of any rate filings submitted by Defendant. Instead, Plaintiff's allegations concern the fact that Defendant intentionally chose *not* to implement the methodology in its Schedule Rating Plans, and instead secretly use an entirely different illegal, undisclosed and unapproved method (the Pretextual Method) to calculate the SRM Multipliers, and consequent final SRM Charges, of Plaintiff and the Class.

## V. Facts Specific to Plaintiff Including Defendant's Fraudulent Manipulation of Plaintiff's Records

### A. Defendant Charged Plaintiff Illegal and Improper Premiums

#### 1. 2018 Policy

144. Defendant offered Plaintiff the 2018 Policy with a total estimated premium of $89,280.00. *See* Ex. B at 6. The policy provided, and Plaintiff understood in agreeing to the policy, that this would not be the final price of the policy, but that instead the final premium due would be based on Defendant's audit of "all [Plaintiff's] records that relate to [the] policy." *Id.* at 12.

145. The 2018 Policy's initial total estimated premium of $89,280.00 was calculated based on an initial estimated Base Premium of $47,795.00. *See id.* at 6. The 2018 Policy provided that one part of the total estimated premium, the estimated SRM Charge, would be calculated based on an SRM Multiplier of 1.25. *See id.* Defendant determined this SRM Multiplier by using the undisclosed and illegal Pretextual Method and not, as mandated by the 2018 Policy, by using any of Defendant's "manuals of rules, rates, rating plans and classifications" filed with the Insurance Department and approved by the Director, and determined using the "proper classifications and rates that lawfully apply to" Plaintiff. Id. at 12.

146. Of the 2018 Policy's initial total estimated premium of $89,280.00, approximately

$17,583.00 was attributable to Defendant's application of the 1.25 SRM Multiplier.

147. On July 16, 2019, Defendant completed its final audit of the 2018 Policy. *See* Exhibit H. Using its audited payroll figures, classification codes, assessments and surcharges, Defendant charged Plaintiff a final total premium of $74,254.00, with a final SRM Charge of approximately $14,577.00 attributable to the application of the 1.25 SRM Multiplier. *See id.* at 2-3.

148. Plaintiff paid Defendant the full final premium charged for the 2018 Policy, including the approximately $14,577.00 final SRM Charge attributable to the application of the 1.25 SRM Multiplier. This final SRM Charge was calculated using the undisclosed and illegal Pretextual Method and not, as mandated by the 2018 Policy, by using any of Defendant's "manuals of rules, rates, rating plans and classifications" filed with the Insurance Department and approved by the Director, and determined using the "proper classifications and rates that lawfully apply to" Plaintiff. *Id.* at 12. Accordingly, under the 2018 Policy Defendant was not permitted to charge Plaintiff this final SRM Charge, and Plaintiff did not agree to pay this charge. Furthermore, under the 2018 Policy, Defendant agreed to refund any final premium charged, like the final SRM Charge here, that were not calculated based on Defendant's approved rate filings or by using "proper classifications and rates that lawfully apply to" Plaintiff. *Id.*

**2. 2019 Policy**

149. Defendant offered Plaintiff the 2019 Policy with a total estimated premium of $50,764.00. *See* Exhibit C at 4. The policy provided, and Plaintiff understood in agreeing to the policy, that this would not be the final price of the policy, but that instead the final premium due would be based on Defendant's audit of "all [Plaintiff's] records that relate to [the] policy." *Id.* at 10.

150. The 2019 Policy's initial total estimated premium of $50,764.00 was calculated based on an initial estimated Base Premium of $42,475.00. *See id.* at 4. The 2019 Policy provided that one part of the total estimated premium, the estimated SRM Charge, would be calculated based on an SRM Multiplier of 1.25. *See id.* Defendant determined this SRM Multiplier by using the undisclosed and illegal Pretextual Method and not, as mandated by the 2019 Policy, by using any of Defendant's "manuals of rules, rates, rating plans and classifications" filed with the Insurance Department and approved by the Director, and determined using the "proper classifications and rates that lawfully apply to" Plaintiff. *Id.* at 10.

151. Of the 2019 Policy's initial total estimated premium of $50,764.00, approximately $9,880.00 was attributable to Defendant's application of the 1.25 SRM Multiplier.

152. On April 15, 2020, Defendant completed its final audit of the 2019 Policy. *See* Exhibit I. Using its audited payroll figures, classification codes, assessments and surcharges, Defendant charged Plaintiff a final total premium of $85,446.00, with a final SRM Charge of approximately $16,769.00 attributable to the application of the 1.25 SRM Multiplier. *See id.* at 2-3.

153. Plaintiff paid Defendant the full final premium charged for the 2019 Policy, including the approximately $16,769.00 final SRM Charge attributable to the application of the 1.25 SRM Multiplier. This final SRM Charge was calculated using the undisclosed and illegal Pretextual Method and not, as mandated by the 2019 Policy, by using any of Defendant's "manuals of rules, rates, rating plans and classifications" filed with the Insurance Department and approved by the Director, and determined using the "proper classifications and rates that lawfully apply to" Plaintiff. *Id.* at 10. Accordingly, under the 2019 Policy Defendant was not permitted to charge Plaintiff this final SRM Charge, and Plaintiff did not agree to pay this charge. Furthermore, under

the 2019 Policy, Defendant agreed to refund any final premium charged, like the final SRM Charge here, that were not calculated based on Defendant's approved rate filings or by using "proper classifications and rates that lawfully apply to" Plaintiff. *Id.*

**3. 2021 Policy**

154. Defendant offered Plaintiff the 2021 Policy with a total estimated premium of $78,809.00. *See* Exhibit D at 6. The policy provided, and Plaintiff understood in agreeing to the policy, that this would not be the final price of the policy, but that instead the final premium due would be based on Defendant's audit of "all [Plaintiff's] records that relate to [the] policy." *Id.* at 12.

155. The 2021 Policy's initial total estimated premium of $78,809.00 was calculated based on an initial estimated Base Premium of $39,606.00. *See id.* at 4. The 2021 Policy provided that one part of the total estimated premium, the estimated SRM Charge, would be calculated based on an SRM Multiplier of 1.70. *See id.* Defendant determined this SRM Multiplier by using the undisclosed and illegal Pretextual Method and not, as mandated by the 2021 Policy, by using any of Defendant's "manuals of rules, rates, rating plans and classifications" filed with the Insurance Department and approved by the Director, and determined using the "proper classifications and rates that lawfully apply to" Plaintiff. *Id.* at 12.

156. Of the 2021 Policy's initial total estimated premium of $78,809.00, approximately $31,847.00 was attributable to Defendant's application of the 1.70 SRM Multiplier.

157. On June 13, 2022, Defendant completed its final audit of the 2021 Policy. *See* Exhibit J. Using its audited payroll figures, classification codes, assessments and surcharges, Defendant charged Plaintiff a final total premium of $67,785.00, with a final SRM Charge of approximately $27,345.00 attributable to the application of the 1.70 SRM Multiplier. *See id.* at 2-

3.

158. Plaintiff paid Defendant the full final premium charged for the 2021 Policy, including the approximately $27,345.00 final SRM Charge attributable to the application of the 1.70 SRM Multiplier. This final SRM Charge was calculated using the undisclosed and illegal Pretextual Method and not, as mandated by the 2021 Policy, as mandated by the 2019 Policy, by using any of Defendant's "manuals of rules, rates, rating plans and classifications" filed with the Insurance Department and approved by the Director, and determined using the "proper classifications and rates that lawfully apply to" Plaintiff. *Id.* at 12. Accordingly, under the 2021 Policy Defendant was not permitted to charge Plaintiff this final SRM Charge, and Plaintiff did not agree to pay this charge. Furthermore, under the 2021 Policy, Defendant agreed to refund any final premium charged, like the final SRM Charge here, that were not calculated based on Defendant's approved rate filings or by using "proper classifications and rates that lawfully apply to" Plaintiff. *Id.*

**4. 2022 Policy**

159. Defendant offered Plaintiff the 2022 Policy with a total estimated premium of $49,862.00. *See* Ex. E at 6. The policy provided, and Plaintiff understood in agreeing to the policy, that this would not be the final price of the policy, but that instead the final premium due would be based on Defendant's audit of "all [Plaintiff's] records that relate to [the] policy." *Id.* at 12.

160. The 2022 Policy's initial total estimated premium of $49,862.00 was calculated based on an initial estimated Base Premium of $26,013.00. *See id.* at 6. The 2022 Policy provided that one part of the total estimated premium, the estimated SRM Charge, would be calculated based on an SRM Multiplier of 1.50. *See id.* Defendant determined this SRM Multiplier by using the

undisclosed and illegal Pretextual Method and not, as mandated by the 2022 Policy, by using any of Defendant's "manuals of rules, rates, rating plans and classifications" filed with the Insurance Department and approved by the Director, and determined using the "proper classifications and rates that lawfully apply to" Plaintiff. *Id.* at 12.

161. Of the 2022 Policy's initial total estimated premium of $49,862.00, approximately $16,175.00 was attributable to Defendant's application of the 1.50 SRM Multiplier.

162. On May 11, 2023, Defendant completed its final audit of the 2022 Policy. *See* Exhibit K. Using its audited payroll figures, classification codes, assessments and surcharges, Defendant charged Plaintiff a final total premium of $61,829.00, with a final SRM Charge of approximately $20,164.00 attributable to the application of the 1.50 SRM Multiplier. *See id.* at 2-3.

163. Plaintiff paid Defendant the full final premium charged for the 2022 Policy, including the approximately $20,164.00 final SRM Charge attributable to the application of the 1.50 SRM Multiplier. This final SRM Charge was calculated using the undisclosed and illegal Pretextual Method and not, as mandated by the 2022 Policy, as mandated by the 2019 Policy, by using any of Defendant's "manuals of rules, rates, rating plans and classifications" filed with the Insurance Department and approved by the Director, and determined using the "proper classifications and rates that lawfully apply to" Plaintiff. *Id.* at 12. Accordingly, under the 2022 Policy Defendant was not permitted to charge Plaintiff this final SRM Charge, and Plaintiff did not agree to pay this charge. Furthermore, under the 2022 Policy, Defendant agreed to refund any final premium charged, like the final SRM Charge here, that were not calculated based on Defendant's approved rate filings or by using "proper classifications and rates that lawfully apply to" Plaintiff. *Id.*

164. In total, Defendant has charged Plaintiff approximately $78,855.00 in illegal premiums not permitted to be charged under the Policies or the Schedule Rating Plans due to Defendant's unlawful use of the secret Pretextual Method to determine Plaintiff's SRM Multiplier, final SRM Charges and consequent final premiums.

**B. Defendant's Fraudulent Manipulation of [redacted]**

165. [redacted] These actions provide yet more evidence that Defendant knew its use of the Pretextual Method was improper and illegal.

166. On February 15, 2022, Plaintiff's President Maureen Kendziera sent Defendant a request for the Schedule Rating Worksheets for each of Plaintiff's policies. Plaintiff was entitled to a full explanation of how the SRM Multipliers (and consequent SRM Charges) were calculated for each of its Policies. *See, e.g., supra*, ¶ 53 (Schedule Rating Plans provide that "[t]he derivation of the schedule factor must be made available to the insured upon request.").

167. Despite the simple nature of Plaintiff's request, [redacted]

[redacted]

168. [redacted]

### 1. 2018 Policy

169. [redacted]

170. [redacted]

171. [redacted]

172. [redacted]

[43] The XLDP set the Maximum Credit Available for the 2018 Policy at 23, which means that the underwriter would not be permitted to issue a quote for the policy unless the SRM Multiplier was at or above 1.23.

[redacted]

[redacted]

173. Following Kendziera's February 15, 2022 request for the Schedule Rating Worksheets, [redacted]

[redacted]

174. [redacted]

[redacted]

175. [redacted]

176. [redacted]

[redacted]

177. [redacted]

### 2. 2019 Policy

178. [redacted]

179. [redacted]

44 [redacted]

[redacted]

180. Following Kendziera's February 15, 2022, request for the Schedule Rating Worksheets, [redacted]

**3. 2021 Policy**

181. [redacted]

[redacted]

182. [redacted]

183. Following Kendziera's February 15, 2022 request for the Schedule Rating Worksheets, [redacted]:

[redacted]

45 [redacted]

[redacted]

### 4. 2022 Policy

184. [redacted]

46 [redacted]

[redacted]

185. [redacted]

186. Following Kendziera's February 15, 2022 request for the Schedule Rating Worksheets, [redacted]

[redacted]

187. The Schedule Rating Worksheets Defendant sent Kendziera for the Policies reflected only [redacted]. Accordingly, if Plaintiff did not [redacted].

## CLASS ALLEGATIONS

188. Plaintiff brings this action, individually and on behalf of a class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3) and/or 23(c)(4). The Class is defined as follows:

**All Illinois insureds of Defendant whose workers' compensation insurance premiums were calculated by Defendant using a Schedule Rating Modification Multiplier above 1.00 for any policies processed manually and effective on or after August 1, 2009.**

189. Excluded from the Class are Defendant; Defendant's employees and agents; any judge conducting proceedings in this action and the judge's parents, spouses and children as well as any other member of the judge's family residing in the judge's household; counsel of record in this action and their parents, spouses and children as well as any other member of counsel's family residing in counsel's household; counsel's employees; and the legal representatives, heirs, successors and assigns of any excluded person.

190. Subject to additional information obtained through further investigation and discovery, Plaintiff reserves the right to modify, change or expand the definition of the Class as appropriate, including through the use of subclasses and Rule 23(c)(4) issues classes.

191. **Numerosity:** The exact number of the members of the Class is not presently known but is so numerous that joinder of individual members is this action is impracticable. Based on the nature of the activities alleged, Plaintiff believes that the members of the class number in the thousands.

192. Class members are readily identifiable from information and records in possession, custody, or control of Defendant and the Class members.

193. **Commonality:** There are numerous issues of law and fact common to Plaintiff and Class Members that predominate over any issue affecting only individual class members. Resolving these common issues will advance resolution of the litigation for all class members. These common issues of law and fact include, but are not limited to, the following:

a. Whether Defendant filed the Pretextual Method with the Insurance Department;

b. Whether Defendant publicly disclosed its use of the Pretextual Method;

c. Whether the Director approved Defendant's use of the Pretextual Method;

d. Whether Defendant violated 215 ILCS 5/457 by failing to file the Pretextual Method with the Insurance Department;

e. Whether Defendant violated 215 ILCS 5/457 by failing to publicly disclose its use of the Pretextual Method;

f. Whether Defendant violated 215 ILCS 5/457 by hiding the true methodology it used to determine the SRM Multipliers, and consequent final SRM Charges, of Plaintiff and the Class;

g. Whether Defendant violated 215 ILCS 5/457 by using the Pretextual Method without it being approved by the Director;

h. Whether Defendant violated 50 Ill. Adm. Code 2902.30 by failing to file the Pretextual Method with the Insurance Department;

i. Whether Defendant violated 50 Ill. Adm. Code 2902.30 by failing to publicly disclose its use of the Pretextual Method;

j. Whether Defendant violated 50 Ill. Adm. Code 2902.30 by hiding the true methodology it used to determine the SRM Multipliers, and consequent final SRM Charges, of Plaintiff and the Class;

k. Whether Defendant violated 215 ILCS 5/467 by knowingly give false or misleading information to the Director;

l. Whether Defendant violated 215 ILCS 5/467 by filing Schedule Rating Plans with the Insurance Department that Defendant did not use, or intend to use, to calculate the SRM Multipliers, and consequent final SRM Charges, of Plaintiff and the Class;

m. Whether Defendant violated 215 ILCS 5/467 by failing to file the Pretextual Method with the Insurance Department;

n. Whether Defendant violated 215 ILCS 5/467 by failing to publicly disclose its use of the Pretextual Method;

o. Whether Defendant violated 215 ILCS 5/467 by hiding the true methodology it used to determine the SRM Multipliers, and consequent final SRM Charges, of Plaintiff and the Class;

p. Whether Defendant violated 215 ILCS 5/149(1) by making, issuing, or circulating, or causing or knowingly permitting to be made, issued or circulated, any verbal or written statement of any sort misrepresenting the terms of its Policies with Plaintiff or the Class or the benefits or advantages promised thereby;

q. Whether Defendant violated 215 ILCS 5/149(1) by filing Schedule Rating Plans with the Insurance Department that Defendant did not use, or intend to use, to calculate the SRM Multipliers, and consequent final SRM Charges, of Plaintiff and the Class;

r. Whether Defendant violated 215 ILCS 5/149(1) by failing to file the Pretextual Method with the Insurance Department;

s. Whether Defendant violated 215 ILCS 5/149(1) by failing to publicly disclose its use of the Pretextual Method;

t. Whether Defendant violated 215 ILCS 5/149(1) by hiding the true methodology it used to determine the SRM Multipliers, and consequent final SRM Charges, of Plaintiff and the Class;

u. Whether Defendant breached its contracts for insurance with Plaintiff and the Class through its conduct;

v. Whether Defendant violated the ICFA through its deceptive conduct;

w. Whether Defendant violated the ICFA through unfair practices that offend public policy;

x. Whether Defendant violated the ICFA through unfair practices that are immoral, unethical, oppressive, or unscrupulous;

y. Whether Defendant violated the ICFA through unfair practices that have caused substantial injury to consumers;

z. Whether Defendant's actions constitute fraudulent concealment;

aa. Whether Defendant's actions constitute fraud;

bb. Whether Defendant concealed its improper and illegal actions from members of the Class;

cc. The proper measure and type of restitution and/or damages for each claim, including whether punitive damages are appropriate; and

dd. Whether Plaintiff and the Class are entitled to an award of attorneys' fees and costs.

194. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class in that Plaintiff, like all members of the Class, has been charged illegal insurance premiums by Defendant through its use of the Pretextual Method. Plaintiff, like all members of the Class,

was damaged by Defendant's misconduct and suffered actual damages as a result of Defendant's illegal scheme. Furthermore, the factual bases of Defendant's misconduct are common to Plaintiff and the Class, and represent a common thread of misconduct resulting in injury to all members of the Class. Plaintiff has the same interest in this matter as all members of the Class, and Plaintiff's claims arise out of the same set of facts and conduct as the claims of all members of the Class.

195. **Adequacy:** Plaintiff has no interests that conflict with the interests of the Class, understands and appreciates its duties to the Class, and is committed to pursuing this action vigorously on behalf of the Class. Plaintiff has also retained counsel that are competent and experienced in complex consumer class action litigation and insurance law. Accordingly, Plaintiff and its counsel will fairly and adequately protect the interests of the Class. If necessary, Plaintiff may seek leave of the Court to amend this complaint in order to (a) include additional representatives to represent the Class; (b) include additional claims as may be appropriate; and/or (c) amend the definition of the Class or propose subclasses or Rule 23(c)(4) Issues classes.

196. **Superiority:** A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual member of the Class is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for individual members of the Class to effectively redress the wrongs done to them. And even if the members of the Class could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and

provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

197. **23(c)(4) Issues Class**: In the alternative to the certification of a class action pursuant to Rule 23(b)(3), numerous common issues raised by Plaintiff's claims are also appropriate for classwide resolution pursuant to Rule 23(c)(4), including but not limited to (a) Defendant's liability to the Class for breach of contract; (b) Defendant's liability to the Class for violations of the ICFA; (c) whether Defendant's conduct amounts to fraud on the Class and/or fraudulent concealment; and (d) the appropriate measures of classwide damages or other remedies. A class action is the most efficient method of resolving these issues, and their resolution would materially advance the disposition of this case as a whole.

## TOLLING, CONCEALMENT AND ESTOPPEL

198. Any statute of limitation applicable to Plaintiff's or the Class members' claims are tolled as a result of Defendant's knowing, active and fraudulent concealment of its conduct alleged herein.

199. Defendant has actively and vigorously concealed, and continues to conceal, the true manner by which it determined insureds' SRM Multipliers, and consequent final SRM Charges, through the illegal Pretextual Method. As part of this deception Defendant has misrepresented to Plaintiff and the Class, in their Policies and elsewhere, that their SRM Multipliers, and consequent final SRM Charges, would be, and were, calculated in the lawful manner identified in Defendant's Schedule Rating Plans filed with, and approved by, the Director, and as also required by Defendant's policies with Plaintiff and the Class.

200. Plaintiff and the Class were not aware of Defendant's illegal and fraudulent conduct described herein, including the true methodology Defendant used to determine their SRM

Multipliers and consequent final SRM Charges, the Pretextual Method, at the time they agreed to the Policies.

201. Plaintiff and the Class did not have the information necessary to pursue their claims, without any fault or lack of diligence on their own part.

202. Under the circumstances, Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiff and the Class. Instead, as detailed herein, Defendant has made extensive efforts to conceal its prior and continuing use of the Pretextual Method. Defendant is therefore estopped from relying on any statute of limitations.

203. All applicable statutes of limitations have been tolled by operation of the Discovery Rule. Plaintiff and other members of the Class could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein, including Defendant's secret use of the undisclosed Pretextual Method; and its failure to use the methodology it represented it would use in the Schedule Rating Plans and in its Policies with Plaintiff and the Class.

204. Plaintiff did not discover the basic outlines of Defendant's illegal and fraudulent conduct described herein until February 2022 during the course of Plaintiff's and its counsel's investigation into the bases for the SRM Multipliers, and consequent final SRM Charges, Plaintiff was assessed by Defendant. Plaintiff had no way to learn through reasonable diligence about Defendant's illegal and fraudulent conduct described herein prior to Plaintiff's discovery of the basic outlines of Defendant's illegal and fraudulent acts in February 2022. Until this date, Plaintiff did not have sufficient information concerning its injury, and the cause of its injury, to put a reasonable person on inquiry to determine whether actionable conduct had occurred.

205. Information about Defendant's secret use of the Pretextual Method in calculating the SRM Multipliers, and consequent final SRM Charges, of its Illinois insureds could not have

become known to the other members of the Class until approximately September 13, 2023, when Plaintiff initially filed this action in Illinois State Court. The other members of the Class had no way to learn through reasonable diligence about Defendant's secret use of the Pretextual Method prior to Plaintiff's filing of the complaint. Until approximately September 13, 2023, members of the Class did not have sufficient information concerning their injuries, and the causes of their injuries, sufficient to allow a reasonable person to determine whether actionable conduct had occurred.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

206. Plaintiff incorporates the allegations in paragraphs 1 to 205 as if fully set forth herein.

207. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

208. Plaintiff and the Class entered into binding contracts with Defendant for it to provide workers' compensation insurance to Plaintiff and the Class (the Policies).

209. These standard form contracts each include the following provisions that Defendant has breached with respect to Plaintiff and the Class.

210. **First**, each policy contains the "Disclosure Provision" representing that "*[a]ll* premium for this policy *will be* determined by our manuals of *rules*, *rates*, *rating plans* and classifications. We *may change our manuals* and apply the changes to this policy *if authorized by law or a governmental agency regulating this insurance*." Ex. B at 12 (emphasis added).

211. As detailed herein, Defendant breached this provision of the Policies by charging Plaintiff and the Class final SRM Charges based on SRM Multipliers that were *not* determined by

Defendant's "manuals of rules, rates, rating plans and classifications" filed with and approved by the Director, including Defendant's Schedule Rating Plans that purported to provide the methodology by which any SRM Multipliers would be calculated, but in fact did not.

212. Had Defendant complied with this provision and *only* charged Plaintiff and the Class final SRM Charges based on Defendant's "manuals of rules, rates, rating plans and classifications" filed with and approved by the Director, Defendant would not and could not have charged Plaintiff and the Class the final SRM Charges because they were based on an SRM Multiplier *not* determined by Defendant's "manuals of rules, rates, rating plans and classifications" filed with and approved by the Director. Moreover, because Defendant *chose* not to determine the SRM Multiplier based on its "manuals of rules, rates, rating plans and classifications" filed with and approved by the Director, Defendant waived any entitlement under the Policies to later assess Plaintiff and the Class the final SRM Charges. Therefore, Plaintiff and the Class would have been charged, and would have paid, less final premium than Plaintiff and the Class have been charged due to Defendant' breach of this provision.

213. Furthermore, under this provision Plaintiff and the Class explicitly agreed to *only* pay final premiums, including final SRM Charges, that were determined based on Defendant's "manuals of rules, rates, rating plans and classifications" filed with and approved by the Director. At the same time, Plaintiff and the Class *explicitly disclaimed* any obligation to pay any final premiums, including final SRM Charges, that were *not* determined by Defendant's "manuals of rules, rates, rating plans and classifications" filed with and approved by the Director. Accordingly, because Defendant declined to determine the final SRM Charges based on its "manuals of rules, rates, rating plans and classifications" filed with and approved by the Director as required by the Policies, under the Policies Plaintiff and the Class are not obligated to pay *any* final SRM Charges,

and Defendant is not permitted to charge Plaintiff or the Class the final SRM Charges.

214. **Second,** each policy contains the "Lawful Provision" representing that "[t]he premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the *proper* classifications *and rates* that *lawfully apply* to the business and work covered by this policy." Ex. B at 12 (emphasis added).

215. As detailed herein, Defendant breached this provision of the Policies by charging Plaintiff and the Class final SRM Charges that were *not* determined using proper classifications and rates that lawfully apply to Plaintiff and the Class for the numerous reasons detailed herein, including because Defendant instead used the unlawful, unfiled and unapproved Pretextual Method.

216. Had Defendant complied with this provision and *only* charged Plaintiff and the Class final SRM Charges that were determined using proper classifications and rates that lawfully apply to Plaintiff and the Class, Defendant would not and could not have charged Plaintiff and the Class the final SRM Charges because they were *not* determined using proper classifications and rates that lawfully apply to Plaintiff and the Class. Moreover, because Defendant *chose* not to determine the final STM Charges using proper classifications and rates that lawfully apply to Plaintiff and the Class, Defendant waived any entitlement under the Policies to later assess Plaintiff and the Class the final SRM Charges. Therefore, Plaintiff and the Class would have been charged, and would have paid, less final premium than Plaintiff and the Class have been charged due to Defendant' breach of this provision.

217. Furthermore, under this provision Plaintiff and the Class explicitly agreed to *only* pay final premiums, including final SRM Charges, that were determined using proper

classifications and rates that lawfully apply to Plaintiff and the Class,. At the same time, Plaintiff and the Class *explicitly disclaimed* any obligation to pay any final premiums, including final SRM Charges, that were *not* determined using proper classifications and rates that lawfully apply to Plaintiff and the Class. Accordingly, because Defendant declined to determine the final SRM Charges by using proper classifications and rates that lawfully apply to Plaintiff and the Class as required by the Policies, under the Policies Plaintiff and the Class are not obligated to pay *any* final SRM Charges, and Defendant is not permitted to charge Plaintiff or the Class the final SRM Charges.

218. **Third,** each policy contains the "Refund Provision" representing that the "final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the *proper* classifications *and rates* that *lawfully apply* to the business and work covered by this policy. **If the final premium is more than the premium you paid to us, you must pay us the balance.** ***If it is less, we will refund the balance to you.***" Ex. B at 12 (emphasis added).

219. As detailed herein, Defendant breached this provision of the Policies by not refunding Plaintiff and the Class the illegal and improper final SRM Charges. Moreover, as the final SRM Charges incurred by Plaintiff and the Class have been determined using improper and unlawful rates, and in an unlawful, unfiled and unapproved manner, this provision requires Defendant to refund the final SRM Charges to Plaintiff and the Class.

220. By having been charged the final SRM Charges that Defendant was not permitted to assess under the Policies, and that Plaintiff and the Class explicitly disclaimed any duty to pay under the Policies, Plaintiff and the Class have also been denied the benefit of their bargain with Defendant, namely insurance coverage provided based on the explicit terms of the Policies, and at a final cost calculated based on the terms of the Policies. In order for Plaintiff and the Class to be

returned to the position they would be in if Defendant had not breached the policies, Defendant must refund the final SRM Charges.

221. Plaintiff has performed all of the terms of its agreements with Defendant except for those for which performance has been excused by Defendant' unlawful conduct described herein. Plaintiff has paid Defendant all final premiums that Defendant is permitted to charge based on its policies with Plaintiff and under the law, and therefore Plaintiff has fully performed its policies with Defendant.

222. Plaintiff provided Defendant notice of Plaintiff's claims by FedExed letter received by Defendant on August 9, 2023. Counsel for the parties subsequently communicated but were unable to reach a resolution of Plaintiff's class claims, leaving Plaintiff with no other means of redress apart from bringing this class action.

223. As a direct and proximate result of Defendant's breach of the Policies, Plaintiff and the Class have suffered losses in an amount exceeding the jurisdictional minimum of this Court.

**SECOND CLAIM FOR RELIEF**
**(VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.*)**

224. Plaintiff incorporates the allegations in paragraphs 1 to 205 as if fully set forth herein.

225. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

226. At all times relevant hereto, the ICFA was in full force and effect.

227. The ICFA is a regulatory and remedial statute intended to protect consumers, including Plaintiff and the Class, against unfair or deceptive acts or practices. Specifically, Chapter 2 of the ICFA prohibits unfair or deceptive acts or practices used or employed in the conduct of any trade or commerce with the intent that others rely upon such deceptive acts or

practices. *See* 815 ILCS 505/2.

228. Plaintiff and the other members of the Class are "consumers" or "persons" as defined under the ICFA.

229. Section 2 provides that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section, consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2.

230. As alleged in detail *supra*, Defendant made material misrepresentations and otherwise failed to disclose or affirmatively concealed material information, namely that it would use the secret and illegal Pretextual Method, and not the method set forth in its publicly-filed Schedule Rating Plans, to calculate the SRM Multipliers, and consequent SRM Charges, of Plaintiff and the Class. Defendant's failure to file, or publicly disclose, its true method of calculation, and its deceit in falsely claiming to use an entirely different methodology, constitute unfair and/or deceptive acts and practices prohibited by Chapter 2 of ICFA. *See* 815 ILCS 505/2. Defendant also misrepresented in its Policies that it would only assess final SRM Charges determined by its manuals of rules, rates, rating plans and classifications filed with and approved by the Director, and by using proper classifications and rates that lawfully apply to Plaintiff and the Class.

231. Defendant intended that Plaintiff and the Class rely on Defendant's deceptive acts and practices as alleged in detail herein, and Plaintiff and the Class reasonably relied on the

deceptive acts and practices to their detriment.

232. Defendant's intent that Plaintiff and the Class rely on Defendant's deceptive acts and practices is evidenced by, *inter alia*, Defendant's knowing promulgation of the publicly-filed Schedule Rating Plans containing methodologies Defendant knew it would not use, and misrepresentations in the Policies that Defendant would only assess final SRM Charges determined by its manuals of rules, rates, rating plans and classifications filed with and approved by the Director, and by using proper classifications and rates that lawfully apply to Plaintiff and the Class.

233. The above-described unfair and/or deceptive acts and practices occurred in the course of conduct involving trade or commerce, namely the sale of workers' compensation insurance policies.

234. Defendant's business acts and practices are unfair under the ICFA because they offend established public policies, as demonstrated by Defendant's violation of numerous state laws and regulations. Defendant violated 215 ILCS 5/457 and 50 Ill. Adm. Code 2902.30 by using the secret, unfiled Pretextual Method to determine Plaintiff's and the Class Members' SRM Multipliers and final SRM Charges. *See* 215 ILCS 5/457(1) ("Every company shall prefile with the Director every manual of classifications, every manual of rules and rates, every rating plan and every modification of the foregoing which it intends to use."); 215 ILCS 5/457(4) (a "filing shall not be *effective nor used until approved* by the Director.") (emphasis added); 50 Ill. Adm. Code 2902.30 ("workers' compensation insurers "shall file the following materials with the Illinois Department of Insurance . . . All Manuals -- Every manual of classifications, every manual of rules, every rating plan, every *schedule rating plan* . . . and every modification of any such manual or plan used in this State or intended for use in this State.") (emphasis added).

235. Defendant also violated 215 ILCS 5/467 and 215 ILCS 5/149(1) through its misrepresentations and attempts to conceal its true illegal actions described herein. *See* 215 ILCS 5/467 ("No person, company or organization shall willfully withhold information from, or knowingly give false or misleading information to the Director, any statistical agency designated by the Director, any rating organization, or any company which will affect the rates or premiums chargeable under this Article."); 215 ILCS 5/149(1) ("No [insurance] company doing business in this State, and no officer, director, agent, clerk or employee thereof, broker, or any other person, shall make, issue or circulate or cause or knowingly permit to be made, issued or circulated any estimate, illustration, circular, or verbal or written statement of any sort misrepresenting the terms of any policy issued or to be issued by it or any other company or the benefits or advantages promised thereby.").

236. Defendant's business acts and practices are unfair under the ICFA because Defendant has engaged in immoral, unethical, oppressive, and unscrupulous activities as described herein.

237. Defendant's business acts and practices are unfair under the ICFA because Defendant's conduct has been substantially injurious to consumers, including Plaintiff and the Class, as alleged in detail herein.

238. The unfair acts and practices alleged herein proximately caused actual damage to Plaintiff and the Class, including by, *inter alia*, Defendant's decision to charge Plaintiff and the Class unlawful final SRM Charges that Defendant was not permitted to charge, and agreed not to charge, under its Policies with Plaintiff and the Class.

239. Among other things, Plaintiff and the Class were deceived into agreeing to pay final SRM Charges based on SRM Multipliers that (a) were not determined by Defendant's manuals of

rules, rates, rating plans and classifications filed with and approved by the Director, as represented in Defendant's Policies with Plaintiff and the Class; and (b) were not determined based on proper classifications and rates that lawfully apply to Plaintiff and the Class, as represented in Defendant's Policies with Plaintiff and the Class.

240. By being charged for and/or by paying these final SRM Charges that Defendant was not permitted to charge under the Polices, or under the law, Plaintiff and the Class were harmed, lost money, and suffered injury in fact, by paying for something that they were not required to pay for under their Policies, and did not agree to pay for.

241. Similarly, Plaintiff and the Class would have been charged, and would have paid, less final premiums under their Policies with Defendant if Defendant had complied with the Policies, and the law, by calculating the final premiums based only on charges that were permissible under the Policies and under the law, in which case Defendant would not have charged Plaintiff and the Class the final SRM Charges.

242. Plaintiff and the Class would not have agreed to pay Defendant final SRM Charges if Defendant had fully and fairly disclosed that the SRM Multipliers, and consequent final SRM Charges, would not be determined by Defendant's manuals of rules, rates, rating plans and classifications filed with and approved by the Director, or be based on proper classifications and rates that lawfully apply to Plaintiff and the Class.

243. By being charged and paying these final SRM Charges that Plaintiff and the Class would otherwise not have agreed to pay had they been informed of the true facts of Defendant's use of the Pretextual Method and the other material facts identified herein, Plaintiff and the Class were harmed, lost money, and suffered injury in fact by paying for something that they otherwise would not have paid for.

244. If Plaintiff and the Class had been made aware of the true facts of Defendant's use of the Pretextual Method and the other material facts identified herein prior to agreeing to the Policies, they would not have agreed to enter into the Policies with Defendant, or to pay the final SRM Charges.

245. Plaintiff and the Class did not agree to pay Defendant final SRM Charges calculated using an undisclosed or an unlawful method, or in any other manner contrary to what was promised and agreed to by Defendant in the Policies.

246. Due to Defendant's unfair and deceptive practices described herein, Plaintiff and the Class paid more final premiums for their insurance from Defendant than the insurance was worth.

247. Due to Defendant's unfair and deceptive practices described herein, Plaintiff and the Class were induced to pay more for the Policies that they would otherwise have agreed to pay.

248. Defendant's fraudulent conduct described herein shows that it acted maliciously or with deliberate indifference, thereby justifying punitive damages being imposed on Defendant under the ICFA.

249. Plaintiff and the other members of the Class have suffered injury in fact and lost money as a result of these unlawful, unfair, and fraudulent practices.

**THIRD CLAIM FOR RELIEF**
**(FRAUDULENT CONCEALMENT)**

250. Plaintiff incorporates the allegations in paragraphs 1 to 205 as if fully set forth herein.

251. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

252. Defendant falsely misrepresented in its Policies with Plaintiff and the Class that it

would only determine premiums, including final SRM Charges, by using its manuals of rules, rates, rating plans and classifications filed with and approved by the Director, and using proper classifications and rates that lawfully apply to Plaintiff and the Class.

253. Defendant also falsely misrepresented in its publicly-filed Schedule Rating Plans that it would determine Plaintiff's and the Class's SRM Multipliers, and consequent final SRM Charges, using the precise method set forth in the Schedule Rating Plans.

254. At the same time, Defendant knew that it was not determining Plaintiff's and the Class's SRM Multipliers, and consequent final SRM Charges, based on the method detailed in the Schedule Rating Plans, because it was instead secretly using the Pretextual Method as described herein.

255. Defendant failed to disclose to Plaintiff and the Class the material facts, among others, that (a) Defendant was not calculating the SRM Multipliers and consequent final SRM Charges based on its manuals of rules, rates, rating plans and classifications filed with and approved by the Director, and by using proper classifications and rates that lawfully apply to Plaintiff and the Class; (b) Defendant was not using the methodology it represented it would use in the Schedule Rating Plans; and (c) Defendant was secretly using the illegal, undisclosed Pretextual Method. Defendant's failure to disclose these and other material facts constituted fraudulent omissions.

256. Defendant concealed these material facts under circumstances that created a duty to speak, because Defendant made statements in the Policies and in the Schedule Rating Plans that it falsely passed off as the "whole truth," while omitting material facts that rendered those statements misleading "half-truths" at best.

257. By omitting this material information, Defendant intended to induce, and did

induce, Plaintiff and the Class into paying final SRM Charges that Defendant was not legally permitted to charge, and that Plaintiff and the Class did not agree to pay and were not obligated to pay.

258. Plaintiff and the Class could not have discovered the truth of Defendant's fraudulent conduct through reasonable inquiry or inspection. *See, e.g., supra*, ¶¶ 198-205.

259. Plaintiff and the Class would not have purchased workers' compensation insurance from Defendant, or would not have paid as much for the Policies, if they had been aware of the material facts fraudulently omitted by Defendant.

260. Because of Defendant's fraudulent misrepresentations and omissions, and Plaintiff and the Class's reliance on the misrepresentations and omissions, Plaintiff and the Class have suffered injury in the form of the unlawful final SRM Charges that Defendant was not permitted to charge and Plaintiff and the Class did not agree to pay and were not obligated to pay.

261. Defendant's fraudulent conduct described herein rises to the level of wantonness, malice, oppression, willfulness, or other circumstances of aggravation, thereby justifying punitive damages being imposed on Defendant.

**FOURTH CLAIM FOR RELIEF**
**(FRAUD)**

262. Plaintiff incorporates the allegations in paragraphs 1 to 205 as if fully set forth herein.

263. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

264. Defendant falsely misrepresented in its Policies with Plaintiff and the Class that it would only determine premiums, including final SRM Charges, by using its manuals of rules, rates, rating plans and classifications filed with and approved by the Director, and using proper

classifications and rates that lawfully apply to Plaintiff and the Class. Defendant also falsely misrepresented in its publicly-filed Schedule Rating Plans that it would determine Plaintiff's and the Class's SRM Multipliers, and consequent final SRM Charges, using the precise method set forth in the Schedule Rating Plans.

265. The foregoing misrepresentations were deceptive, false, and misleading because, at the time they were made, Defendant knew that it did not determine Plaintiff's and the Class's SRM Multipliers, and consequent final SRM Charges, based on the method detailed in the Schedule Rating Plans because it was instead secretly using the Pretextual Method as described herein.

266. The actual methodologies used by Defendant to calculate insureds' premiums are highly material to Plaintiff and the Class because, *inter alia*, such methodologies determine the price of workers' compensation insurance that Plaintiff and the Class are required by law to obtain in order to operate their businesses, and allow insureds to shop for the best insurance policies for their businesses.

267. Defendant intended that the foregoing misrepresentations be relied upon by purchasers of its workers' compensation insurance policies. Plaintiff and the Class were exposed to, and relied upon, the foregoing misrepresentations when purchasing the Policies from Defendant. Plaintiff and the Class would not have purchased workers' compensation insurance from Defendant, or would not have paid as much for the Policies, if they had been aware of misrepresentations made and material facts fraudulently omitted by Defendant described herein.

268. Because of Defendant's false, deceptive, and misleading representations, Plaintiff and the Class have suffered injury, and will suffer injury in the future, in the form of unlawful final SRM Charges that Defendant was not permitted to charge, and Plaintiff and the Class did not agree to pay and were not obligated to pay.

269. Defendant's fraudulent conduct described herein rises to the level of wantonness, malice, oppression, willfulness, or other circumstances of aggravation, thereby justifying punitive damages being imposed on Defendant.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the proposed Class, respectfully requests that this Court enter an Order:

A. Finding that this action satisfies the prerequisites for maintenance as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(3) and/or 23(c)(4), and certifying the Class defined herein;

B. Designating Plaintiff as representative of the Class and its counsel as counsel for the Class;

C. Finding in favor of Plaintiff and the putative Class on all counts asserted herein;

D. Awarding Plaintiff and the Class restitution and compensatory damages, statutory damages, punitive damages and any other damages as appropriate;

E. Awarding Plaintiff and the Class attorneys' fees and costs;

F. Awarding Plaintiff and the Class prejudgment and post-judgment interest; and

G. Granting all such further and other relief, including equitable relief, as the Court deems just and appropriate.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 6, 2024

Respectfully submitted,

*/s/ Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

Michael Liskow
**GEORGE FELDMAN MCDONALD, PLLC**
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (561) 232-6002
Fax: (888) 421-4173
mliskow@4-justice.com

Scott M. Priz
**PRIZ LAW, LLC**
3230 S. Harlem Avenue, Suite 221B
Riverside, IL 60546
Tel: (708) 268-5768
priz@priz-law.com

*Attorneys for Plaintiff*